UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| TARA HALL AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARCEL THEO HALL, and derivatively on behalf of Biz Markie, Inc.,<br><br>       Plaintiff,<br><br>vs.<br><br>BIZ MARKIE, INC., a Washington, D.C. corporation, and JENNIFER IZUMI, individually,<br><br>       Defendants. | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No.: 1:22-cv-00806-CKK |

## MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*,
  417 U.S. 703 (1974)...............................................................................................8

*Bazarian Intl. Fin. Associates, LLC v. Desarrollos Aerohotelco, C.A.*,
  315 F. Supp. 3d 101 (D.D.C. 2018) ....................................................................7

*Blake v. Securitas Sec. Servs.*,
  292 F.R.D. 15 (D.D.C. 2013)................................................................................8

*Casciano v. Jasen Rides, LLC*,
  109 F. Supp. 3d 134 (D.D.C. 2015) ...................................................................12

*In re Citigroup, Capital Accumulation Plan Litig., Weems v. Citigroup, Inc.*,
  2004 U.S. Dist. Lexis 35348 (D. Mass. 2004).....................................................15

*Estate of Coll-Monge v. Inner Peace Movement*,
  524 F.3d 1341 (D.C. Cir. 2008) .........................................................................18

*Design Res., Inc. v. Leather Indus. of Am.*,
  2016 U.S. Dist. Lexis 134319 (M.D.N.C. 2016) ...............................................20

*Digital Camera Int'l, Ltd. v. Antebi*,
  2017 WL 2992719 (E.D.N.Y. July 14, 2017) .......................................................8

*Eagles, Ltd. v. Am. Eagle Found*,
  356 F.3d 724 (6th Cir. 2004) .............................................................................20

*El Paso Nat. Gas Co. v. United States*,
  750 F.3d 863 (D.C. Cir. 2014) ...........................................................................10

*Emergency One, Inc. v. Am. FireEagle, Ltd.*,
  228 F.3d 531 (4th Cir. 2000) .............................................................................17

*Evergreen Safety Council v. RSA Network Inc.*,
  697 F.3d 1221 (9th Cir. 2012) ...........................................................................13

*Fed. Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.*,
  813 F. Supp. 234 (S.D.N.Y. 1993).....................................................................13

*First Am. Title Ins. Co. v. Stevenson (In re Stevenson)*,
  2013 Bankr. Lexis 33 (Bankr. D.D.C. 2013) ......................................................20

*Halscott Megaro, P.A. v. McCollum*,
    2022 U.S. Dist. Lexis 79296 (E.D.N.C. 2022) ....................................................................12

*Hanover Star Milling Co. v. Metcalf*,
    240 U.S. 403 (1916)................................................................................................................18

*Healthcare v. Dr/Decision Res.*,
    521 F. Supp. 3d 112 (D. Mass. 2021) .....................................................................................8

*Hutton Contracting Co. v. City of Coffeyville*,
    2004 U.S. Dist. Lexis 19580 (D. Kan. 2004)...........................................................................7

*Ideal Image Dev. Corp. v. Idealaser Hair Removal Corp.*,
    2019 U.S. Dist. Lexis 144098 (S.D. Fla. 2019) ...............................................................13, 14

*Jake's Fireworks, Inc. v. Sky Thunder, LLC*,
    2017 U.S. Dist. Lexis 147875 (D. Kan. 2017)........................................................................7

*Ketab Corp. v. Mesriani Law Grp.*,
    2016 U.S. Dist. Lexis 37151 (C.D. Cal. 2016) ......................................................................7

*Koninklijke Philips N.V. v. Cinram Int'l, Inc.*,
    2013 U.S. Dist. Lexis 76163 (S.D.N.Y. 2013) .....................................................................13

*LeSane v. Hillenbrand Indus., Inc.*,
    791 F. Supp. 871 (D.D.C. 1992) .............................................................................................6

*Margo v. Weiss*,
    1997 U.S. Dist. Lexis 20867 (S.D.N.Y. 1997) ....................................................................14

*Marketquest Grp. Inc. v. BIC Corp.*,
    316 F. Supp. 3d 1234 (S.D. Cal. 2018)...................................................................................6

*Needham v. Innerpac, Inc.*,
    2007 U.S. Dist. Lexis 41721 (N.D. Ind. 2007) .......................................................................7

*Paskvan v. Klier*,
    2011 U.S. Dist. Lexis 33976 (D. Nev. 2011)........................................................................12

*Portus Sing. PTE Ltd. v. Kenyon & Kenyon LLP*,
    449 F. Supp. 3d 402 (S.D.N.Y. 2020)....................................................................................6

*Pro-Football, Inc. v. Harjo*,
    567 F. Supp. 2d 46 (D.D.C. 2008), *aff'd in part*, 565 F.3d 880 (D.C. Cir. 2009)...................13

*Republic of Turk. v. Christie's, Inc.*,
    2021 U.S. Dist. Lexis 169215 (S.D.N.Y. 2021) ...................................................................12

*Rexa, Inc. v. Chester*,
   2020 U.S. Dist. Lexis 165615 (N.D. Ill. 2020) ....................................................................12

*Rivard v. Linville*,
   133 F.3d 1446, 45 U.S.P.Q.2d 1374 (Fed. Cir. 1998) ..........................................................17

*Safex Found., Inc. v. Safeth, Ltd.*,
   531 F. Supp. 3d 285 (D.D.C. 2021) ......................................................................................17

*Schism v. United States*,
   316 F.3d 1259 (Fed. Cir. 2012)..............................................................................................13

*SME Steel Contractors, Inc. v. Seismic Bracing Co., LLC*,
   681 F. Supp. 3d 1181 (D. Utah 2023) .....................................................................................6

*Spalding Labs., Inc. v. Ariz. Biological Control, Inc.*,
   2008 U.S. Dist. Lexis 56100 (C.D. Cal. 2008) .....................................................................20

*Taje Monbo & Deafueh Monbo v. Lotfy Nathan, Red Gap Film Grp., LLC*,
   623 F. Supp. 3d 56 (E.D.N.Y. 2022) .....................................................................................12

*U.S. v. Honeywell Intl. Inc.*,
   337 F.R.D. 456 (D.D.C. 2020)................................................................................................8

*Xereas v. Heiss*,
   933 F. Supp. 2d 1 (D.D.C. 2013) ..........................................................................................17

*Yeager v. Fort Knox Sec. Prods.*,
   602 F. App'x 423 (10th Cir. 2015) ........................................................................................12

**State Cases**

*Brenner v. Berkowitz*,
   634 A.2d 1019 (N.J. 1993)......................................................................................................11

*Daskais v. Kline*,
   53 A.2d 289 (Md. 1947) .........................................................................................................20

*Egan v. McNamara*,
   467 A.2d 733 (D.C. 1983) ................................................................................................11, 19

*Fulton v. Fulton*,
   106 A.3d 127 (Pa. Super. 2014)..............................................................................................13

*Gunderson v. All. of Comput. Prof'ls, Inc.*,
   628 N.W.2d 173 (Minn. App. 2001).......................................................................................11

*Head v. Lane*,
   495 So.2d 821 (Fla. App. 1986)..............................................................................................12

*Lewis v. Estate of Lewis*,
    193 A.3d 139 (D.C. 2018) ...........................................................................16

*Naccache v. Taylor*,
    72 A.3d 149 (D.C. 2013) ............................................................................13

*Strawn v. Jones*,
    285 A.2d 659 (Md. 1972) ...........................................................................20

*Vickery v. Garretson*,
    527 A.2d 293 (D.C. 1987) ..........................................................................12

*In re Wallace's Estate*,
    149 A. 473 (Pa. 1930) ................................................................................13

**Statutes**

15 U.S.C. § 1117(a) ...........................................................................20, 21

15 U.S.C. § 1125(a) ...................................................................................17

15 U.S.C. § 1125(d) ...................................................................................17

15 U.S.C. § 1127 ........................................................................................17

Anti-Cybersquatting Protection Act ...........................................................17

Lanham Act ..................................................................................................7

Lanham Act § 43, 15 U.S.C. § 1125 ..........................................................12

**Court Rules**

Fed. R. Civ. P. 26 ...................................................................................6, 7, 8

Fed. R. Civ. P. 56(a) ....................................................................................6

Rule 26(a)(1)(A)(iii) .................................................................................7, 8

Rule 702 ........................................................................................................7

*Rule* § 5981 n. 2 ..........................................................................................8

**Treatises**

RESTATEMENT (SECOND) OF AGENCY § 385(1) ...........................................11

**Other Authorities**

BMI/"Biz Markie" ................................................................................................................9

13 FLETCHER CYC. CORP., *Acquiescence, ratification, or laches*, § 5956 ....................................8

Fletcher, *Cyclopedia of the Law of Private Corporations*, § 5874 (1984 Rev.)...........................12

Izumi *and BMI* ...................................................................................................................9

I. **Factual background.**[1]

    A. **Marcel and Izumi had a long-standing business relationship; they succeeded by working cooperatively for years.**

Marcel had few people who were constants in his life. (Statement of Undisputed Material Facts ("SOF") ¶ 1) Two of them were his first manager/partner, Lamont Wanzer; and Izumi. (*Id.*, ¶ 2) Wanzer ran his and Marcel's affairs through a Maryland corporation that Wanzer formed, Bizmont Entertainment, Inc. (*Id.*, ¶ 3) Wanzer was Bizmont's sole shareholder. (*Id.*, ¶ 5) Wanzer handled all of the business affairs associated with "Biz Markie" through Bizmont and Marcel focused entirely on the artistic side of that work. (*Id.*, ¶ 4) Izumi met Marcel through mutual friends and her work with Bizmont, more than 20 years ago. (*Id.*, ¶ 10) At Bizmont, Izumi was responsible for developing, revising, and refining contracts, ensuring they were aligned with strategic objectives and tailored to meet evolving business needs. (*Id.*, ¶ 11) Over the years, she and Biz became family to each other. (*Id.*, ¶¶ 12-13)

Unfortunately, Wanzer passed from cancer in 2014. (*Id.*, ¶ 6) Wanzer's passing motivated Marcel to get his own personal and business affairs in order. (*Id.*, ¶ 7) Marcel had experienced health issues, too. (*Id.*, ¶ 8) Part of Marcel's process of getting affairs in order included replacing Bizmont. (*Id.*, ¶ 9)

By this time, Marcel and Izumi had worked together nearly 20 years, and trusted each other. (*Id.*, ¶¶ 12, 13) They agreed to work together through an entity they formed called Biz Markie, Inc. (*Id.*, ¶ 14) Izumi owned 51% of BMI, and Marcel owned 49%. (*Id.*, ¶¶ 15-24, 31) Marcel agreed to make Jenni the majority owner for two main reasons. First, so she could

---

[1] Defined terms have the meaning ascribed to them in the Motion for Partial Summary Judgment filed herewith.

execute documents on her own if Marcel was traveling, got sick, or if he passed. (*Id.*, ¶¶ 25-26) Second, to compensate Izumi to continue her work with him, and continue his legacy if he passed. (*Id.*, ¶ 26)

Izumi and Marcel's business relationship and arrangement worked. The two talked about BMI expenses, and Izumi ensured expenses got paid. (*Id.*, ¶ 27) Marcel and Izumi would roughly split the remainder 51/49; though that split was not exact or something they adhered to rigidly. (*Id*, ¶¶ 28-29)  If Marcel ever needed more money, the two would talk and have BMI pay Marcel. (*Id*, ¶ 29) To account for these additional payments, BMI's certified public accountant advised that Marcel be paid via a 1099 so that his 49% ownership in BMI would not be reduced. (*Id*, ¶¶ 30-32) Marcel and Izumi successfully operated this way for years.

### B. Four months into the Hall's marriage, Marcel is talking about divorce after he catches Tara sleuthing for assets.

The Halls married in October 2018. (SOF ¶ 45) After that, Marcel told Izumi that he wanted everything to stay the same regarding their business. (*Id.*, ¶ 49) In fact, Marcel even chose to keep Izumi in control of his advanced medical directive and power of attorney. (*Id*, ¶ 48)

Four months into the marriage, Marcel was contemplating divorce. (*Id*, ¶ 49) He lost trust in Tara when he found out she had gone behind his back to try to gather information about his finances and business. (*Id*, ¶ 50)  Marcel always wanted to keep his marriage and finances separate. (*Id*, ¶ 46) He did not want Tara to have access to his personal or business finances. (*Id*. and ¶¶ 49-55) Marcel even filed a married, but separate tax return – so Tara would not see his assets. (*Id*, ¶ 47)

Despite Marcel's wishes, Tara tried to get access to his business and financial information. Tara sent emails to Izumi, without copying Marcel, trying to change how Marcel got

paid. (*Id.*, ¶ 54) Tara called Marcel's life insurance agent and tried to change his policies, and get access to his power of attorney, as well as to documents relating to his business agreements with Izumi. (*Id.*, ¶¶ 51-53) Marcel found out and put an immediate stop to Tara's actions. (*Id.*, ¶ 55) But Tara's actions made her untrustworthy to Marcel. (*Id.*, ¶ 50)

Marcel's refusal to accede to Tara's desire for more assets upset Tara, too. Marcel told Tara in late 2018 that he was going to get a life insurance policy and name her as beneficiary. (*Id.*, ¶ 56) In fact, Marcel did not intend to get such a policy, but he was trying to mollify Tara after stopping her efforts to access his other financial and business information. (*Id.*, ¶¶ 56-57) Tara knew that Marcel did not follow through because she was present at the couple's home when he refused to take the required medical exam. (*Id.*, ¶¶ 58-60) Afterwards, Tara texted Izumi to express Tara's displeasure that Izumi was one of Marcel's life insurance beneficiaries while Tara herself was not. (*Id.*, ¶¶ 61-62) Tara told Izumi that she thought that was "inappropriate." (*Id.*, ¶ 62)

Meanwhile, in early 2019, as previously discussed with their CPA, Marcel told Izumi he wanted to focus on his art and leave business affairs entirely to her – as he had with Wanzer/Bizmont. (*Id.*, ¶ 37) So Marcel and Izumi agreed she would run their business through Balancing Acts, Inc. ("BAI"), instead of BMI. (*Id.*) Izumi solely owned BAI. (*Id.*, ¶ 39) Aside from focusing on his art, Marcel also hoped that running the business through BAI would let Izumi work to continue his legacy free of interference if something happened to him. (*Id.*, ¶ 38) Financially, to Marcel, the change was immaterial. BAI paid his personal expenses via 1099s, and would pay BMI's overhead, too. (*Id.*, ¶¶ 42-43)

. . .

. . .

### C.  Upon Marcel's passing, Tara promptly acts – for herself.

Marcel ultimately suffered health issues. He was hospitalized in June 2020, and passed in July 2021. Marcel did not have a will. So, by default, not choice, Tara became the personal representative of his estate, in August 2021.

Tara then initiated three actions involving Izumi, and caused a fourth to be filed. Courts have repeatedly acted against Tara in these actions, *sua sponte*. For example, Tara filed a complaint in the probate court that was effectively a precursor to her claims in this suit. (SOF ¶¶ 64-65) The probate court, *sua sponte*, dismissed it for lack of jurisdiction. (*Id*., ¶ 65) In this case, Judge Kollar-Kelly *sua sponte* ordered Tara to brief her standing to assert a conversion claim against Izumi over life insurance proceeds in which the estate had no interest. *See* Minute Order dated 2/9/23. Tara had to withdraw the claim. (Doc. 37) But by then, Tara had already filed an action in state court to stop those same proceeds from being distributed. (SOF ¶¶ 67-68) And she had caused that same life insurance company to file an interpleader in this Court, which is still pending.

Tara's actions and allegations belie her claims of wrong-doing against Izumi. For example, the gist of Tara's claims is that Izumi put her interests first. Yet it was Tara who was willing to assert claims to Marcel's life insurance proceeds to stop Izumi from getting them, even though the estate had no interest in the proceeds, and even though it meant Marcel's grandnephews' and grandniece's distribution would be frozen, too. And Tara's allegations show that what's really driving her is her animus against Izumi. For example, regarding the power of attorney Marcel gave Izumi, Tara could not resist adding the irrelevant detail that it happened "five months before he was married." (Doc. 61, ¶ 24) And Tara alleges that after the Halls'

marriage, "Izumi computed what Mr. and Mrs. Hall's expenses were each month and forwarded that exact amount to them to pay their personal bills – but no more." (*Id.*, ¶ 33)

## II.    Argument.

### A.    Plaintiff lacks admissible evidence to support the damages element of her claims: the only calculation she has disclosed is based on inadmissible expert opinions.

The Court can grant summary judgment on even part of a claim, such as one theory of damages. *See* Fed. R. Civ. P. 56(a); *LeSane v. Hillenbrand Indus., Inc.*, 791 F. Supp. 871, 873 (D.D.C. 1992) (summary judgment on punitive damages); *Marketquest Grp. Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1301 (S.D. Cal. 2018) (on one damages theory). Summary judgment on a damages theory can be appropriate, for example, where the theory was not disclosed as Fed. R. Civ. P. 26 requires. *SME Steel Contractors, Inc. v. Seismic Bracing Co., LLC*, 681 F. Supp. 3d 1181, 1230 (D. Utah 2023). It can also be appropriate where the damages theory is based on inadmissible expert testimony. *Portus Sing. PTE Ltd. v. Kenyon & Kenyon LLP*, 449 F. Supp. 3d 402, 419 (S.D.N.Y. 2020). Here, discovery has closed. Plaintiff has only disclosed one measure of damages, which is premised on expert opinions. (SOF ¶ 69). Those opinions are not admissible.

Plaintiff has two experts whose opinions work in tandem to establish her damages. The first is a professed music-industry expert, Lita Rosario-Richardson, Esq. She opines that that the industry norm for compensation agreements between managers and artists is between 10% and 20% of the income earned by the artist managed. (SOF ¶ 70) Rosario-Richardson opines that this percentage range, total, is the maximum amount of money generated from "Biz Markie" that Izumi should have received. (*Id.*) Plaintiff's other expert is Christopher Williams, a CPA, who calculates the approximate dollar amount of Plaintiff's damages. (*Id.*, ¶ 71). Williams starts by assuming that Rosario-Richardson' compensation opinion is correct, and uses the midpoint figure

of 15%. (*Id.*, ¶ 72) Williams then calculates the difference in what Izumi would have received at 15% and what she actually received to come up with damages of around $819,940. (*Id.*, ¶ 73) The problem with Plaintiff's theory is that Rosario-Richardson's opinion is inadmissible, and without it there is no foundation to support Williams' calculation.

Opinions about industry norms are irrelevant where, as here, there is an actual agreement, as here. *Needham v. Innerpac, Inc.*, 2007 U.S. Dist. Lexis 41721, 8 (N.D. Ind. 2007) ("industry standards are irrelevant . . . because the key question . . . is whether the parties agreed in the particular contract that some other compensation scheme applied."). Marcel and Izumi agreed to split the profits of BMI with Marcel getting 49% and Izumi getting 51%. (SOF ¶¶ 15, 21-22, 31) Rosario-Richardson's opinion is therefore inadmissible because there was an actual agreement. *Hutton Contracting Co. v. City of Coffeyville*, 2004 U.S. Dist. Lexis 19580, 37-38 (D. Kan. 2004) (where parties have agreement, "evidence of industry custom is simply irrelevant and properly excluded pursuant to Rule 702 and *Daubert*."); *Bazarian Intl. Fin. Associates, LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 118-19 (D.D.C. 2018) (opinion about reasonableness of fee and industry standard fees was irrelevant and inadmissible where question was what fee parties actually agreed to, and contractual entitlement to same). Without Rosario-Richardson's 10-20% "industry norm" opinion as a predicate, Williams' 15% damages calculation lacks foundation and is inadmissible for that reason. And without the expert opinions, Plaintiff lacks admissible evidence to support the theory that all compensation above 15% constitutes recoverable damages, making summary judgment on that theory of damages appropriate.

Plaintiff has not disclosed any other calculation of damages, as Rule 26(a)(1)(A)(iii) requires. *See* SOF ¶ 69; *Jake's Fireworks, Inc. v. Sky Thunder, LLC*, 2017 U.S. Dist. Lexis

147875, 7 (D. Kan. 2017) (Rule 26 required disclosure of computation of Lanham Act damages);

*Ketab Corp. v. Mesriani Law Grp.*, 2016 U.S. Dist. Lexis 37151, 5 (C.D. Cal. 2016) (finding

party failed to provide sufficient computation of statutory damages sought); *U.S. v. Honeywell*

*Intl. Inc.*, 337 F.R.D. 456, 460–61 (D.D.C. 2020) (surveying obligation to disclose damages

under Rule 26). Plaintiff therefore cannot present evidence on that element. *See, e.g., Blake v.*

*Securitas Sec. Servs.*, 292 F.R.D. 15, 19 (D.D.C. 2013) ("[T]he overwhelming weight of

authority is that preclusion is <u>required</u> and <u>mandatory</u> absent some unusual or extenuating

circumstances – that is, a substantial justification." (quotation omitted)); *Healthcare v.*

*Dr/Decision Res.*, 521 F. Supp. 3d 112, 126 (D. Mass. 2021) (granting summary judgment where

party could not prove damages due to failure to disclosure as Rule 26(a)(1)(A)(iii) required).

Summary judgment on all of Plaintiff's claims other than that which seeks a temporary custodian

for BMI (Count 14) is therefore appropriate.

> **B. Plaintiff's claims are barred as a matter of corporate law: Plaintiff is impermissibly suing over corporate acts Marcel participated in, or at least acquiesced to.**

A "shareholder may not complain of acts of corporate mismanagement if he acquired his

shares from those who participated or acquiesced in the allegedly wrongful transactions."

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 710 (1974); 1 Closely Held

Corporations 9.06 (2024, Lexis); 13 FLETCHER CYC. CORP., *Acquiescence, ratification, or*

*laches*, § 5956 ("A shareholder has no standing to bring claims on behalf of the corporation if the

shareholder participated or acquiesced or received benefits from . . . [the] acts about which the

shareholder complains in the derivative action.") *and id.* at *Continuous Ownership Rule* § 5981

n.2 (Westlaw 2024) (same); *Digital Camera Int'l, Ltd. v. Antebi*, 2017 WL 2992719, 67

(E.D.N.Y. July 14, 2017). Here, the entirety of Plaintiff's complaint is premised on challenging

corporate acts that Marcel participated in or acquiesced to.

Plaintiff, in her capacity as the administrator of Marcel's estate, filed a sworn pleading with the Probate Court explaining that BMI "is the corporate entity through which the Deceased's [Marcel's] professional activities were performed, including the collection of music royalties." (SOF ¶ 75; *accord* Plaintiff's Second Amended Complaint (Doc. 61) ¶¶ 5, 22) That is correct. From 2015 to 2019, Marcel and Izumi agreed to run all "Biz Markie" business through BMI. (SOF ¶¶ 14, 37) Marcel and Izumi discussed all key BMI/"Biz Markie" business decisions, and acted after reaching consensus. (*Id.*, ¶¶ 35-36) BMI used the "Biz Markie" trademark throughout that time. (*Id.*, ¶¶ 74, 77-78) BMI owned the website "bizmarkie.com" and offered services using the "Biz Markie" trademark with it, and later merchandise, too – including the very merchandise Plaintiff now complains about. *Compare* Doc. 61, ¶¶ 5, 22, 49 *with* SOF ¶¶ 82, 88. Yet, Plaintiff's complaint posthumously seeks to revoke that agreement and impose liability for Marcel and Izumi's joint decisions.

Plaintiff's intellectual property claims are all premised on the idea that Marcel, personally, owned the "Biz Markie" mark or rights to use related intellectual property. Plaintiff contends that Izumi *and BMI* – despite being 49% owned by Marcel – used "his" intellectual property without Marcel's permission during his life. (Plaintiff Second Amended Complaint (Doc. 61) Counts 1-7; *id.* at ¶ 64 ("Defendants [*i.e.*, BMI, so 49% Marcel] began . . . offering goods under . . . the Biz Markie mark for their own financial benefit and without a valid license or M[arcel] Hall's prior authorization."). In fact, Izumi did not use the IP – BMI did. The fact is that BMI owned the IP. (SOF ¶ 74) Even assuming, *arguendo*, that Marcel owned the IP, the very fact that Plaintiff admits he performed his professional activities through BMI, which was using the IP, and he and Izumi profited from doing so – shows Marcel participated in BMI's corporate

acts, or at least acquiesced in them. Plaintiff stands in Marcel's shoes – and, as such, cannot sue about those same acts now.

Plaintiff makes a related claim that Izumi and BMI sold "unauthorized" merchandise. (Plaintiff's Second Amended Complaint (Doc. 61) ¶¶ 49-50, 200) Again, Izumi did not sell merchandise, BMI did – as Plaintiff herself admitted. (*Id.* at ¶¶ 5, 22 (alleging sales and other uses of mark by BMI starting in 2015); *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 876 (D.C. Cir. 2014) ("factual allegations in operative pleadings are judicial admissions of fact" that bind the party through the proceeding)) And Marcel actually knew of the supposedly "unauthorized" uses about which Plaintiff complains about long before he was hospitalized. (SOF ¶ 83) But Plaintiff's arguments also ignore that Marcel's purpose in structuring BMI with Izumi as majority owner was precisely so Izumi could continue the business if Marcel was incapacitated. (*Id.*, ¶¶ 25-26) Continuing the business after Marcel passed would necessarily include licensing merchandise that Marcel would not personally see or approve. There is nothing improper about Izumi doing so, in her capacity as majority BMI shareholder, or in her role with BAI.

Plaintiff next complains about the change in accounts into which royalty payments were deposited. (Count 8) Relatedly, Plaintiff complains that "Biz Markie" operations were later conducted through BAI. (Doc. 61, ¶¶ 130-131, 200) Both acts were business decisions Marcel participated in, and in fact, directed. (SOF ¶¶ 37, 40) Recall that Marcel's arrangement with Lamont Wanzer was that Wanzer owned 100% of Bizmont, and Marcel focused 100% of the art side of his work. Marcel decided after years of operating with Izumi through BMI that he wanted to focusing exclusively on art, with Izumi handling the business. (*Id.*, ¶¶ 33, 37) So Marcel directed that royalty payments go from BMI-held accounts to B<u>A</u>I-held accounts. (*Id.*, ¶ 40) The

money would still be used for BMI and for Marcel's personal expenses. (*Id.*, ¶¶ 42-43) Marcel knew that BAI received the royalty payments that previously went to BMI for more than a year before he was hospitalized. (*Id.*, ¶ 44) Again, standing in Marcel's shoes, Plaintiff cannot now sue over conduct to which Marcel, at a minimum, acquiesced. As above, all of the corporate acts were done at Marcel's direction and with his consent.

Finally, Plaintiff contends that Marcel and Izumi's 51/49% compensation agreement is *itself* somehow a breach of fiduciary duty by Izumi. (Plaintiff's Second Amended Complaint (Doc. 61) ¶¶ 136-141[2]) Plaintiff's complaint theorizes that this agreement should either be revoked or ignored, and premises claims on the idea that Marcel was not paid enough for his contributions to the pair's joint enterprise while Izumi was paid too much. *Id.* at ¶¶ 40 (Izumi should only get a "reasonable fee"), 151-170 (all alleging Marcel was not compensated "as agreed" or not "fully compensate[d]"). As detailed more below (§ II(D)), Marcel and Izumi agreed to this compensation split and operated pursuant to it for more than five years.

Courts have recognized "that unfairness would result if a minority shareholder were permitted to seek judicial intervention after years of acquiescence or participation in the alleged misconduct[.]" *Gunderson v. All. of Comput. Prof'ls, Inc.*, 628 N.W.2d 173, 188 (Minn. App.

---

[2] Plaintiff theorizes that the existence of the Maryland Power of Attorney creates a blanket fiduciary duty over *all* of Izumi's interactions with Marcel regardless of the capacity in which the two were acting, and that the POA's terms prohibited Izumi from obtaining a benefit from *any* relationship or dealing with Marcel. (*E.g.*, Tara Hall Second Amended Complaint (Doc. 61) ¶¶ 25, 137, 138) The theory is incorrect, however, because D.C. law requires a Court to parse the capacity in which parties are acting to determine what duties apply – meaning the existence of the power of attorney *somewhere* does not mean it automatically applies *everywhere*. *Egan v. McNamara*, 467 A.2d 733, 738-39 (D.C. 1983). Moreover, among a fiduciary's obligations is a duty to follow a principle's instructions. *See* RESTATEMENT (SECOND) OF AGENCY § 385(1). So, even <u>if</u> the power of attorney applied to acts done in Marcel and Izumi's roles with BMI (and it did not since Izumi was not using it to act for him), Izumi would not have been duty-bound to ignore Marcel's instructions/agreements in order to avoid receiving a benefit from their business dealings.

2001) (quoting *Brenner v. Berkowitz*, 634 A.2d 1019, 1029 (N.J. 1993)). Plaintiff stands in Marcel's shoes for purposes of her claims. Marcel worked on the "Biz Markie" business with Izumi through BMI for more than five years as described above. Plaintiff's complaint impermissibly seeks to turn decisions in which he participated – or at a minimum acquiesced to – into actionable ones, posthumously. The Court should grant summary judgment on all of her claims.

### C. Laches bars Plaintiff's entire complaint; Marcel could have brought the claims had he believed there was wrongful conduct, and Izumi is prejudiced by his absence now.

The defense of laches should be applied to bar all of Plaintiff's claims. *See, e.g., Taje Monbo & Deafueh Monbo v. Lotfy Nathan, Red Gap Film Grp., LLC*, 623 F. Supp. 3d 56, 117 (E.D.N.Y. 2022) (claims under "section 43 of the Lanham Act, 15 U.S.C. § 1125, including their claims for trademark infringement, false designation of origin, unfair competition, trademark dilution, and cybersquatting, . . . are barred by laches."); *Yeager v. Fort Knox Sec. Prods.*, 602 F. App'x 423, 429 (10th Cir. 2015) (likeness claim); *Paskvan v. Klier*, 2011 U.S. Dist. Lexis 33976, 10-11 (D. Nev. 2011) (unjust enrichment); *Republic of Turk. v. Christie's, Inc.*, 2021 U.S. Dist. Lexis 169215, 25-26 (S.D.N.Y. 2021) (conversion); *Vickery v. Garretson*, 527 A.2d 293, 305-06 (D.C. 1987) (fiduciary duty); *Halscott Megaro, P.A. v. McCollum*, 2022 U.S. Dist. Lexis 79296, 14-15 (E.D.N.C. 2022) (quantum meruit); *Head v. Lane*, 495 So.2d 821, 825 (Fla. App. 1986) (laches applies to shareholder derivative claim, citing 12B Fletcher, *Cyclopedia of the Law of Private Corporations*, Sec. 5874 at p. 313 (1984 Rev.)). This includes Plaintiff's breach of contract claims – because those claims are premised on an implied contract, rather than an express one.[3] *Rexa, Inc. v. Chester*, 2020 U.S. Dist. Lexis 165615, 36 (N.D. Ill. 2020)

---

[3] If the Court finds that there was an express contract concerning Marcel and Izumi's compensation it precludes Plaintiff's claims premised on an implied contract on the same subject

(implied contract); *Koninklijke Philips N.V. v. Cinram Int'l, Inc.*, 2013 U.S. Dist. Lexis 76163, 31 (S.D.N.Y. 2013) (implied contract). To the extent the Court views Plaintiff's request for the appointment of a temporary custodian for BMI (Count 14) as a cause of action rather than a remedy, laches can bar this, too. *Fed. Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.*, 813 F. Supp. 234, 236 (S.D.N.Y. 1993).

Laches bars claims where a plaintiff unreasonably delays in bringing them and the delay prejudices the defendant. *Naccache v. Taylor*, 72 A.3d 149, 153, 157 (D.C. 2013). As to Plaintiff's trademark-based claims, "a presumption of laches arises if plaintiff[] file[d] suit more than four years after discovering the allegedly infringing conduct." *Ideal Image Dev. Corp. v. Idealaser Hair Removal Corp.*, 2019 U.S. Dist. Lexis 144098, 8 (S.D. Fla. 2019). Plaintiff can only overcome this presumption if she establishes the reasonableness of the delay in bringing suit or that Izumi has not suffered prejudice. This presumption applies in this case, since Plaintiff alleges that Defendants' use of the "Biz Markie" mark starting in 2015 was infringement. (Plaintiff's Second Amended Complaint (Doc. 61) ¶¶ 5, 22, 64).

Application of laches is particularly apt where, as here, "the difficulty of doing justice arises through the death of the principal participants in the transactions complained of, or of the witnesses to the transactions." *Fulton v. Fulton*, 106 A.3d 127, 134-35 (Pa. Super. 2014) (applying laches to estate's claim, citing *In re Wallace's Estate*, 149 A. 473, 475 (Pa. 1930)); *Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46, 56 (D.D.C. 2008), *aff'd in part*, 565 F.3d 880 (D.C. Cir. 2009) (laches barred suit where delay caused losses of both witnesses and evidence);

---

matter. *Casciano v. Jasen Rides, LLC*, 109 F. Supp. 3d 134, 141 n.2 (D.D.C. 2015) (stating "the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter" (quoting *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2012)).

*Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1227 (9th Cir. 2012) (laches barred suit where ten-year delay caused evidentiary prejudice because material witness died and others relocated or memories faded). In *Margo v. Weiss*, 1997 U.S. Dist. Lexis 20867, 29-30 (S.D.N.Y. 1997), the Court found that laches barred a trademark claim where the plaintiffs had unreasonably delayed, and in the interim two key witnesses had died. Because of the witnesses' unavailability, they could not testify about whether the plaintiffs should get credit as co-authors of a work, thereby prejudicing defendants. *Id.* The same delay and prejudice is present here – and the same conclusion should follow. *Accord Ideal Image Dev. Corp. v. Idealaser Hair Removal Corp.*, 2019 U.S. Dist. Lexis 144098, 8 (S.D. Fla. 2019) (prejudice "can arise as a result of a defendant's inability to present a full and fair defense on the merits due to . . . the death of a witness . . . thereby undermining the court's ability to judge the facts" (quotation omitted)).

Plaintiff unreasonably delayed in filing suit, and that delay has prejudiced Izumi. Marcel could have sued at any time over the conduct alleged. He did not (because the conduct was not wrongful). Instead, Defendants are now forced to defend actions Marcel consented to and participated in – all after Marcel's passing. Were Marcel still here, he could definitively confirm that he had agreed to the compensation for Izumi that his estate now challenges, BMI's use of the mark, and all other conduct at issue. His absence increases the difficulty of doing justice. As such, the Court should apply laches to bar the meritless claims asserted late by the estate's embittered representative.

### D. The contractual agreement between Marcel and Izumi bars all of Plaintiff's claims.

Plaintiff's intellectual property claims (Counts 1-7) are all predicated on the false idea that BMI and Izumi used Marcel's intellectual property without his permission. Plaintiff's fiduciary duty, contract, and *quantum meruit* claims are premised on the absence of an agreement

regarding what Marcel and Izumi would each be compensated for their work associated with "Biz Markie;" and how they would operate that business (*i.e.*, at first through BMI, later through BAI). So, if there agreements on these issues exist, the claims fail. *See, e.g., In re Citigroup, Capital Accumulation Plan Litig., Weems v. Citigroup, Inc.*, 2004 U.S. Dist. Lexis 35348, 30 (D. Mass. 2004) (fiduciary duty claim fails "where the actions alleged to constitute the breach were authorized by express agreement.").

Assuming, *arguendo*, that the Court were to find that BMI did not own the "Biz Markie" mark, claims premised on the notion that BMI did not have permission to use the mark still fail. Again, Plaintiff herself swore in her capacity as administrator of Marcel's estate BMI was "the corporate entity through which the Deceased's [Marcel's] professional activities were performed, including the collection of music royalties." (SOF ¶ 75) Conversely, Plaintiff here claims that BMI was wrongfully using the "Biz Markie" mark on merchandise; and his name, image, and likeness. (Plaintiff's Second Amended Complaint (Doc. 61) ¶¶ 5, 22, Count VII) But, again, Marcel was 49% owner of BMI. It is absurd to think Marcel was performing his professional activities through BMI (a company name which encompasses the very trademark in dispute), knowing BMI was using the intellectual property, but he did not give his own company permission to do so. The very fact that BMI was using Marcel's intellectual property shows his permission.

The remaining claims, premised falsely on the absence of agreements about Marcel and Izumi's compensation, fail because of the <u>actual agreement</u> that the two had on the issue. (SOF ¶¶ 14-15, 21-22) In 2019, BMI obtained a bank loan. (*Id.*, ¶¶ 16-24) In the process of doing so, BMI submitted its taxes and Marcel submitted his own taxes, as well. (*Id.*, ¶ 21) Those taxes reflect the 51/49% ownership of BMI. (*Id.*) Marcel signed a loan document attesting to the

accuracy of the material he submitted to the bank, and that signature was notarized. (*Id.*, ¶¶ 20-22) Under D.C. law, that notarized signature is presumed to be valid, and it takes "strong and disinterested evidence" to overcome that presumption. *Lewis v. Estate of Lewis*, 193 A.3d 139, 144 (D.C. 2018). Plaintiff lacks evidence to overcome this presumption.

Moreover, a disinterested witness *confirmed* that Marcel had agreed to own 49% of BMI and to be compensated accordingly, with Izumi owning 51% and being compensated that way. One of Marcel and BMI's CPAs was Nick Cusato. (SOF ¶ 30) Cusato testified to a conversation with Marcel and Izumi where they confirmed the 51/49 ownership of BMI. (*Id.*, ¶ 31) Cusato further explained that that Marcel got paid via both W-2 wages and as a 1099 contractor because he "tended to take more money out of the business" than Izumi did and they did not want to "draw on his capital account" which would reduce his ownership percentage. (*Id.*, ¶ 32) On other calls, Marcel expressed his wish that they make Izumi 100% owner of the "Biz Markie" business and put Marcel on payroll because Marcel was "more interested in just receiving money and being taken care of rather than the business." (*Id.*, ¶ 33) Cusato testified that Marcel "had always stated in the calls that [they] had been on that the business was for [Izumi] and to make sure she was taken care of." (*Id.*, ¶ 34)

And even if there could still be any doubt about the signatures on the forms (and there cannot be a reasonable doubt about that), Izumi, Marcel, and BMI's conduct ratifies the information submitted to the bank. Based on the material Marcel, Izumi, and BMI submitted to the bank, the bank gave BMI the loan it sought. (*Id.*, ¶ 23) BMI received the proceeds of the loan. (*Id.*, ¶ 24)

Izumi (and BMI) did not breach any duties or agreements with Marcel by doing as Izumi and Marcel had expressly agreed.

**E.  Plaintiff's intellectual property claims fail because she cannot prove that the estate owns the intellectual property.**

Plaintiff has asserted claims for trademark dilution (Doc. 61, Count 1), federal unfair competition pursuant to 15 U.S.C. § 1125(a) (Count 2), unfair competition pursuant to federal common law (Count 3), federal common law trademark infringement (Count 4), Anti-Cybersquatting Protection Act pursuant to 15 U.S.C. § 1125(d) (Count 5), misappropriation of name or likeness/right of publicity (Count 6), and an unjust enrichment claim premised, in part, on profits allegedly earned from the use of Marcel's name, image, and likeness (Count 7, ¶ 110). Each of these claims requires Plaintiff to prove that Marcel owned the "Biz Markie" mark, or the right to use the related "Biz Markie" intellectual property. *Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 298 (D.D.C. 2021) (plaintiff's burden to prove ownership of mark); *see, e.g.*, *Xereas v. Heiss,* 933 F. Supp. 2d 1, 14 (D.D.C. 2013) (cybersquatting liability is to *owner* of mark).

Discovery is closed. Without proof that Marcel Hall personally owned the mark, Tara's claims fail. Her claims fail because Plaintiff lacks admissible evidence to show that Marcel, personally, owned the mark. (SOF ¶ 79) Marcel Hall did not own the mark. Instead, as explained below, BMI owns the mark. As such, Plaintiff's claims fail.

Even if Marcel had owned the "Biz Markie" mark at *some* time, any rights to its ownership were abandoned long before BMI started using it. Non-use of a mark for three consecutive years "constitutes *prima facie* evidence of abandonment" and "creates a presumption – a mandatory inference of intent not to resume use." *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000) (citing 15 U.S.C. § 1127). To overcome this presumption, Plaintiff **must**  provide evidence of use or an intent to resume use. Plaintiff's bare say-so will not suffice. *Rivard v. Linville*, 133 F.3d 1446, 1449, 45 U.S.P.Q.2d 1374 (Fed. Cir. 1998) ("A

registrant's proclamations of his intent to resume or commence use . . . are awarded little, if any, weight."). Again, Plaintiff lacks admissible evidence that Marcel Hall owned the Biz Markie mark in 2015. (SOF ¶¶ 79-80) Plaintiff also lacks any evidence of any intent on Marcel's part to resume use of mark, even assuming *arguendo* that Marcel once owned it. (*See id.*)

BMI, however, has proof of ownership via its use of the mark back to 2015, including Plaintiff's own admission. SOF ¶¶ 75, 77-78; Plaintiff's Second Amended Complaint (Doc. 61) ¶¶ 5, 22; *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1347 (D.C. Cir. 2008) (marks acquired through use). From 2015 on, it was BMI, rather than Marcel personally, that evinced the signs of ownership, such as use of the mark and quality control regarding licensee's use of it. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916) (trademark ownership evidenced by use such as licensing activity). BMI, rather than Marcel personally, used and entered into agreements relating to the Biz Markie mark, and Marcel Hall's name and likeness. BMI did so as early as 2015. (SOF ¶¶ 77-78, 82). And, prior to Marcel's hospitalization and passing, Izumi and Marcel discussed the use of the intellectual property (owned by BMI). (*Id.*, ¶ 83). All of which further aligns with Marcel's intent that BMI and/or BAI continue his professional legacy after he passed. (*Id.*, ¶ 26)

### F.  Plaintiff's allegations about, and reliance on, the power of attorney that Marcel granted Izumi are irrelevant.

Plaintiff's complaint includes a number of allegations about a Maryland-form power of attorney that Marcel executed, empowering Izumi to act for him. *See generally* Complaint (Doc. 61). Plaintiff premises a breach of fiduciary duty claim on the power of attorney. (Count 9) Plaintiff also uses the power of attorney's existence and cherry-picked language from it as a device to support other claim, as explained below. *See* Doc. 61, ¶¶ 24-31. By doing so, Plaintiff theorizes that the burden shifts to Izumi (as fiduciary) to show her actions were *proper*, rather

than remain on Plaintiff to prove her claims of impropriety. *Id.*, ¶ 32. Plaintiff then seizes on the following language in the power of attorney: "[a]n Attorney-in-Fact that is not my ancestor, spouse, or descendant MAY NOT use my power to benefit the Attorney-in-Fact[.]" (Doc. 61, ¶ 25) Plaintiff believes the existence of the power of attorney and that language in it means that Izumi could not earn money while working with Marcel via BMI. *Id.* at ¶ 137 ("The terms of the purported Power of Attorney specifically disallowed the use by Izumi of any of Plaintiff's property to benefit her."). Plaintiff's theory fails as a matter of law and fact.

The mere existence of the power of attorney does not mean it applies to <u>all</u> of Marcel and Izumi's dealings with each other. To the contrary, the law requires parsing of the capacity in which someone is acting to determine the duty owed. *See, e.g., Egan v. McNamara*, 467 A.2d 733, 738-39 (D.C. 1983) (parsing whether attorney/member of close corporation owed a fiduciary duty, and to whom; and so who had burden of proof). By its express terms, the prohibition in the power of attorney only applies where the POA is being "use[d] . . . to benefit the Attorney-in-Fact[.]" (Doc. 61, ¶ 25) Plaintiff lacks evidence that Izumi used the power of attorney in the complained-of transactions. (SOF ¶ 87) That's because Izumi did not use the POA. The POA was not involved in Marcel and Izumi's agreement to the 51/49 ownership split in BMI, or their agreement concerning compensation. The POA was not involved in BMI owning the IP at issue here. Nor was the POA implicated or involved in Marcel and Izumi's agreement to have BAI operate some of the "Biz Markie" business. And while Plaintiff casts Izumi as diverting royalty payments using the POA, that is incorrect. Marcel decided to change the accounts. (SOF ¶¶ 40-41) He further directed Izumi to sign his name on the letter that was sent to accomplish the change. (*Id.*, ¶¶ 41-42, 84-85) Izumi following Marcel's express direction to apply Marcel's electronic signature to a document does not involve use of the POA. In that

instance, Marcel was validly causing a document to be signed with his own electronic signature, and his direction to Izumi to do so was specific agency authority to her in that instance to do so. *Strawn v. Jones*, 285 A.2d 659, 662 (Md. 1972) (agent's testimony can establish authority); *Daskais v. Kline*, 53 A.2d 289, 293 (Md. 1947) (principal can authorize agent to sign); *First Am. Title Ins. Co. v. Stevenson (In re Stevenson)*, 2013 Bankr. Lexis 33, 35-37 (Bankr. D.D.C. 2013) (surveying cases on various methods of execution other than a physical signature).

### G. The Court should award Defendants their attorneys' fees pursuant to 15 U.S.C. § 1117(a), with the amount to be set on further application.

Fees are available to a prevailing party on trademark claims where the plaintiff prosecutes them lacking either a factual or legal basis. *See* 15 U.S.C. § 1117(a); *Spalding Labs., Inc. v. Ariz. Biological Control, Inc*., 2008 U.S. Dist. Lexis 56100, 2-4 (C.D. Cal. 2008) (fee award appropriate where party maintained claims even after motions *in limine* and *Daubert* motion removed key evidence, all but nullifying claims); *Design Res., Inc. v. Leather Indus. of Am*., 2016 U.S. Dist. Lexis 134319, 12 (M.D.N.C. 2016) (noting a party's on-going duty to evaluate bases for the party's positions and abandon unsupported ones, or else be liable for fees).

Fees are properly awarded in trademark cases where a plaintiff persists with a claim after finding it lacks a legal or factual basis. Here, Tara Hall has been pursuing trademark claims when she has known from the start that she cannot prove ownership of the mark itself. She should have abandoned those claims long ago. Tara Hall has persisted with those claims because of her personal animus against Izumi, which is also what makes Tara Hall's case "oppressive," further justifying a § 1117(a) fee award. *See, e.g., Eagles, Ltd. v. Am. Eagle Found*, 356 F.3d 724, 728-29 (6th Cir. 2004) (collecting cases on what is "exceptional" or "oppressive.").

Plaintiff should have abandoned her trademark claims long ago. Before she filed this case she should have known she could not prove that the estate owned the "Biz Markie" mark. And

she should have known she could not prove the estate did not abandon the mark. Instead, Plaintiff forged ahead, and did so armed with allegations like the one that Marcel's own company (BMI) supposedly used "his" IP for years – without Marcel's own consent. A moment's reflection would have revealed how illogical it is to have Marcel's estate file a lawsuit claiming his company used "his" IP without his own permission. These positions, coupled with the lack of evidence, make a fee award appropriate here.

### III.    Conclusion.

For the foregoing reasons, the Court should grant summary judgment on Tara Hall's claims and award Defendants their attorneys' fees pursuant to 15 U.S.C. § 1117(a).

Dated: October 11, 2024                    Respectfully submitted,

                                           /s/ *Dayna Cooper*

                                           Dayna C. Cooper (D.C. Bar. No. 1033851)
                                           Cooper Legal, LLC
                                           1 Olympic Pl, Suite 900
                                           Towson, MD 21204
                                           (202) 642.5470
                                           Dayna@CooperLegalSolutions.com