# EXHIBIT 1

Page 1

1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

2

3      --------------------------

       TARA HILL AS PERSONAL        :

4      REPRESENTATIVE OF THE        :

       ESTATE OF MARCEL THEO HALL,:

5                                   :

            Plaintiff,              :

6                                   :  Case No.:

       vs.                          :

7                                   :  1:22-cv-00806(CKK)

       BIZ MARKIE, INC.,            :

8      et al.,                      :

                                    :

9           Defendant.              :

       --------------------------

10

11       VIDEO-RECORDED DEPOSITION OF JENNIFER IZUMI

12     DATE:          December 29, 2023

13     TIME:          9:55 a.m.

14     LOCATION:      Vorys Sater Seymour & Pease LLP

                      1909 K St NW Suite 900

15                    Washington, D.C. 20006

16

17     REPORTED BY:  Felicia A. Newland, CSR

18

19

20

21              Veritext Legal Solutions

            1250 Eye Street, N.W., Suite 350

22                Washington, D.C. 20005

Page 2

1              A P P E A R A N C E S

2       On behalf of Plaintiff:

3            MICHAEL J. GARVIN, ESQUIRE

4            Vorys Sater Seymour & Pease, LLP

5            200 Public Square

6            Suite 1400

7            Cleveland, Ohio 44114

8            mjgarvin@vorys.com

9       On behalf of Defendants:

10           DAYNA COOPER, ESQUIRE

11           Cooper Legal

12           1 Olympic Place

13           Suite 900

14           Towson, Maryland 21204

15           dayna@cooperlegalsolutions.com

16      Also Present:

17           Tara Hall (Via Zoom)

18           Videographer, Veritext Legal Solutions

19

20

21

22

1               C O N T E N T S

2    EXAMINATION BY:                                    PAGE

3         Counsel for Plaintiff                          7

4              IZUMI DEPOSITION EXHIBITS

5    NO.  DESCRIPTION                                   PAGE

6    6    Bates Number Hall_JRH_01038                   22

7    2    District of Columbia Certificate, Bates       49

8         Number D002185

9    4    Bates Number Hall_JRH_01514 through 1543      59

10   7    Maryland Statutory Form, Power of             76

11        Attorney

12   10   Bates Numbers D004530 through 4545           124

13   11   Bates Numbers D00053 through 61              127

14   19   Bates Numbers D001292 through 1300           135

15   31   1040 Individual Income Tax Return 2017       141

16   38   Bates Number Hall_JRH_01511                  143

17   29   1040 U.S. Individual Tax Return 2015         151

18   37   Bates Number D001990                         156

19   8    Defendant's Biz Markie, Inc. and             158

20        Jennifer Izumi's Rule 26(a)(1)(A)

21        Initial Disclosures

22

Page 4

1                    IZUMI DEPOSITION EXHIBITS

2     NO.   DESCRIPTION                                    PAGE

3     9    Responses to Plaintiff's First Set of          163

4          Interrogatories and Second Set of

5          Requests for Production to

6          Defendant/Counterclaimant Jennifer Izumi

7     12   Bates Numbers D00008 through 14                 165

8     14   Bates Numbers D007216 through 7217              175

9     16   Bates Number D000052                           177

10

     (*Exhibits attached to transcript.)

11

12

13

14

15

16

17

18

19

20

21

22

Page 5

1                   P R O C E E D I N G S

2                        *  *  *  *  *  *  *

3                   VIDEOGRAPHER:  Good morning.  We're

4        going on the record at 9:55 a.m. on December 29th,

5        2023.  Please note that the microphones are

6        sensitive and may pick up whispering and private

7        conversations.  Please mute your phones at this

8        time.

9                   Audio and video recording will

10       continue to take place unless all parties agree

11       to go off the record.

12                   This is Media Unit 1 of the

13       video-recorded deposition of Ms. Jennifer Izumi

14       in the matter of Tara Hall versus Biz Markie,

15       Inc., et al., filed in the United States District

16       Court for the District of Columbia, Case No.

17       1:22-cv-00806-CKK.

18                   My name is Orson Braithwaite

19       representing Veritext Legal Solutions, and I'm

20       the videographer.  And the court reporter is

21       Felicia Newland from the firm Veritext Legal

22       Solutions.

Page 6

1              Counsel will now state their

2     appearances and affiliations for the record.

3              MR. GARVIN:  Michael Garvin, Vorys,

4     Sater, Seymour, and Pease, on behalf of Tara Hall,

5     and as administrator of the Estate of Marcel Hall.

6              MS. COOPER:  Isn't co-counsel

7     going --

8              MR. GARVIN:  No.  They're not on.

9              MS. COOPER:  Okay.  So who's on

10    the --

11             MR. GARVIN:  Tara Hall is on both.

12             MS. COOPER:  Oh, okay.

13             Dayna Cooper of Cooper Legal,

14    counsel for the Defendants.

15             VIDEOGRAPHER:  Okay.  Thank you.

16             Will the court reporter please

17    swear in the witness.

18          (Witness duly sworn in.)

19             MS. COOPER:  Before we begin, I would

20    like to state for the record my objections to all

21    lines of questionings to Jenny Izumi -- Jennifer

22    Izumi in her individual capacity or in her capacity

1    as owner for -- owner of Biz Markie, Inc.

2              The notice of deposition -- the

3    notice of -- the notice deposition was for

4    Balancing Acts for today, but I see here that we

5    have exhibits for Jennifer Izumi in her

6    individual capacity -- potentially Jennifer Izumi

7    in her individual capacity or in her capacity as

8    owner of BMI.

9              MR. GARVIN:  Okay.

10             MS. COOPER:  Okay.

11                   * * * * * *

12   Whereupon,

13                   JENNIFER IZUMI

14   was called as a witness and, having been first duly

15   sworn, was examined and testified as follows:

16        EXAMINATION BY COUNSEL FOR PLAINTIFF

17   BY MR. GARVIN:

18        Q    Ms. Izumi, have you ever given

19   testimony of any sort before?

20        A    No.

21             It's Izumi.

22        Q    Izumi.  Excuse me.

Page 12

 1            Q      Did you do anything --

 2            A      Wait.  I'm sorry.  Could you repeat

 3     that again?

 4            Q      Sure.  Sure.

 5                   Before you worked with Mr. Hall as

 6     his manager --

 7            A      Uh-huh.

 8            Q      -- were you working full time in the

 9     entertainment industry?

10            A      Yes.

11            Q      Okay.  So you weren't doing anything

12     to supplement your income in addition to your

13     working in the entertainment industry?

14            A      No.

15            Q      And just to be clear, you were never

16     a bartender?

17            A      No.

18            Q      Okay.  Or a server in an -- in a --

19     in a restaurant or a bar?

20            A      No.

21            Q      Okay.  Did you know Mr. Hall before

22     you began working with him?

Page 13

1            A      Did I know Mr. Hall?  No.

2            Q      Okay.  So tell us how you came to be

3      working with Mr. Hall.

4            A      Through doing part-time

5      administrative work for him.

6            Q      Okay.  But you didn't know him when

7      you were doing that part-time administrative work?

8            A      I knew him.

9            Q      Okay.  Tell us how you came to meet

10     Mr. Hall.

11           A      I met him through mutual friends.

12           Q      Okay.  That sounds like plural.  So

13     more than one mutual friend?

14           A      Yes.  I mean, we are talking over two

15     decades ago, so I'm just trying to recall, but yes.

16           Q      Okay.  Can you --

17           A      In D.C.  You know, D.C. is small,

18     so . . .

19           Q      Uh-huh.

20                  Do you recall the names of those

21     friends?

22           A      I don't.

Page 14

```
1            Q     Okay.  Were you working -- when you
2      were doing this administrative work, was it through
3      his prior business manager?
4            A     Yes.
5            Q     Okay.  And that was Lamont Wanzer?
6            A     Correct.
7            Q     Okay.  Describe the administrative
8      work that you were doing for him.
9            A     The administrative work would be
10     updating, creating, and editing contracts,
11     organizational administrative items to help get the
12     company organized.
13           Q     Was the company BizMont
14     Entertainment?
15           A     Yes.
16           Q     Okay.  Did you know Mr. Wanzer's
17     compensation arrangements with Mr. Hall?
18           A     No.
19           Q     Okay.  Can you describe -- and when I
20     say "Mr. Hall," it's Marcel Hall.
21           A     Yes, that's fine.
22           Q     Can you describe Mr. Hall's
```

Page 15

```
 1      personality?
 2              A      Comical, easygoing.  That's pretty
 3      much it.
 4              Q      Okay.  Did he place his trust in you
 5      as his business manager?
 6              A      He did.
 7              Q      Okay.  Do you know how far Mr. Hall
 8      got in formal education?
 9              A      High school.
10              Q      Okay.  A graduate?
11              A      Yes.
12              Q      Okay.  Do you know if he had any
13      business training?
14              A      I do not.
15              Q      Okay.  Do you know if he had any
16      business experience?
17              A      I do not.
18              Q      Okay.  Would you agree that he wasn't
19      sophisticated, as far as being a business person?
20              A      Could you repeat the question?
21              Q      Sure.
22                     Would you agree that he was not
```

Page 14

1            Q     Okay.  Were you working -- when you
2      were doing this administrative work, was it through
3      his prior business manager?
4            A     Yes.
5            Q     Okay.  And that was Lamont Wanzer?
6            A     Correct.
7            Q     Okay.  Describe the administrative
8      work that you were doing for him.
9            A     The administrative work would be
10      updating, creating, and editing contracts,
11      organizational administrative items to help get the
12      company organized.
13            Q     Was the company BizMont
14      Entertainment?
15            A     Yes.
16            Q     Okay.  Did you know Mr. Wanzer's
17      compensation arrangements with Mr. Hall?
18            A     No.
19            Q     Okay.  Can you describe -- and when I
20      say "Mr. Hall," it's Marcel Hall.
21            A     Yes, that's fine.
22            Q     Can you describe Mr. Hall's

Page 15

1     personality?

2              A     Comical, easygoing.  That's pretty

3     much it.

4              Q     Okay.  Did he place his trust in you

5     as his business manager?

6              A     He did.

7              Q     Okay.  Do you know how far Mr. Hall

8     got in formal education?

9              A     High school.

10             Q     Okay.  A graduate?

11             A     Yes.

12             Q     Okay.  Do you know if he had any

13    business training?

14             A     I do not.

15             Q     Okay.  Do you know if he had any

16    business experience?

17             A     I do not.

18             Q     Okay.  Would you agree that he wasn't

19    sophisticated, as far as being a business person?

20             A     Could you repeat the question?

21             Q     Sure.

22                   Would you agree that he was not

1       experienced -- let me just start over.

2                    Would you agree that he was not

3       sophisticated with respect to business matters?

4            A    Would I agree that he was not?  No, I

5       would not agree.

6            Q    You think he was sophisticated

7       regarding business matters?

8            A    I think he was -- he was

9       knowledgeable.  Do I think it was his -- when you

10      say "sophisticated," he was an artist, an

11      entertainer, so . . .

12           Q    I can assume what you mean by that,

13      but I don't really know.  Can you expand on that,

14      please?

15           A    He was more like sophisticated.  I

16      mean, he was aware -- he knew of -- he was aware

17      of -- it wasn't his specialty.  So when you say

18      "sophisticated," what is your definition of

19      sophisticated?

20                    MS. COOPER:  So "knowledgeable"

21      doesn't answer your question.  Are you -- it may

22      help -- I'm just trying to close the gaps here.

Page 17

1                MR. GARVIN:  I appreciate it.  I'm
2      thinking about it.
3                MS. COOPER:  Okay.
4                MR. GARVIN:  So it's all right.  No,
5      that's a fair question.  I'm not sure I can do
6      better, but let me give it a moment's thought.
7      BY MR. GARVIN:
8           Q    I will try to make it more tangible.
9      Was he directly involved in negotiating contracts
10     pertaining to his entertainment services?
11          A    Occasionally.
12          Q    Okay.  Do you know whether he had
13     done that prior to your becoming his manager?
14          A    I think occasionally with -- with --
15     well, you say Lamont, but with Monte, I think
16     occasionally.
17          Q    Okay.  I may -- I don't want to make
18     assumptions.  Monte and Lamont are the same person?
19          A    Correct.  That's why I said when you
20     say Lamont and I say Monte, but yes.
21          Q    Okay.  Before you became Mr. Hall's
22     manager, were you the manager of any other

Page 25

1          basis, it didn't always make time -- I would say

2          time-wise, it didn't make sense for Biz and I to

3          connect over the years to get an actual signature,

4          and so he gave permission to use a signature to

5          then sign on his behalf.

6                    Q      Okay.

7                    A      And we would have -- but before

8          signing anything on a digital signature of his, we

9          would have conversations for him to approve

10         signing.

11                   Q      Is this one of those signatures?

12                   A      Is what one of these signatures?

13                   Q      Where you had a conversation for him

14         to approve signing.

15                   A      Yes.

16                   Q      Okay.  So you created that signature?

17                   A      I didn't create the signature.

18                   Q      Who created it?

19                   A      I don't remember who -- again, I

20         don't remember who created it.  It was over the

21         years.  It's definitely a digital signature that we

22         created sometime in the past over two decades that

Page 52

1   us.

2          Q     Okay.  Do you know why Biz Markie

3   does not have directors?

4          A     I do not.

5          Q     Okay.  How was share ownership in Biz

6   Markie determined?

7          A     Through conversations between

8   Mr. Hall and myself.

9          Q     Okay.  What -- what is the share

10  ownership of Biz Markie, Incorporated?

11         A     51 percent myself and 49 percent

12  Mr. Hall.

13         Q     Okay.  And how did the two of you

14  come to agree on those share ownerships?

15         A     How did we agree on them?  So just

16  through conversation, also with his -- with Lamont

17  recently passing, how we wanted to set up the

18  company, and what we thought would make the most

19  sense and be in the best interest of Biz Markie's

20  brand.

21         Q     Just to make sure I followed your

22  testimony, you didn't make those determinations

Page 53

1     based on conversations with Mr. Wanzer in any way,

2     correct?

3             A     No.  He had already passed.

4             Q     Okay.  And you don't know what

5     Mr. Wanzer's compensation arrangements were with

6     Mr. Hall?

7                   MS. COOPER:  Objection.  Asked and

8     answered.

9                   Go ahead.

10                  THE WITNESS:  I do not.

11    BY MR. GARVIN:

12            Q     Okay.  Mr. Hall was the performer

13    whose work generated income for Biz Markie, Inc.,

14    correct?

15            A     Yes.  And through his relationships

16    and my relationships over the years.

17            Q     Okay.  Why did -- why did Mr. Hall

18    agree that you would make more money on the company

19    than he would?

20            A     I think -- so in the over two decades

21    of us working together, I was his one constant

22    outside of Lamont.

Page 64

```
 1       the shareholder agreement?
 2            A     I don't know.  I would have to
 3       reference the advanced directive -- I don't
 4       understand the question.
 5            Q     Okay.  In -- Mr. Hall got married to
 6       Tara Hall in 2018?
 7            A     Yes.
 8            Q     Okay.  And they were still married at
 9       the time of his death?
10            A     Correct.
11            Q     And at the time you signed the
12       shareholders agreement, was it your understanding
13       that Mr. Hall wanted you to have 51 percent of the
14       income of his -- coming from his performing works
15       even though he was married to Tara Hall?
16            A     Yes.
17            Q     Okay.  Did he ever tell you that
18       after he got married?
19            A     Yes, he wanted everything to stay the
20       same.
21            Q     Okay.  And I take it that was an oral
22       discussion, not something that was captured in
```

Page 65

1      writing somehow?

2              A      Correct, but the advanced directive

3      and power of attorney, which Biz knew -- and yes,

4      we had a conversation that it would remain the same

5      unless he physically changed it, so yeah.

6              Q      Okay.  Did he ever explain to you why

7      he wanted it to remain the same even though he had

8      in the interim gotten married to Tara Hall?

9              A      Why he wanted it to -- why he wanted

10     the business to stay the same?

11             Q      The ownership shares to stay the

12     same.

13             A      Yes, because that's the way --

14     because business was business.  Tara was never a

15     part of our business.

16             Q      Okay.  Did he ever say anything about

17     his relationship with Tara that influenced his

18     desire to maintain the 51/49 percent share

19     ownership split?

20             A      Did he ever say anything about his

21     relationship with Tara that he wanted the 51/49 to

22     remain the same?

Page 66

1          Q      Yes.

2          A      Is that what you are asking me?

3          Q      Yes.

4          A      Did he ever -- yes, through -- yes.

5    Just leaving everything the same, even just because

6    they were married, again, Tara was not a part of

7    the business.  Also why he wanted to file married,

8    but separate on his tax returns, it was -- he

9    wanted to keep things separate.

10         Q      Okay.  But he didn't say anything

11   specific about their relationship that caused him

12   to have those viewpoints, I take it?

13         A      Why -- yes, we had conversations

14   about a prenup, about a postnup, about divorce,

15   trust issues, having reservations and finances.  He

16   wanted everything to remain the same.  Just because

17   they were married, he wanted the business to remain

18   the same, he wanted his finances to stay in place.

19         Q      Okay.

20         A      His assets, et cetera.

21         Q      Did he have a prenup with Tara?

22         A      He did not.

Page 86

1          Q    It does.  What do you mean?

2          A    Because we own the trademark, then it

3    allows us to.

4          Q    Did Mr. Hall ever provide Biz Markie,

5    Inc. a signed assignment of trademark rights?

6          A    I don't know what that is.

7          Q    A written document that he signed

8    agreeing that Biz Markie could exploit his

9    trademark rights.

10         A    We had conversations about it, and

11   then -- and then we executed it through our

12   trademark attorneys.

13         Q    Okay.

14              MS. COOPER:  I need some

15   clarification.  So from the -- the first question

16   was an assignment and then the next question was

17   exploitation.

18              Did I understand that correctly?

19   Could you read from the record?  It was?  That

20   was it?

21              COURT REPORTER:  It was, but if you

22   want me to go back and read it, I can.

Page 87

1           MS. COOPER:  No.  I just needed

2     clarification.  Thank you.

3           MR. GARVIN:  But we may need

4     clarification.

5     BY MR. GARVIN:

6           Q    Did Mr. Markie ever sign a written

7     agreement granting Biz Markie, Inc. the right to

8     use his trademarks?

9           A    No.

10          Q    Okay.  Did Mr. Markie -- excuse me,

11    did Mr. Mall --

12          A    I mean, you call him Markie or Hall,

13    it's the same -- it's one and the same.

14          Q    Yeah, it might be, but it's going to

15    be a confusing transcript if I switch between the

16    two.

17          Did Mr. Hall ever sign a written

18    agreement permitting Biz Markie, Inc. to exploit

19    his name, image, or likeness?

20          A    I would -- so when you say this --

21    when you're asking this question, sorry, the reason

22    why Mr. Hall and I agreed to 51 percent ownership,

Page 88

1    with me having 51 percent, is so that it gave me

2    the authority, but also in conversations with Biz,

3    to be able to sign documents on behalf of Biz

4    Markie, Incorporated, which would then transfer to

5    trademark -- you said, you know, filing for a

6    trademark, exploitation, assignment, if I am the

7    majority shareholder, that was the -- that was

8    under the umbrella and the understanding of me

9    having majority ownership of Biz Markie,

10   Incorporated.

11           Q    Okay.

12           A    So --

13           Q    Okay.

14           A    -- I -- so when signing documents, if

15   you're majority owner, it was to our understanding

16   that we did not need Mr. Hall to sign every

17   physical document while he was traveling and also

18   not -- not executing all of the day-to-day

19   transactions because that would then slow down the

20   efficiency of our workflow.

21           Q    Okay.  I appreciate that answer.  I

22   tried to ask a more specific question.  I'm going

Page 119

1          Q     Just a written agreement.

2                MS. COOPER:  -- but I'm going to

3     object.  Asked and answered.

4                Go ahead.

5                THE WITNESS:  Yes.  Those would be

6     our business documents and agreements over the --

7     yes.

8     BY MR. GARVIN:

9          Q     Can you identify a specific agreement

10    he signed that you're talking about here?

11         A     I would think tax returns through the

12    IRS, or government, is considered an agreement or

13    something that's valid that shows his agreement of

14    51/49 percent.  And also in, like, business

15    operations practices.

16         Q     Okay.  What is Balancing Acts,

17    Incorporated?

18         A     It is a booking and management

19    company.

20         Q     Who are the shareholders?

21         A     Myself.

22         Q     Anybody else?

Page 120

```
 1              A     No.

 2              Q     Does it hold bank accounts?

 3              A     Yes.

 4              Q     Where?

 5              A     Truist, formerly BB&T.

 6              Q     Okay.  Did Balancing Acts ever

 7      perform services for Mr. Hall?

 8              A     Occasionally, yes.

 9              Q     What?

10              A     Different performance -- different

11      performance or acting, merchandise agreements,

12      regular -- you know, those same type of agreements.

13              Q     Did Balancing Acts ever perform

14      services for Biz Markie, Incorporated?

15              A     Yes.

16              Q     What?

17              A     Negotiating, executing contracts,

18      advancing shows.  Yeah, that's it.

19              Q     Are there any written agreements

20      between Balancing Acts, Inc. and Biz Markie, Inc.?

21              A     No.

22              Q     Are there any written agreements
```

Page 122

1          A     No.

2          Q     Okay.   What were the promissory notes

3     for?

4          A     Promissory notes between -- you're

5     saying promissory notes for --

6          Q     You mentioned promissory notes, so

7     I'm just trying to get some information on those.

8          A     Between BMI and BAI, correct?

9          Q     Yes.

10         A     Money loaned to -- from BAI to BMI.

11         Q     Okay.

12         A     From Balancing Acts, Incorporated to

13    Biz Markie, Incorporated.

14         Q     Do you have any idea how much money

15    was ever loaned from Balancing Acts to Biz Markie,

16    Incorporated?

17         A     I don't know off the top of my head.

18         Q     Okay.   Yeah, I don't -- if you know,

19    you know.   If you don't, you don't.

20         A     Well, it's actually, I believe, in

21    my -- but I don't recall off the top of my head.

22                MS. COOPER:  Let's not waste time

Page 123

1      going through that.

2                      THE WITNESS:  Okay.  I'm sorry.

3                      But yes, I don't recall.  Me, I

4      honestly don't recall.

5      BY MR. GARVIN:

6              Q      Okay.

7              A      I don't recall the exact amount,

8      sorry.

9              Q      Did Biz Markie, Inc. ever repay

10     Balancing Acts for any loans?

11             A      Did Biz Markie, Incorporated ever pay

12     Balancing Acts, Incorporated for any loans?  I

13     think so.

14             Q      Okay.  In fall?

15             A      In fall?

16             Q      In full.  Sorry.

17             A      No.

18             Q      Okay.  Did Mr. Hall ever agree that

19     payments related to his -- his creative works

20     should be made -- let me start over again.

21                      Did Mr. Hall ever agree that

22     Balancing Acts should be paid for his artistic

Page 124

1      endeavors?

2            A     Yes.

3            Q     Okay.  Was that -- was that agreement

4      ever in writing?

5            A     No.

6            Q     Ms. Izumi -- I told you I would get

7      it right -- please turn to Exhibit 10 in the book

8      in front of you.

9                  (Izumi Deposition Exhibit Number 10

10                  marked for identification.)

11                 THE WITNESS:  Yes.  Uh-huh.

12                 MR. GARVIN:  There are some -- so we

13     have to take Mrs. Hall off Zoom for a while.  I

14     think we're going to go through a few, so . . .

15                 MS. COOPER:  Okay.

16     BY MR. GARVIN:

17           Q     Okay.  So do you have Exhibit 10 in

18     front of you?

19           A     I do.

20           Q     Do you recognize it?

21           A     I do.

22           Q     What is Exhibit 10?

Page 125

1           A      Letter of direction for payment.

2           Q      Okay.  And who is -- what is Rhino

3     Entertainment Company?

4           A      A music label, a division of Warner

5     Music.

6           Q      Okay.  The signature of Mr. Hall at

7     the bottom looks like the digital signature that

8     we've seen.  Is that -- is it in fact that?

9           A      It is.

10          Q      Okay.  Why was Rhino being paid this

11    money instead of Biz Markie, Incorporated?

12                 MS. COOPER:  I think you want to

13    reask that question.  You said why was Rhino being

14    paid?  You meant why was --

15                 MR. GARVIN:  Yeah, I do.  Thank you.

16                 MS. COOPER:  Uh-huh.

17    BY MR. GARVIN:

18          Q      Why was Balancing Acts being paid

19    rather than Biz Markie, Incorporated?

20          A      So Mr. Hall, entertainer, artist.

21    Really that was his focus, what he enjoyed doing.

22    And the day-to-day business -- the day-to-day

Page 126

1     business, which is what he entrusted me in.  And

2     also a good balance of roles for us, he had had

3     some health issues, which is -- you know, just a

4     lot going on in his life, health issues, health

5     concerns.

6              I would say prenup conversations,

7     marriage conversations, postnup conversations,

8     divorce conversations, and also business items that

9     we had in our pipeline over the past years and

10    really wanted to start a shift from Biz Markie,

11    Incorporated to Balancing Acts, Incorporated in the

12    event that he got sick, in the event of his

13    passing, and so decided that if -- like I said, if

14    something were to happen, that I would be able to

15    then continue the affairs -- the business affairs,

16    so -- but just wanted a shift.  He didn't want to

17    be -- he didn't want to have to deal with all of

18    the business affairs day to day.

19         Q     So as 51 percent share owner of Biz

20    Markie, Inc., you would have been able to continue

21    to work with Rhino on behalf of Biz Markie,

22    correct?

Page 178

1          Q      Okay.  For what?

2          A      Biz Markie's royalties.

3          Q      For these specific royalties, to what

4     artistic endeavors does it pertain to?

5          A      His music royalties.

6          Q      Okay.  Is that strictly for "Just A

7     Friend" or additional music royalties for other --

8     for other performances?

9          A      So it's any music under Universal

10    Music Group.

11         Q      Okay.  Who received the payment for

12    this?

13         A      Balancing Acts.

14         Q      Okay.  Why?

15         A      To help pay -- to help pay Biz

16    Markie, Incorporated, Balancing Acts, Incorporated,

17    its overhead, as well as Marcel Hall's personal

18    expenses.

19         Q      Okay.  Is there any single document

20    showing monies paid by Balancing Acts to Biz

21    Markie, Incorporated?

22         A      Yes.

Page 193

1     in that.

2            Q     I'm moving away from that, so you can

3     set it aside.

4                  Ms. Izumi, when did you first meet

5     Tara Hall?

6            A     When I first met her?

7            Q     Yes.

8            A     Probably sometime in 2019 after --

9     after they were married.

10           Q     Do you have any reason to think that

11    Mrs. Hall is dishonest?

12           A     I don't know her to say what her --

13    to speak to her character.

14           Q     Do you have any reason to believe

15    that Mrs. Hall's testimony in this case would be

16    untrustworthy?

17           A     Yes.

18           Q     And what's that?

19           A     I don't know what specific testimony

20    she has given that I could speak on that, but, you

21    know, in conversations with Biz about sharing --

22    shortly after they got married, sharing household

Page 194

1    expenses -- not sharing.  I don't want to --

2    sharing is not the word, paying household expenses.

3    She then sent an e-mail to myself, and not to Biz,

4    saying that they wanted to pay their household

5    bills.  Biz would sign his own paychecks.

6                    She had called Mr. Brown to make

7    changes to his life insurance policy, asked for his

8    log-in to his -- oh, yeah, it was his Citibank

9    checking account and asked to see power of attorney

10   and business agreements between myself and

11   Mr. Hall.

12                    And because that then made her

13   untrustworthy to Biz, it then made her

14   untrustworthy in her actions with Biz.  And then it

15   caused him to have reservations, more conflict in

16   their marriage, which, you know, was contributing

17   to even, you know, discussing prenup, postnup,

18   divorce.

19                    And so his reservations and red flags

20   and requests, and him not -- after that, Biz not

21   wanting to put her name on any of his assets,

22   credit card bills, utilities.  One bill was

Page 195

1    Allstate because he was driving -- because she was

2    driving one of his vehicles, filing married, but

3    separate, and also an e-mail from one of

4    Mrs. Hall's accountants saying that they were going

5    to -- or she was going to have her file Marcel

6    Hall's personal taxes and Biz Markie,

7    Incorporated's taxes.

8              But when Biz and I spoke about that,

9    he did not want to do that and he didn't want

10   Mrs. Hall to have access to any of his personal

11   finances, as well as his business finances.  And so

12   certain actions that she took for him to feel like

13   she was untrustworthy, it then overlaps into how I

14   see things.

15        Q    Okay.  Other than you and Mr. Hall,

16   is anyone else aware of this information?

17        A    Yes.

18        Q    Who?

19        A    Our accountants, attorneys, Tara,

20   Mrs. Hall.

21        Q    Do you have the e-mails that you just

22   testified to?

Page 196

1        A      Yes, we shared them with you.

2               And after I shared the e-mail with

3    Biz, with Mrs. Hall requesting certain information,

4    he specifically said, "Don't do nothing.  I'm going

5    to call you back."  He then called her.  He called

6    me back and said, "Don't do nothing.  Leave

7    everything the same."

8               And from that point on, Mr. Hall

9    didn't share any of his finances, even when -- and

10   that was business and personal.  And even when

11   Mr. Hall was in the hospital, Tara has sent emails

12   saying she had no access or knowledge of the bills

13   because he never shared that information with her.

14              MR. GARVIN:  Subject to the other

15   discovery issues that we and your counsel are

16   discussing, I'm done for the day.

17              But I'm not agreeing that this

18   deposition is concluded, I understand you may

19   have comments on that, but I just want to make

20   sure that the deposition is open because we are

21   owed a lot of discovery that we're entitled to to

22   depose Ms. Izumi on.