# EXHIBIT 2

**In the Matter Of:**

NorthWestern Mutual Life Ins. vs J.R.H.

1:22-cv-3588-CKK

---

**JENNIFER IZUMI**

*April 25, 2024*

*Vol. II*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2    NORTHWESTERN MUTUAL LIFE
      INSURANCE COMPANY,
 3               Plaintiff,

 4    vs.                              Case No.

 5    J.R.H. EX RE. MALEEQUA C.,    1:22-cv-3588-CKK

 6    HALL, et al.,

 7               Defendants.

 8    _____/

 9

10                      VOL II

11        The Zoom Deposition of JENNIFER IZUMI

12            10:00 a.m. - 6:03 p.m.

13                 April 25, 2024

14

15

16

17

18

19

20

21

22

23    REPORTED BY:

24    STEVEN POULAKOS, RPR

25    JOB NO:  J11148963
```



1

2

3

4

5

6

7

8            The deposition of JENNIFER IZUMI was held

9    via Zoom videoconference on Thursday, April 25, 2024,

10   commencing at 10:00 a.m., before Steven Poulakos,

11   Notary Public.

12

13

14

15

16

17

18

19

20   REPORTED BY:  Steven Poulakos, RPR

21

22

23

24

25



```
 1   APPEARANCES:

 2       ON BEHALF OF THE DEFENDANTS J.R.H. AND M.R.H::

 3       SAM McHALE, ESQUIRE

 4           WilmerHale

 5           2100 Pennsylvania Avenue, N.W.

 6           Washington, D.C.  20037

 7           Telephone:  202.663.6153

 8           Email:  ahmed.rizk@wilmerhale.com

 9

10       ON BEHALF OF THE DEFENDANT JEREMIAH WATSON:

11       CHRISTOPHER E. WATTS, ESQUIRE

12           McDermott Will & Emery

13           500- North Capitol Street, N.W.

14           Washington, D.C.  20001

15           Telephone:  202.756.8179

16           Email:  cwatts@mwe.com

17

18

19

20

21

22

23

24

25
```



```
 1    APPEARANCES (Continued):

 2         ON BEHALF OF THE DEFENDANT JENNIFER D. IZUMI:

 3         DAYNA COOPER, ESQUIRE

 4             Cooper Legal

 5             1 Olympic Place

 6             Suite 900

 7             Towson, Maryland  21204

 8             Telephone:  202.642.5470

 9             Email:  dayna@cooperlegalsolutions.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                              INDEX

 2                  Deposition of JENNIFER IZUMI

 3                          April 25, 2024

 4    Examination by:                                Page

 5    Mr. McHale                                      330

 6    Ms. Cooper                                      530

 7    Mr. McHale                                      539

 8

 9    Exhibit No.                                   Marked

10    Exhibit 13    2020 federal tax return for Biz    334

11                  Markie, Inc

12    Exhibit 14    Request for interrogatories        361

13    Exhibit 15    December 5th, 2015, designation of  376

14                  beneficiaries form

15    Exhibit 16    Biz Markie's Maryland statutory     385

16                  power of attorney

17    Exhibit 17    May 23rd, 2018, designation of      397

18                  beneficiaries for policy A

19    Exhibit 18    Emails                              404

20    Exhibit 19    Owner designation form for policies 414

21                  A and B

22    Exhibit 20    Owner designation form              425

23    Exhibit 21    Two signatures from each of the     427

24                  November 2018 designation forms

25    Exhibit 22    An email                            445
```



```
 1                Exhibit Index (Continued)
 2    Exhibit No.                                    Marked
 3    Exhibit 23    Text message                      448
 4    Exhibit 24    Text message                      456
 5    Exhibit 25    Text message                      465
 6    Exhibit 26    Owner designation form transferring  470
 7                  ownership of the policies from Biz
 8                  Markie, Inc. to Balancing Acts,
 9                  Inc.
10    Exhibit 27    Text messages                     475
11    Exhibit 28    Settlement and tax information for  491
12                  Ms. Jennifer Izumi
13    Exhibit 29    Presentation of beneficiary form   498
14                  for policies A and B
15    Exhibit 30    A letter                          511
16    Exhibit 31    Designation of beneficiaries for   513
17                  policy A
18    Exhibit 32    Answers to interrogatories         515
19    Exhibit 33    A chart with transactions          526
20    Exhibit 34    Text message                      529
21
22
23
24
25
```



```
 1              P R O C E E D I N G S

 2                    - - -

 3   Whereupon,

 4                JENNIFER IZUMI,

 5   called as a witness, having been first duly sworn to

 6   tell the truth, the whole truth, and nothing but the

 7   truth, was examined and testified as follows:

 8              EXAMINATION BY MR. McHALE

 9        Q     Good morning, Ms. Izumi.  Welcome back to

10   what is now our second day of your deposition.  I want

11   to start by just clearing up a few things for the

12   record.  During the first day of your deposition, we

13   discussed conversations in which you say that Biz gave

14   you his permission to apply his digital signature to a

15   shareholder certificate.

16              Do you recall that?

17        A     Yes.

18        Q     Is it accurate that no person other than

19   you can corroborate that Biz gave you his permission to

20   apply his signature to that certificate?

21        A     Yes, that's correct.

22        Q     In the time between the first day of your

23   deposition and today, did you do anything to educate

24   yourself about the salaries that were paid to the

25   employees of Biz Markie, Inc.?
```



1      Q      Why did Biz want to obtain policy B in

2    September 2015?

3      A      I'm sorry.  Why did Biz want to obtain

4    policy B?

5      Q      In September 2015.

6      A      We had been getting his personal affairs in

7    order after his previous manager had passed and he

8    wanted to make sure that he had a life insurance policy

9    and to make sure that in the event that something

10   happened to him that there was one in place.

11     Q      Why did he want to do that?

12     A      He wanted to make sure that in the event

13   that something did happen to him that he had a life

14   insurance policy in place and to make sure that there

15   would be funds available in the event of his passing

16   for his grandnephews, grandniece and myself as well

17   as -- and myself and as well as again making sure that

18   that was in place especially after -- and when I say

19   Monte, Mr. Wanzer.  So after Mr. Wanzer had passed who

20   had terminal cancer and in 2014.  So that was

21   definitely an experience that made us want to make sure

22   that he had a reasonable life insurance policy in place

23   in the event that he passed.

24     Q      So Biz wanted to make sure to provide for

25   his grandnephews, grandniece and for you; is that

1  right?

2      A      Correct.

3      Q      And he did that by naming a certain

4  beneficiary to the policies; is that right?

5      A      Correct.

6      Q      Biz's life insurance policy never named --

7  strike that.

8             Biz Markie, Inc. was never named as a

9  beneficiary of Biz's life insurance policies; is that

10 right?

11     A      Correct.

12     Q      How do you know that Biz wanted to make

13 sure he could provide for his grandnephew -- strike

14 that.

15            How do you know that Biz wanted to provide

16 for his grandnephews, his grandniece and for you?

17     A      He named us as beneficiaries on his life

18 insurance policies.

19     Q      Is there anything else that informed your

20 opinion that Biz wanted to provide for his

21 grandnephews, grandniece and for yourself?

22     A      We were family.  Biz considered -- while I

23 was not his blood, Biz and I worked together for over

24 two decades.  I was his only constant after Monte had

25 passed.  When Monte was alive, his constants were --



1   Biz's constants were Monte and myself for, you know,

2   over 30 years and he told me and he -- he told me he

3   wanted me to be a beneficiary.  He told me he wanted

4   his grandnephews and nieces to be beneficiaries as

5   well.

6           We worked very closely with one another.

7   We were available to each other 24/7 over more than 20

8   plus years and working with one another.  And so we

9   formed a professional relationship, a friendship that

10  was like family and we did consider one another family.

11      Q    When you say we were family, you don't mean

12  that you were related by blood, correct?

13      A    Correct.  I said that earlier.  While we

14  were not, you know, related by blood, we considered

15  each other family.

16      Q    When did Biz tell you that he wanted you to

17  be a beneficiary?

18      A    When we began conversations of getting life

19  insurance policies or a life insurance policy.

20      Q    When was that?

21      A    2015, on or about 2015, late -- yeah, 2015.

22      Q    Do you recall when in 2015 Biz first told

23  you this?

24      A    I don't recall.  You know, in 2014 when

25  Monte was terminally ill, we had conversations about



1  how we wanted to move forward and just making sure that

2  things would continue how they currently were in the

3  sense of myself and Vaughan Lee which is his cousin to

4  support Biz.

5           And Biz and I in 2014 said that in 2015, we

6  would figure out how we would structure things.  So I

7  would say first quarter of 2015, we started talking

8  about business and personal affairs.  So really from --

9  so life insurance policies.  So first quarter of 2015.

10      Q      How many conversations did you have with

11  Biz where he told you that he wanted you to be a

12  beneficiary of his policies?

13      A      On numerous occasions because we had been

14  having conversations, you know, beginning of 2015 to

15  the time that we -- to the time that his life insurance

16  policy began.

17      Q      When you say numerous, do you have any

18  sense of how many times you had conversations with Biz

19  where he mentioned that he wanted you to be a

20  beneficiary on his policies?

21      A      A lot.  I can't give you an exact number.

22  I can give you over the course of months up until it

23  was started and, you know, since he received the policy

24  in September of 2015.

25      Q      Did all of your conversations with Biz



1   BY MR. McHALE:

2       Q      Was Biz's decision to name you as a 40

3   percent beneficiary surprising to you?

4       A      No.

5       Q      Why not?

6       A      I had -- again, I was Biz's only constant

7   for over 20 years.  We considered each other family.

8   We talked to each other.  We were available to each

9   other 24/7.  Had lots of business and personal

10  conversations, considered each other family.  He

11  entrusted me with his -- he entrusted me with his

12  advance directive, his medical advance directive, his

13  power of attorney, his brand legacy, the historical

14  knowledge that he had shared with me in his 30 plus

15  years of being in the music industry.

16              And he didn't have family or friends that

17  he entrusted or felt comfortable that he could rely on.

18  And Biz knew a lot of people and had a lot of options.

19  And Biz chose to continue to want to work and made a

20  decision to work together.  And even after Monte's

21  passing and you had mentioned, you know, in our -- in

22  my first deposition coming up with the name of Biz

23  Markie, Incorporated and I came up with that name when

24  Biz wanted to do a fusion just like he did with Monte

25  of Biz Monte.



1          And he wanted a fusion of something with
2     his name and my name and I said that it should be Biz
3     Markie, Incorporated and it should always be Biz
4     Markie, Incorporated.  And Biz wanted me to be -- even
5     at that time just like when Monte was a hundred percent
6     owner, Biz wanted me to be a hundred percent owner of
7     Biz Markie, Incorporated.
8          And I didn't want to do the -- I didn't
9     want to do things the same way that Monte and Biz did
10    things together in business.  I wanted Biz to really be
11    present and an active participant in his brand.  And
12    Biz is an artist and he isn't -- Biz isn't -- he's an
13    artist, so he's not interested in the business aspect
14    and trusted me where if you are saying I trust you to
15    be my medical advance directive and have a power of
16    attorney that listed, you know, everything in the event
17    that he got sick and even if he wasn't sick that he
18    relied upon me to be truthful with him and what would
19    serve him, you know, in the sense of him and his brand
20    professionally and personally.
21          And I think he saw that and that's why he
22    chose to again go into business with me and, you know,
23    be willing to say, hey, let's do a hundred percent like
24    we did with Monte.  And I was like, no, let's do 51/49.
25    That's how we came to the conclusion because again you



 1  BY MR. McHALE:

 2      Q     My question was:  You were also required to

 3  act in Biz's best interest when you became his manager;

 4  is that right?

 5      A     And so I think Biz and I -- Biz and I

 6  considered each other business partners and so I think

 7  we collaborated and agreed on what we felt was in Biz's

 8  best interest.  So as his business partner, manager,

 9  it's a title, right, that businesses or individuals

10  look at to help identify how you assist the business

11  and/or an individual.  So I think that business

12  partner, manager are fluid.  We considered each other

13  business partners.

14      Q     Whether you were acting as business manager

15  or his business partner, you were obligated to act in

16  his best interest, correct?

17      A     Yes.

18      Q     Do you understand that this power of

19  attorney prohibited you from giving away business

20  property unless certain conditions were met?

21      A     Yes.

22      Q     The power of attorney prohibited you from

23  giving away business property unless he directed you to

24  do so; is that right?

25      A     No.



1   you normally would see -- you would normally expect to

2   see certain people from -- from -- again, depending on

3   what the event is, but you would expect to see people

4   from that social circle in the venue.

5            So that could be anyone.  Like if it is

6   a -- if it is an attorney event and you normally attend

7   these events and Park is having an event, I would

8   probably expect to see you there, but I don't have the

9   full context.  I don't know if there is anything before

10  this, so I don't know what the event is to say that I

11  absolutely expected to see him there.

12       Q    What did you mean when you said I hope you

13  have recovered from Friday night?

14       A    I don't know what was happening on that

15  Friday night.

16       Q    It was your responsibility at Biz Markie,

17  Inc. to manage business finances, right?

18       A    It was both of our -- it was a

19  collaborative effort and agreed collaboration that --

20  about Biz's finances.  You can't just make Biz do

21  something or any adult do something unless they agree

22  to it.  So it was my responsibility to speak with Biz

23  and advise and give my opinion about finances, but not

24  my sole responsibility.

25       Q    It was your responsibility to manage Biz



1  Markie, Inc.'s finances too, correct?

2       A     It was both of ours.  We would discuss our

3  business finances as well.  Same thing with personal.

4  It was a collaborative effort.  We talked about our

5  finances and money often.

6       Q     You include two bullet points in this email

7  to Mr. Brown and Ms. Kee.  Do you see those here?

8       A     There's three.

9       Q     My apologies.  Let's look at the second

10  bullet point.  It says Biz's second $500 life insurance

11  policy that was added later and who the beneficiaries

12  are.  It should have been the same as the first one.  I

13  thought we went from a $500,000 life insurance policy

14  to a $1 million policy.  But from our conversation on

15  Friday, you think it is two separate ones and just has

16  two nephews and one niece listed as the beneficiaries.

17  Please clarify.

18             Do you see that?

19       A     I do.

20       Q     You were confused here in 2018 about

21  whether Biz had one or two life insurance policies; is

22  that right?

23       A     Correct.

24       Q     So it took three years from the issuance of

25  the first policy for you to realize that Biz had two



1       Q       Did Ms. Diaz apply her handwriting to this
2    form?
3               MS. COOPER:  Objection, asked and answered.
4               THE WITNESS:  I don't know whose
5    handwriting that is.
6    BY MR. McHALE:
7       Q       Earlier you referenced a November 5th,
8    2018, conversation with Biz.  Do you recall that?
9       A       I do.
10      Q       Why did the conversation take place?
11      A       Tara Hall, Biz's wife, sent me an email
12   asking for more information other than paying the
13   household bills which was a conversation that Biz and I
14   had on Saturday, November the 3rd.  And so when I
15   received the email and she asked for business documents
16   and Biz's personal information other than household
17   bills, then what Biz and I discussed such as they
18   wanted to start paying their household bills along
19   these lines, not verbatim, but pay the household bills,
20   Biz to sign his own paychecks which we used Paychex,
21   the actual payroll company.  The name is just Paychex.
22               She was going to talk to Mr. Brown about
23   making changes to Biz's life insurance policy.  Wanted
24   to see our business license and power of attorney and
25   gave his full Citibank account number and asked for the



 1  log in information and gave Biz's full Citibank account
 2  number and asked for the log in information because
 3  that was not what Biz and I had discussed.
 4          I then in turn called him and let him know
 5  of the email that I received and the contents.  And he
 6  was disturbed because -- and confused because that
 7  wasn't what he and Tara had talked to or agreed to.
 8  And he said that not to do anything and that he was
 9  going to speak with her and call me back.
10          He then called me back and told me don't do
11  nothing.  Leave everything the same and that then put
12  up a red flag for Biz.  And as I said in my first day
13  of deposition, it caused tension and trust issues
14  because Biz didn't understand why Tara was asking for
15  personal information, business information that they
16  had not previously discussed and household bills that
17  she wasn't paying for with her money and so it then put
18  a, like I said, trust issue within Biz.
19          And so he opted not to share any of the
20  information from that day forward until the time that
21  he was admitted in the hospital.  And we then talked
22  to -- again, I said this earlier in the previous day.
23  Then we spoke with Mr. Brown.  We spoke to another
24  attorney about the postnup and changing the policies
25  from Marcel Hall to Biz Markie, Incorporated.



1      Q      Why would Biz want to transfer ownership of

2   his policies to a company that he did not have majority

3   control over?  Strike that.

4            Why did Biz want to transfer ownership of

5   his policies to a company that he does not have

6   majority control over?

7      A      Biz told me and he -- he told me that this

8   is what he wanted to do.  And we've known each other.

9   We've worked together for over 20 plus years.  I was

10  his only constant after -- his only constant.  So this

11  is what he wanted to do.  Biz was aware of this.  Biz

12  also as stated earlier was willing to give me a hundred

13  percent ownership.

14           It was the same way that he and Monte had

15  worked together previously.  In retrospect should have

16  just put the business a hundred percent in my name or

17  in BAI's name.  And I should have listened to him, but,

18  again, that's hindsight.  And so it was what Biz was

19  comfortable with.  It's what he wanted to do.  That's

20  what he decided to do.

21           And, you know, I mean, we -- and also he

22  knew that BMI would, you know, benefit in the event

23  that he passed.  And I was the one who had been with

24  him who could continue his legacy and it would

25  provide -- it would provide us with a form of cushion



 1  to be able to then generate revenue, right, more

 2  revenue since there wasn't -- that he wasn't with us in

 3  the physical and have, you know, income from him

 4  physically being with us.

 5          We would be able to try and find other

 6  revenue streams like marketing in the sense of like

 7  merchandise or AI voice generated likeness, holograms,

 8  all the things.  And so we discussed that in the past.

 9  And I said before just in trusting me and wanting me to

10  continue his brand legacy because he shared all of that

11  historical knowledge with me over the years.

12      Q     Why did the policies need to be transferred

13  to Biz Markie, Inc. in order for you to do any of the

14  things you just described?

15      A     I'm sorry.  Say that again.

16      Q     Why did the policies need to be transferred

17  to Biz Markie, Inc. in order for you to do any of the

18  things that you just described?

19      A     I don't think it needed to be.  It was just

20  what Biz -- after conversations that Biz and I had that

21  that's what Biz wanted to do.

22      Q     He did not give you a specific reason; is

23  that correct?

24      A     You know, there are -- you want to know why

25  he changed it to -- why did it have to be changed to



1   message after -- sometime after November the 10th

2   because Biz received the, you know, same type of --

3   same type of -- same type of confirmation letter that

4   he received at his residence when he added the

5   beneficiaries, you know, in May of 2018.

6          And then -- and what I wanted to add which

7   I said earlier was like we did -- I believe we provided

8   that document that Biz gave to me that he received at

9   his home naming the four beneficiaries had been updated

10  with Northwestern on May 23rd, 2018.  So Tara

11  received -- I'm sorry.  Not Tara.  Biz received the

12  same type of letter changing ownership designation at

13  his residence which Tara saw.

14          And that's when she sent the text message

15  saying that something along the lines of Biz told me

16  that he took -- he took care of it or handled it,

17  canceled it, whatever, and you're still on the policies

18  and I think that's very inappropriate.  Again, not

19  verbatim, but along those lines.  But I did not respond

20  to that text message and called Biz and let him know

21  that I had received a text message.

22          MR. McHALE:  I'll mark and publish for the

23  witness what will be Exhibit 22.  It bears the Bates

24  stamp number NWMI-JDI-000000240.

25          (Izumi Exhibit 22 was marked for purposes



1    Q    You told Mr. Brown that Biz agreed to 250K.

2         Do you see that?

3    A    I do.

4    Q    What is that in reference to?

5    A    So as I mentioned before, this caused

6    tension and trust issues with Biz and Tara and so Biz

7    said that he was going to -- or Biz said I'm going to

8    tell her that I'm going to agree to $250,000 policy

9    naming her as a beneficiary.  However, Biz never -- and

10   even if though that's what Tara wanted him to do as

11   stated earlier, you can never make Biz do something he

12   doesn't want to do.

13        And so Biz may have shared that with Tara.

14   That wasn't his attention.  It was to calm things in

15   the household and Tara or Biz never got an insurance

16   policy solely naming Tara as a beneficiary.

17   Q    So is it correct that 250K referenced in

18   this text message refers to a $250,000 life insurance

19   policy that would benefit Tara Hall and which was never

20   issued?

21   A    It was never issued because there was never

22   an application nor physical taken to submit the

23   application, so that is correct.

24   Q    Why was it never issued?

25        MS. COOPER:  Objection, asked and answered.



1          THE WITNESS:  Because Biz never wanted nor

2    intended on getting a policy naming Tara as a

3    beneficiary.

4    BY MR. McHALE:

5          Q     What did you mean when you said Biz agreed

6    to 250K?

7          A     Again, Biz agreed.  However, that really

8    wasn't his intention.  It was to calm things down in

9    his household and Biz never took the medical exam.

10   Tara knew he never took the medical exam because she

11   was home when he was supposed to take the medical exam

12   that morning and he refused and didn't.  So Tara knew

13   she was never a beneficiary on whatever policy he said

14   that he was going to do or any other policy.

15         Q     How do you know it was never Biz's

16   intention to provide for Tara Hall with his life

17   insurance proceeds?

18         A     Because he told me and then he never

19   executed a life insurance policy naming her as a

20   beneficiary.

21         Q     When did he tell you that?

22         A     Between November the 5th and to the -- into

23   the first quarter of 2019.

24         Q     How many conversations are you referring to

25   when you say between November 5th into the first



1   contacted him earlier in the day or tried to contact

2   him earlier in the day, Biz was highly upset.  He was

3   frustrated because it is not what they discussed along

4   with everything else in the email that Tara tried to

5   get information from me that Biz didn't -- that Biz and

6   Tara did not talk about and never shared with Tara or

7   added Tara to any of his assets from utilities to

8   vehicles to his house title deed property until the

9   time that he entered the hospital.  And one of -- I

10  guess one of the ways of Biz making a statement that he

11  doesn't trust you with his assets information.

12         He didn't want Tara involved in his

13  personal -- especially life insurance after this

14  exchange.  So he wanted to know if Tara tried to call

15  Mr. Brown that he wanted to be made aware of and to let

16  me know and then I in turn would let Biz know.

17      Q    So is your testimony that Biz instructed

18  you to tell Mr. Brown that if Tara called, he should

19  let you know?

20         MS. COOPER:  Objection, asked and answered.

21         THE WITNESS:  Yes, that's my testimony.

22  Biz would instruct many people to call me or -- not

23  many.  Instruct -- Biz would instruct me to, you know,

24  share information with him if I received a phone call

25  or anything pertaining to whether it was business or



1   personal.  So that was a normal formality.  Call Jenny.

2           And then, again, he just trusted me to

3   handle -- he trusted me to handle his affairs and also,

4   yes, if something that -- in this case -- I guess you

5   could say in this case because he was upset with Tara

6   and didn't want her to have access to this information.

7   That was I guess his additional way of saying make sure

8   you let me know and so I then communicated that to

9   Mr. Brown.

10  BY MR. McHALE:

11      Q     I'll take this exhibit down now.

12            When the policies were transferred to Biz

13  Markie, Inc., the mailing address that notices will be

14  sent to was changed from Biz's home address to Biz

15  Markie, Inc.'s address, right?

16      A     Correct.

17      Q     By changing the mailing address for the

18  policies, any information about the policies would go

19  to Biz Markie, Inc.'s offices, right?

20      A     Correct.

21      Q     If mail was sent to Biz Markie, Inc.'s

22  offices, Tara Hall would not be able to see the mail;

23  is that right?

24      A     I don't know that that was the intention,

25  but if that's what you're implying, yes.  Tara would



1   Northwestern -- I don't know how Northwestern perceives

2   that because, again, I think that clearly that's a

3   mistake that I didn't catch either and apparently they

4   didn't either.

5       Q     It is your signature that appears on the

6   bottom left; is that right?

7       A     It is.

8       Q     Underneath the title -- underneath the

9   field that says signature of authorized company

10  representative; is that right?

11      A     Yes.

12      Q     Only the owner of a policy could transfer

13  ownership of the policy, correct?

14      A     Yes.

15      Q     I'll take this exhibit down.

16            MR. McHALE:  Let's mark and publish for

17  witness what will now be Exhibit 27.  Exhibit 27 has

18  the file name that reflect the Bates stamped number

19  M1JB00000157.

20            (Izumi Exhibit 27 was marked for purposes

21  of identification.)

22  BY MR. McHALE:

23      Q     Ms. Izumi, do you see that these are

24  January 17th, 2019, text messages between you and

25  Mr. Brown?



1   pertaining to the insurance policies.  Then, yes, we

2   would have produced them if I had them.

3        Q     In the first message here, you state to

4   Mr. Brown, hey there, sunshine.  How are you?  Please

5   set up a time to make changes to the BMI life insurance

6   stuff and set up a time for Biz to get life insurance

7   on himself for Tara.

8             Do you see that?

9        A     I do.

10       Q     This time you agree the policies were owned

11  by Biz Markie, Inc. and not by you personally, correct?

12       A     Correct.

13       Q     In January 2019, you state that Biz is

14  getting life insurance on himself for Tara.  See that?

15       A     Yes.

16       Q     In between November of 2018 and January of

17  2019, did Biz decide to get a life insurance policy on

18  himself for Tara?

19       A     He thought about it.

20             MS. COOPER:  I know I'm late.  I'm going to

21  object to this line of -- objection, relevance.

22             THE WITNESS:  So he did not decide to get

23  an insurance policy on Tara Hall ever with Northwestern

24  Mutual.

25  BY MR. McHALE:



1      Q      Why did you tell Mr. Brown that you wanted

2  to set up a time for Biz to get life insurance on

3  himself for Tara?

4            MS. COOPER:  Objection, relevance.

5            THE WITNESS:  Because Tara continued to

6  push Biz to get a life insurance policy naming her as a

7  beneficiary which again just was an annoyance to Biz

8  and to calm things in the household, he called me and

9  said, hey, let's -- I'll get a life insurance on Tara.

10 She keeps bringing this up.  She keeps bringing this

11 up.  I don't know why she feels like she needs to -- I

12 don't know why she feels like she needs to have a life

13 insurance policy on me.

14           And I was like on you and, well, he's like

15 you know what I mean, but naming her as a beneficiary.

16 So, again, they continued to go back and forth.  One of

17 the reasons why -- I mean, Biz had even talked about

18 getting a divorce during this time at this time.  They

19 just kept going back and forth and not being able to

20 agree on a life insurance policy naming Tara as the

21 beneficiary.

22 BY MR. McHALE:

23     Q      Was Biz just trying to avoid conflict here?

24     A      Biz was definitely not a person who

25 liked -- I said liked.  Biz was definitely not a person



1  who liked confrontation.  I don't know any of us like

2  confrontation.

3      Q     Scroll down a little bit in this exchange.

4  This is labeled 12:16 a.m.  I don't know if that's a

5  accurate time.  I should say I don't know if that is

6  eastern standard time or a different time zone, but at

7  that time that's reflected here, you say let's talk

8  ASAP about BMI life insurance.  Can I change the owner

9  for Biz's policy from BMI to Balancing Acts or myself?

10  But Balancing Acts will be paying the bill.

11          Do you see that?

12      A     I do.

13      Q     There does not appear to be response.  The

14  next message is also from you.  It says all life

15  insurance and STD and LTD.  I'm changing our business

16  to be handled out of Balancing Acts, Inc. going

17  forward.

18          Do you see that?

19      A     I do.

20      Q     Why were you changing the business to be

21  handled out of Balancing Acts, Inc.?

22      A     Because Biz and I had been having

23  conversations about, you know, changing everything from

24  BMI to BAI and this wasn't your guy or type of person

25  was interested in a business aspect, business affairs



1   of the business.  And so Biz wanted to be -- he didn't

2   want to be.  Biz was an artist and if you have worked

3   with artists, if you have worked with talent before in

4   the entertainment industry, artists are a completely

5   different breed.

6           And if you've been in the weeds with an

7   artist especially Biz, Biz was your -- Biz was the type

8   of person who just wanted to be an artist.  He just

9   wanted to have fun.  He wanted to talk about the

10  Lakers.  He wanted to talk about football.  He would

11  be -- we would talk about draft today, but he wanted to

12  talk about sneakers and music and then also -- then

13  started collecting guns later in life.

14          So those were the types of things that he

15  wanted to talk about and he wanted to -- he was a fun

16  person.  He wanted to bet you.  Biz would always say I

17  bet you.  So he trusted me to handle all of the

18  business aspects from BMI again even being initially a

19  hundred percent majority owner of BMI and wanted to

20  just start transitioning everything from BMI to BAI

21  since I was a hundred percent owner at BAI and not

22  at -- and at BAI, there was two people.

23          And while he was 49 and I was 51 percent,

24  we weren't quite sure how to start changing things over

25  in the event something happened to him, but he wanted



1    to make sure that once again I preserved and really

2    stayed true to his brand in the event that something

3    did happen to him, if he got sick or passed.

4              And so we just decided that it would be

5    best to transfer things from BMI to BAI and this was

6    one of the things that we were starting to transfer

7    since we were transferring everything over or beginning

8    to transfer everything over to BAI.

9        Q    Biz was an artist when the policies were

10   issued in 2015/2016, right?

11       A    Yes.

12       Q    Biz was a person who wanted to have fun in

13   2015 and 2016, right?

14       A    Since forever, yes.

15       Q    Biz trusted you to handle the business in

16   2015 and 2016, correct?

17       A    He did.

18       Q    Why did you wait until 2019 to transfer the

19   business over to Balancing Acts, Inc.?

20       A    I didn't wait to transfer.  It was a

21   conversation that Biz and I had, conversations that Biz

22   and I were having and made the decision that it would

23   be best if everything was in my name.  There was no

24   question if it was 51/49 percent if there was just one

25   owner.  It was -- BMI had two owners 51/49 and even



1  from that policy.  So if Biz Markie, Inc. borrowed from

2  the policy, it would go from the policy into Biz

3  Markie, Inc.'s bank account.

4       Q     Biz Markie, Inc. could not borrow from the

5  policy in your words if the policy were owned by

6  Balancing Acts, Inc., correct?

7       A     Could you ask that question again?

8       Q     Biz Markie, Inc. could not borrow from the

9  policy to use your words if the policy were owned by

10 Balancing Acts; is that right?

11      A     That's correct.

12      Q     How was it in Biz Markie, Inc.'s best

13 interest to transfer the policies to Balancing Act if

14 Biz Markie, Inc. could not then borrow from the

15 policies?

16      A     Biz and I were still business partners and

17 Biz trusted and wanted all of the business to be

18 handled out of BAI and that's what we did.  And Biz

19 trusted that I'm not just going to take money and

20 borrow it and use it for something that didn't benefit

21 us.  And we did borrow -- BAI did borrow money.  It did

22 go into BAI's account, so it was accounted for and we

23 used it to help pay BMI's bills.

24      Q     BMI could have done the same thing had it

25 owned the policies?



1   Ms. Latimer include discussions about ownership

2   interest?

3       A     Yes.

4       Q     Did you have conversations with any -- was

5   Tina Latimer your only accountant?

6       A     No.

7       Q     Who was your other accountant?

8       A     Nick Cusato.

9       Q     Did you have conversations with Mr. Cusato

10  about ownership interest?

11      A     Yes.

12      Q     Did Marcel have conversations with

13  Mr. Cusato about ownership interest?

14      A     Yes.

15      Q     Did Marcel Hall ever pay for any of the

16  insurance policies at issue in this case?

17            MR. McHALE:  Object to the form.

18            THE WITNESS:  Did Mr. Hall ever pay for any

19  of the insurance policies in this case, no.

20  BY MS. COOPER:

21      Q     Who -- just for the sake of time, I'm

22  talking about policy A and policy B and you don't have

23  to give me specific dates.  Who were the purchasers of

24  the policies -- not the purchasers.  Who paid the

25  premiums for the insurance policies at issue in this

