# EXHIBIT 3

 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3    _____)

 4    NORTHWESTERN MUTUAL LIFE
      INSURANCE COMPANY,
 5
                   Plaintiff,
 6
         v.                          Civil Action No.
 7                                   1:22-cv-2588-CKK
      J.R.H. ex rel. MALEEQUA
 8    C. HALL, et al.,

 9
                   Defendants.
10    _____)

11

12              DEPOSITION OF JENNIFER IZUMI

13

14                    April 23, 2024

15                7:14 a.m. Pacific Time

16

17

18

19

20

21    Reported by:  Lori J. Goodin, RPR, CLR, CRR,
                    RSA, California CSR #13959
22    Job No. J11148961



```
 1              REMOTE APPEARANCES:

 2   ON BEHALF OF DEFENDANT JEREMIAH WATSON:

 3        MCDERMOTT WILL & EMERY
          BY:  MICHAEL S. NADEL, ESQUIRE
 4        BY:  CHRISTOPHER E. WATTS, ESQUIRE
          The McDermott Building
 5        500 North Capitol Street, Northwest
          Washington, D.C.  20001
 6        202-756-8000
          mnadel@mwe.com
 7        cwatts@mwe.com

 8

 9   ON BEHALF OF JRH AND MRH DEFENDANTS:

10        WILMERHALE
          BY:  SAM MCHALE, ESQUIRE
11        BY:  JERRY A. SALVATORE, ESQUIRE
          2100 Pennsylvania Avenue, Northwest
12        Washington, D.C.  20037
          202-663-6000
13        sam.mchale@wilmerhale.com
          jerry.salvatore@wilmerhale.com
14

15   ON BEHALF OF THE WITNESS:

16        COOPER LEGAL, LLC
          DAYNA C. COOPER, ESQUIRE
17        1 Olympic Place, Suite 900
          Towson, Maryland  21204
18        202-642-5470
          dayna@cooperlegalsolutions.com
19

20

21

22
```



```
 1                    INDEX TO EXAMINATION

 2     WITNESS:  JENNIFER IZUMI

 3
       EXAMINATION BY                         PAGE
 4
       MR. MCHALE                               6
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```



```
                     INDEX TO EXHIBITS
                      JENNIFER IZUMI
       Northwestern Mutual Life Insurance Company v.
         J.R.H. ex. rel., Maleequa C. Hall, et al.
              Lori J. Goodin, RPR, CLR, CRR,
              RSA, California CSR #13959


EXHIBIT       DESCRIPTION                        PAGE

Exhibit 1     Subpoena to Biz Markie, Inc.        18

Exhibit 2     Subpoena to Balancing Acts, Inc.   30

Exhibit 3     Text message exchange,

              2/23/22, M1JB000000205              46

Exhibit 4     Ms. Izumi's LinkedIn profile       76

Exhibit 5     Shareholders' Certificate          128

              NWMI-JDI-00001942

Exhibit 6     Stockholders' Agreement            129

              NWMI-JDI-00003982

Exhibit 7     Text message exchange,

              6/14/18, M1JB00000264               217

Exhibit 8     BMI's Articles of Incorporation,

              2/4/2015, NWMI-JBI-00001436         229

Exhibit 9     BMI bylaws, NWMI-JBI-00001454       253

Exhibit 10    Policy A life insurance policy,     277

              1/10/16, NML Subpoena

              Response 000064
```



```
 1                    INDEX TO EXHIBITS
                        JENNIFER IZUMI
 2         Northwestern Mutual Life Insurance Company v.
           J.R.H. ex. rel., Maleequa C. Hall, et al.
 3                Lori J. Goodin, RPR, CLR, CRR,
                   RSA, California CSR #13959
 4

 5    EXHIBIT      DESCRIPTION                      PAGE

 6    Exhibit 11  Northwestern Mutual Business      297

 7                Risk Management website,

 8                4/22/24

 9    Exhibit 12  Policy B life insurance policy    300

10                NML Subpoena Response 000214

11

12

13         (Exhibits retained by reporter.)

14

15

16

17

18

19

20

21

22
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              TUESDAY, APRIL 23, 2024, 7:14 a.m. PT

 2                         PROCEEDINGS

 3                           *   *   *

 4   Whereupon,

 5                       JENNIFER IZUMI,

 6   a witness called for examination, having been

 7   first duly sworn, was examined and testified as

 8   follows:

 9                           *   *   *

10                         EXAMINATION

11   BY MR. MCHALE:

12         Q.    Good morning, Ms. Izumi.  My name is

13   Sam McHale.  And I represent JRH and MRH in this

14   matter.

15               Please state your full name and

16   residential address for the record.

17         A.    Jennifer Izumi, 1905 Fifteenth

18   Street, Northwest, Number 32, Washington, D.C.

19   20009.

20         Q.    You have been deposed in another

21   case entitled Hall V.  Biz Markie, Inc., correct?

22         A.    Correct.
```



 1  |  I'm sorry.  Could you ask that question again?

 2  |          Q.    Why were you designated as a

 3  |  representative to provide testimony for Biz

 4  |  Markie, Inc., in this case?

 5  |          A.    In this case.  Because, because BMI

 6  |  was named in the case.

 7  |          Q.    Why were you, rather than some other

 8  |  employee or agent of Biz Markie, Inc. designated

 9  |  to provide testimony for the company today?

10  |          A.    I am the now sole owner, because

11  |  Mr. Hall, or Biz, passed away, but I, since

12  |  inception, have been 51 percent majority owner.

13  |          Q.    Is it your understanding that you

14  |  now own 100 percent of the shares of BMI?

15  |          A.    Is it my understanding that I own

16  |  100 percent of the shares?

17  |                It is not my wheel house.  I would

18  |  need to defer to my attorney.

19  |          Q.    But you are the sole owner of BMI,

20  |  Inc., correct?

21  |          A.    Correct.

22  |          Q.    Why were you designated as the



1    experience.

2              A.    Yes.

3              Q.    And BizMont Entertainment, Inc.

4                    Do you see that in the page?

5              A.    Yes.  BizMont Entertainment, Inc.,

6    yes.

7              Q.    Under BizMont Entertainment, Inc.

8    you write, "Managed daily operations, brand

9    strategy, strategic partnerships while function

10   as PR and legal liaison for represented talent

11   roster."

12                   Do you see that?

13             A.    I do.

14             Q.    That accurately reflects your

15   responsibilities at BizMont; is that right?

16             A.    Yes.

17             Q.    You are not a lawyer, correct?

18             A.    No.

19             Q.    But you served as a legal liaison,

20   right?

21             A.    Yes.

22             Q.    What does that mean?



1          A.    I reviewed and negotiated contracts.

2    And after 16 years, a lot of the legal verbiage

3    is the same for the majority of the artists.

4                So, I am very familiar with the

5    information.

6          Q.    When you say familiar with the

7    information, what are you referring to?

8          A.    Contracts.  So, contracts between,

9    you know, the artists and/or their companies and

10   the client.

11         Q.    And who was the client that you are

12   referring to in your previous answer?

13         A.    Who was the client?  The clients

14   would be just various, various, various clients.

15               So, various entities that wanted to

16   book certain talent for their events.

17         Q.    So, were these clients of BizMont

18   Entertainment or somebody else's clients?

19         A.    Both.  Could be BizMont.  Could be

20   separate from BizMont.

21               You, after being in the

22   entertainment industry for 98 -- for, you know,



1   had no idea about the sources of revenue that the

2   company had; is that right?

3              MS. COOPER:  Objection, relevance.

4              THE WITNESS:  For the talent roster,

5       yes.  Managing daily operations, I can speak

6       on that.  I can't speak on all of BizMont

7       Entertainment's income.

8   BY MR. MCHALE:

9       Q.    After you left -- strike that.

10             Why did you leave BizMont

11  Entertainment?

12      A.    Lamont Wanzer passed away.

13      Q.    He died in December of 2014; is that

14  right?

15      A.    No, that is incorrect.

16      Q.    When did he die?

17      A.    November 2014.

18      Q.    And upon his death, what happened to

19  BizMont Entertainment?

20             MS. COOPER:  Objection, relevance.

21             THE WITNESS:  The company folded.

22      The company closed.



JENNIFER IZUMI                                                April 23, 2024
NW Mutual Life Ins v J.R.H.                                          90

```
 1   BY MR. MCHALE:
 2         Q.    Earlier today you referenced a
 3   person named Mr. Hall or Biz Markie; is that
 4   right?
 5         A.    Yes.
 6         Q.    Did they all refer to Marcel Theo
 7   Hall or Mr. Hall, or Biz, as I believe you have
 8   already.
 9               If I use either of those terms, you
10   will understand that I am referring to Mr. Hall?
11         A.    Yes.
12         Q.    You worked for Mr. Hall prior to
13   your time at Biz Markie, Inc., correct?
14         A.    Yes.
15         Q.    And that was at BizMont
16   Entertainment?
17         A.    Yes.
18         Q.    And you said that he along with
19   Mr. Wanzer hired you to work at BizMont
20   Entertainment; is that right?
21         A.    Yes.
22         Q.    Did Biz have an ownership stake in
```



1    BizMont Entertainment?

2         A.    No.

3         Q.    How is it that he came to hire you?

4         A.    Biz and Monte worked closely with

5    one another.  And if you work in the

6    entertainment industry, there are a lot of people

7    that want to, that want to or are willing to work

8    with artists.  And artists normally have a very

9    small circle of trust.

10              And so, an artist, and not just

11   their manager, needs to give their, as you would

12   say in the entertainment industry, you would say

13   their blessing or approval.

14              It is not like corporate America

15   where you are sitting down and having a formal

16   interview.

17              And so, since I had already been

18   doing, you know, some part-time work prior to

19   coming on full-time, Biz, Mr. Hall, if you -- and

20   if you would prefer me to refer to him one way,

21   just let me know.

22              But, so, prior to coming on



 1  full-time, Lamont and Biz came to see that I was

 2  an asset to the company and would be able to help

 3  them and felt comfortable and trusted me.

 4          So, it wouldn't just be because

 5  Monte was 100 percent owner that Monte was the

 6  sole person that would hire me.

 7      Q.   Was Mr. Wanzer the 100 percent owner

 8  of BizMont?

 9      A.   Yes.

10      Q.   When you were employed at BizMont

11  Entertainment, did you have an employment

12  contract with Mr. Hall?

13      A.   No.

14          MS. COOPER:  Objection, relevance --

15      I will withdraw that objection.  Sorry.

16  BY MR. MCHALE:

17      Q.   After you left BizMont Entertainment

18  your next job was at Biz Markie, Inc.; is that

19  correct?

20      A.   Correct.

21      Q.   You worked at Biz Markie, Inc. since

22  it was founded; is that right?



1            And so BizMont -- and Biz and I had

2   talked about different company names and he

3   wanted to -- he actually wanted to come up with a

4   fusion, just like BizMont, something that was

5   like Biz and Jenni.  And I said for brand

6   marketing purposes it should be Biz Markie,

7   Incorporated.

8            And it shouldn't be anything else

9   other than that.  And it should have always been

10  Biz Markie, because you want that -- it is like,

11  like I said, marketing.

12            It is the packaging.  It is the

13  name.  It is the font.  It is all of the things

14  that you want your consumers, your clients, your

15  fans to constantly see.

16            So, Biz Markie was the obvious

17  choice.

18       Q.   Biz Markie, Inc. was created to

19  receive Biz's entertainment income.  Right?

20       A.    Biz Markie, Inc. was created as a

21  partnership with Biz and I, because I was like at

22  that time I was like -- I mean I had been almost



1    20 years since we had been working with one

2    another.

3              And, it was created to continue, you

4    know, Biz --

5              After Lamont's passing, Biz didn't

6    have to choose to go into business or for us to

7    be business partners.

8              He could have picked anyone.  And

9    because he trusted me in working with him for

10   almost 20 years, we decided that it would be to

11   continue his brand legacy and to strengthen his

12   brand legacy.

13             You know, he had been in the

14   industry for, at that time, it was like '90's,

15   2000's -- you know, for almost 30 years.

16             So it wasn't solely for income.  It

17   was about his.  It was about his brand and

18   continuing his brand legacy.

19             That is why Biz Markie, Incorporated

20   was conceived, if you want to say that.  And it

21   was definitely, you know, a project for Biz and I

22   working together for so long, you know.



```
 1                    And you end up becoming, you form a,

 2    not just a business relationship but, you know, a

 3    friendship.  And you consider each other family.

 4                    So, that was definitely a -- sorry,

 5    a continuation of, you know, his brand.  It

 6    wasn't so we could just make income.

 7                    Because there wasn't a lot of income

 8    that we were making or that we made.  And

 9    unfortunately he passed before I feel like he

10    actually would have seen it to be really

11    lucrative.

12         Q.    A brand exists in order to help make

13    additional income.  Correct?

14                    MS. COOPER:  Objection, relevance.

15                    THE WITNESS:  A brand exists to make

16        additional income?

17                    I think our belief in a brand is

18        staying authentic.

19                    And if you know Biz, it is really to

20        be -- you know, I can only speak about Biz's

21        brand, right.

22                    So, a brand is for, you know,
```



1    know, some administrative things as well, but

2    really oversaw the administrative things.

3          Q.    Is there anything else that you did

4    in your capacity as CEO for Biz Markie, Inc.?

5          A.    Day-to-day affairs, marketing,

6    branding.  Generating new business, retaining

7    current business.  Opportunities, assisting -- I

8    would say a -- also, you know, personal, medical,

9    financial advisor to Biz.

10               You know, we had been working

11   together, like I said, for over 20-plus years.

12               So, we probably talked almost every

13   day about a lot of things.  So, yes, I would say

14   those would be the majority of my roles and

15   responsibilities.

16         Q.    You said you provided medical advice

17   to Biz in your capacity as CEO of Biz Markie,

18   Inc.?

19         A.    As -- as a, again, so I know you

20   want to say CEO.  But CEO is fluid with Partner.

21   We consider each other family.

22               And so, yes, I encouraged Biz to try



 1   and be heart healthy.  Diet.  Go to his medical

 2   appointments, eat healthier.

 3              It is hard when you are on the road

 4   and you are eating at all hours of the night.

 5              So, yeah, definitely encouraged him.

 6   And he trusted me -- you know, I don't want to

 7   say medical advice like you have to take this

 8   prescription -- like, I couldn't say that to him.

 9              But medical advice in the sense of

10   living a heart healthier life.

11        Q.    You provided financial advice to Biz

12   as well, correct?

13        A.    Yes, advice, opinion, yes.  Because

14   we shared a company together.

15              So, he and I would talk and advise

16   and -- one another on what we thought would be

17   best for the business.

18        Q.    Did you ever provide advice to Biz

19   about what would be best to him personally?

20        A.    You couldn't advise on, you

21   couldn't -- --

22              MS. COOPER:  Sorry, objection asked



1          Q.    Your responsibilities at Biz Markie,

2     Inc. did not change substantially over time.

3     Correct?

4          A.    At BMI?

5          Q.    Yes.  At BMI.

6          A.    No.

7          Q.    How were you compensated for your

8     work at Biz Markie, Inc.?

9          A.    Compensated?  You know, our company

10    was set up as 51/49, when we started in February

11    of 2015.

12               So, income wise, it was

13    51/49 percent compensation.

14         Q.    When you say it was 51/49 percent

15    compensation, what do you mean by that?

16         A.    You asked how I was compensated.

17    So, normally, you know, like after --

18               So, normally after, you know, our

19    expenses, it was 51/49, but we were just always

20    set up as 51/49 percent.  That is how we will be

21    compensated.

22               And so normally we would -- we



1  didn't have a lot of money.  But, so, you know,

2  we would pay bills.  And then anything that was,

3  you know, left over we would try and do the

4  51/49 percent.  But the priority was to make sure

5  that our overhead expenses were paid.

6       Q.   So, after you paid any overhead

7  expenses for Biz Markie, Inc., any remaining

8  money was divided along a 51/49 split.  Is that

9  right?

10           MS. COOPER:  Objection, asked and

11       answered.

12  BY MR. MCHALE:

13       Q.   You may answer.

14           MS. COOPER:  And I would also object

15       to mischaracterization of her testimony.

16  BY MR. MCHALE:

17       Q.   You may answer.

18       A.   So, yes.  I mean, we would always

19  try and do, excuse me, 51/49 percent.

20       Q.   And does that mean that you would

21  receive 51 percent of the income?

22       A.   No, that is not really how it was



 1    broken down.  It was really, if -- after the

 2    expenses were, you know, paid, if it was 51/49,

 3    then yes, we would try and pay out 51/49.

 4           Q.    I'm going to ask the question one

 5    more time because I'm not sure that you actually

 6    answered it.

 7           A.    Okay.

 8           Q.    Are you saying that after Biz

 9    Markie, Inc. paid its overhead expenses, any

10    money left over was divided with 51 percent going

11    to you and 49 percent going to Biz?

12               MS. COOPER:  Objection, asked and

13        answered.  Go ahead, Jenni.

14               THE WITNESS:  I mean we were just

15        set up as 51/49 percent.  So, yes, I mean we

16        were set up as 51/49 percent, and if there

17        was any money left over after our expenses

18        then yes, we would try and break it down

19        51/49 percent.

20    BY MR. MCHALE:

21           Q.    And if you, if there were money left

22    over after expenses were paid, who received



1    51 percent?

2          A.    I would.  At least that is the way

3    that we would try and break it down.

4          Q.    And Biz would receive 49 percent.

5    Correct?

6          A.    Yes.  Usually.  Sometimes.  If it

7    worked out that way.

8          Q.    Why would it not work out that way?

9          A.    Sometimes Biz received more money.

10   If Biz, if Biz ever needed additional money, if

11   you would ever receive additional money, we

12   wanted to make sure -- so, he wouldn't -- so, I'm

13   sorry.  Could you ask -- I mean, could you ask

14   the question again?

15         Q.    I asked you whether it was correct

16   that Biz would receive 49 percent of any money

17   left after overhead was paid.

18         A.    Uh-huh.

19         Q.    And yes, usually, sometimes, if it

20   worked out that way.

21         A.    Yes.

22         Q.    I asked why would it not work out



1   that way?

2          A.    Because sometimes Biz needed -- I

3   don't want to say needed.  Sometimes Biz wanted,

4   requested money for himself for whatever reason.

5   And if that was the case, then we would 1099 him

6   or pay a personal bill.

7                And so, you know, we just tried to

8   always, we tried to always make sure, you know,

9   that he had 49 percent capital, so --

10         Q.    What does it mean when you say you

11  would 1099 him?

12         A.    In the event that Biz requested

13  money for whatever reason and we then ACH or

14  wired him money from BMI's bank account, you

15  know, to make sure that it was accounted for,

16  then we would 1099 him at the end of the year.

17         Q.    What does it mean to 1099 him at the

18  end of the year?

19         A.    You don't know what 1099 means?

20  When someone gets 1099ed?

21         Q.    My question is what does it mean to

22  1099 Biz at the end of the year?



 1   Mr. Hall's personal tax returns for the years

 2   2015 and 2016 also show the split?

 3          A.   Yes.

 4          Q.   And for Mr. Hall's personal tax

 5   returns, the 51/49 split is shown on Schedule E.

 6   Is that right?

 7          A.   Yes.  And that -- any of those

 8   splits would be shown on his Schedule E tax

 9   returns.

10          Q.   And why would the 51/49 split not

11   appear on Mr. Hall's 2017, 2018, 2019, or 2020

12   returns?

13          A.   It would.

14          Q.   So, the split is shown on the

15   business tax returns for Biz Markie, Inc. from

16   2015 through 2020 and on Biz's personal tax

17   returns for the same period of time; is that

18   right?

19          A.   Yes.

20          Q.   We had also referenced a line of

21   credit that reflects the 51/49 split; is that

22   right?



JENNIFER IZUMI                                          April 23, 2024
NW Mutual Life Ins v J.R.H.                                        132

1          A.    Yes.

2          Q.    What line of credit are you

3    referring to?

4          A.    Truist, formerly BB&T.  $50,000 line

5    of credit that we had.

6          Q.    When you say we, who are you

7    referring to?

8          A.    BMI.

9          Q.    When was that line of credit

10   established?

11         A.    2019.

12         Q.    And how does the line of credit

13   establish the 51/49 split that you have referred

14   to?

15         A.    We submitted our business and

16   personal tax returns.

17         Q.    Aside from any business or personal

18   tax returns that were submitted in connection

19   with the line of credit, is there anything else

20   in the line of credit that establishes the 51/49

21   split?

22         A.    Could you repeat the question again?



1  inebriated that Biz had to leave the event that

2  he was working to then take her back to her

3  hotel.

4              And he was concerned about her

5  drinking.  And after a period of time he then

6  ended the relationship with her because he was

7  uncomfortable with her drinking.

8              And -- met Tara, so, when did I meet

9  Tara?  So, it was 2003.  They got married.  So

10  some time after they got married.  So, some time

11  after October the -- after October of 2018.

12       Q.    So, you didn't attend Biz and Tara's

13  wedding; is that right?

14       A.    No.

15       Q.    Do you recall where you first met

16  Tara?

17       A.    At Biz's house.

18       Q.    And she lived at Biz's house at that

19  time, correct?

20       A.    Correct.

21       Q.    Did you come to her house with

22  Ms. Diaz at that time?



1          A.    We were continuing to get a list of

2     his assets together and personal affairs.  I say

3     assets, but personal affairs together.  And that

4     was just one of the things that we had discussed.

5                And Biz didn't trust anyone else to

6     go through his vinyl.

7          Q.    Why were you working to get a list

8     of his assets and personal affairs together?

9          A.    Because he -- we started getting a

10    list of his personal affairs, assets together,

11    after Monte had passed.

12               So, probably -- so, yes, so it was

13    some time in 2015 we had started that journey

14    together in the event that, you know, something

15    happened to Biz, also, if we wanted to insure

16    anything.

17               And then, and then also we had

18    discussed before Tara and Biz got married, a

19    prenup, a prenup.

20               So, yeah, to, you know, just again

21    get his personal affairs in order.

22          Q.    And when you say that we had



1            MS. COOPER:  Objection, relevance.

2            THE WITNESS:  Because from that date

3    to when Biz was hospitalized, he never shared

4    that information nor voiced that he wanted to

5    share that information with her.  He never

6    included her on any of his assets, so his

7    home, any of his cars, any of the utilities.

8            And he told me one day that Tara and

9    her sister wanted to start a booking agency.

10    And Biz laughed because he said I would like

11    to see her try.  It is not as easy as you

12    think, and she thinks that she can get dates

13    for me.  I told her that is fine, but

14    everything has to go through Jenni.

15            And, it was another way of him

16    feeling like she was trying to gain access to

17    Biz's business affairs.

18            And another time, you know, as well

19    after they had gotten married, I received an

20    e-mail from Tara's accountant stating that

21    because Biz and Tara were married, that she

22    was going to file Biz's personal taxes and



1   BMI's tax returns.

2            And I told Biz, remember, we have

3   already filed BMI's tax returns because those

4   are due in March.  So, she missed the

5   deadline for that.

6            And, for your personal tax returns,

7   we had already discussed that -- missed the

8   deadline for that.

9            And, and then for the personal tax

10  returns, I let him know you have the option

11  to file married or you could file married but

12  separate.  And he was like huh, married but

13  separate?

14           And I was like, yes, so just because

15  you are married does not mean that you have

16  to file your taxes together.  You can file

17  them separately, where you are still filing

18  your taxes but you are filing them separately

19  but you are stating that you are married.

20           And so, he, through the

21  conversation, then understood that he would

22  not have to share any of his personal or



JENNIFER IZUMI                                                    April 23, 2024
NW Mutual Life Ins v J.R.H.                                              210

```
 1        business income because he could file married

 2        but separate.

 3               And that is what he chose to do.

 4        And he felt like it was another way for Tara

 5        to try and get into his business.  And I

 6        would say personal affairs, because she

 7        didn't have access to, you know, his assets

 8        and bills, as well as his income and business

 9        income.

10               And so, it made him feel

11        uncomfortable where he had trust issues as to

12        why Tara would want to or try to find

13        different ways to access his personal and

14        business finances.

15    BY MR. MCHALE:

16         Q.    So, the first, the first thing that

17    you referenced was the conversation with Biz

18    about Tara Hall wanting to start her own booking

19    agency.

20               Do you remember that?

21         A.    I do.

22         Q.    When did that conversation occur?
```



JENNIFER IZUMI                                                April 23, 2024
NW Mutual Life Ins v J.R.H.                                              231

```
 1          Q.    And how was that particular

 2   allocation of shares determined?

 3          A.    Initially, when we started having

 4   conversations about establishing a company, we

 5   talked about naming the company.  We talked about

 6   who would own the company.

 7                And through multiple conversations

 8   came up with 51/49 percent.  51 percent me being

 9   the majority owner, Marcel Hall being 49 percent.

10                And that was because, you know, in

11   the event that Biz got sick or something happened

12   to him, Biz wanted me to -- wanted me to continue

13   to maintain his brand legacy.

14                And so we settled on making sure

15   that I was the majority owner.

16          Q.    And how would being the majority

17   owner of Biz Markie, Inc. enable you to continue

18   to maintain his brand legacy?

19          A.    We would be able to continue his

20   brand legacy by, you know, selling merchandise,

21   doing any type of, you know, before it was

22   holograms, now it is AI voiceovers, and, you
```



1  know, possible collaborations with other types of

2  businesses using Biz's likeness.

3          Q.    Why did you need to own 51 percent

4  of the company to do that?

5          A.    Biz wanted me to.  Biz actually

6  wanted me to just own the company 100 percent

7  outright, but it would enable me to continue to

8  carry on the same business practices, and again,

9  preserving his legacy.

10              Having all of the historical

11  knowledge of working with Biz over the 20-plus

12  years and -- working with Biz over the 20-plus

13  years, him sharing his historical knowledge with

14  me about his career, would allow me to do that,

15  being majority owner.

16          Q.    My question was why do you need to

17  be majority owner to do that?

18          A.    Because Biz wanted me to.

19          Q.    So there was no need for you to be a

20  51 percent owner to continue to do the work that

21  you described in your previous answer, right?

22          A.    No.  It was under our impression



JENNIFER IZUMI                                        April 23, 2024
NW Mutual Life Ins v J.R.H.                                      233

1  | that if I was majority owner -- it was to our

2  | understanding, that if I was majority owner, then

3  | I would be able to facilitate things seamlessly

4  | or continuously in the event that Biz got sick

5  | and/or that Biz passed.

6  |        Q.    Is it your understanding that you

7  | would not be able to run the business if you only

8  | had a 49 percent stake in the business?

9  |        A.    Not clear about that.  But, just

10 | knowing that if you are majority owner, there

11 | shouldn't be, you know, an issue.  Or if you are

12 | a sole owner then there shouldn't be an issue

13 | with continuing to, to continue the work.

14 |              But, who knows, hence why we are

15 | here.

16 |        Q.    At least while Biz was alive, you

17 | were not the sole owner of Biz Markie, Inc.,

18 | right?

19 |        A.    Correct.

20 |        Q.    When did you first acquire 51 shares

21 | of Biz Markie, Inc.?

22 |        A.    Since the inception.



```
 1                And, more so that because his trust

 2    circle was extremely small, that if he needed or

 3    wanted access to any of our finances, that his

 4    name would be listed on the documents as well as

 5    any accounts that we opened.

 6          Q.    So, initially, Biz wanted you to be

 7    the sole owner of Biz Markie, Inc.; is that

 8    right?

 9          A.    Yes.

10          Q.    But prior to the actual

11    incorporation of Biz Markie, Inc., he decided

12    that you should be the majority owner.  Is that

13    right?

14          A.    He didn't decide.  We decided.  It

15    was a -- it was a collaborative decision.

16          Q.    So the two of you agreed, prior to

17    incorporation, that you would be the majority

18    owner of Biz Markie; is that right?

19          A.    Yes.

20                MS. COOPER:  Objection, asked and

21       answered.

22    BY MR. MCHALE:
```



1          Q.    And as a result, you were entitled

2     to a majority of the income from Biz Markie,

3     Inc.; is that right?

4          A.    Correct.

5          Q.    Why did Biz agree that you would

6     make more money on the company than he would?

7          A.    Because he wanted me to, again in

8     the event that he got sick or he passed.

9               He wanted to make sure that I would

10    be able to execute those things.  That there

11    wouldn't be a delay in his business and personal

12    affairs, again, if he were to get sick or pass.

13    And things would be as seamless of a transition

14    as possible.

15               And, I think from, you know -- yeah,

16    I mean that would be the reason.  I mean, he

17    wanted me to.

18          Q.    So, he didn't explain to you why he

19    thought you should make more money from his

20    company than he did; is that right?

21               MS. COOPER:  Objection, asked and

22       answered.

