# **EXHIBIT 6**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------

TARA HILL AS PERSONAL              :
REPRESENTATIVE OF THE              :
ESTATE OF MARCEL THEO HALL,:
                                   :
    Plaintiff,                    :
                                   : Case No.:
vs.                                :
                                   : 1:22-cv-00806(CKK)
BIZ MARKIE, INC.,                  :
et al.,                            :
                                   :
    Defendant.                    :
---------------------------

VIDEOCONFERENCE DEPOSITION OF
NICHOLAS P. CUSATO, CPA

DATE:           January 31, 2024
TIME:           9:32 a.m. to 2:08 p.m.
LOCATION:       Witness Location

REPORTED BY:  Felicia A. Newland, CSR


Veritext Legal Solutions
1250 Eye Street, N.W., Suite 350
Washington, D.C. 20005

Page 2

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | On behalf of Plaintiff: |
| 3 | PETER C. NANOV, ESQUIRE |
| 4 | Vorys Sater Seymour & Pease, LLP |
| 5 | 200 Public Square |
| 6 | Suite 1400 |
| 7 | Cleveland, Ohio 44114 |
| 8 | pcnanov@vorys.com |
| 9 | On behalf of Defendants: |
| 10 | DAYNA COOPER, ESQUIRE |
| 11 | Cooper Legal |
| 12 | 1 Olympic Place |
| 13 | Suite 900 |
| 14 | Towson, Maryland 21204 |
| 15 | dayna@cooperlegalsolutions.com |
| 16 | On behalf of the Witness: |
| 17 | AARON NEAL, ESQUIRE |
| 18 | McNamee Hosea |
| 19 | 6404 Ivy Lane |
| 20 | Suite 820 |
| 21 | Greenbelt, Maryland 20770 |
| 22 | aneal@mhlawyers.com |

```
                                                         Page 3
 1                      C O N T E N T S
 2      EXAMINATION BY:                                  PAGE
 3           Counsel for Plaintiff                          6
 4           Counsel for Defendants                       151
 5              CUSATO DEPOSITION EXHIBITS
 6      NO.    DESCRIPTION                               PAGE
 7    Exhibit 1    Subpoena to Testify at a Deposition in a    8
 8                 Civil Action
 9    Exhibit 2    Power of Attorney, dated January 13,      35
10                 2021
11    Exhibit 3    Marcel Hall 2015 1040 Tax Return          39
12    Exhibit 4    Marcel Hall 2016 1040                     41
13    Exhibit 5    Marcel Hall 2017 1040                     51
14    Exhibit 6    Marcel Hall 2018 1040                     58
15    Exhibit 7    Marcel Hall 2019 1040                     60
16    Exhibit 8    Marcel Hall 2020 1040                     64
17    Exhibit 9    Biz Markie, Incorporated 2015 1120S       72
18    Exhibit 10   Biz Markie, Incorporated 2016 1120S       74
19    Exhibit 11   Biz Markie, Incorporated 2016 1120S       78
20    Exhibit 12   Amended 2017 Corporate Tax Return for     80
21                 Biz Markie, Inc.
22    Exhibit 13   Biz Markie, Incorporated 2018 1120S       85
```

Page 4

| | | | |
|---|---|---|---|
| 1 | Exhibit 14 | Biz Markie, Incorporated 2019 1120S | 88 |
| 2 | Exhibit 15 | Biz Markie, Incorporated 2020 1120S | 90 |
| 3 | Exhibit 16 | Biz Markie, Incorporated 2021 8879S | 92 |
| 4 | Exhibit 17 | Biz Markie, Incorporated 2022 8879-CORP | 94 |
| 5 | Exhibit 31 | Bates Numbers Cusato_00387 to 405 | 96 |
| 6 | Exhibit 32 | Bates Numbers Cusato_00406 through 407 | 106 |
| 7 | Exhibit 33 | Bates Numbers Cusato_00408 through 466 | 107 |
| 8 | Exhibit 34 | Bates Numbers Cusato_472 through 530 | 112 |
| 9 | Exhibit 35 | Bates Numbers Cusato_531 through 602 | 116 |
| 10 | Exhibit 18 | Jennifer D. Izumi 2015 1040 | 121 |
| 11 | Exhibit 19 | Jennifer D. Izumi 2016 1040 | 127 |
| 12 | Exhibit 20 | Jennifer D. Izumi 2017 1040 | 128 |
| 13 | Exhibit 21 | Jennifer D. Izumi 2018 1040 | 131 |
| 14 | Exhibit 22 | Jennifer D. Izumi 2019 1040 | 134 |
| 15 | Exhibit 23 | Jennifer D. Izumi 2020 1040 | 135 |
| 16 | Exhibit 24 | Balancing Acts, Inc. 2015 1102S | 137 |
| 17 | Exhibit 25 | Balancing Acts, Inc. 2016 1120S | 139 |
| 18 | Exhibit 26 | Balancing Acts, Inc. 2017 1120S | 141 |
| 19 | Exhibit 27 | Balancing Acts, Inc. 2018 1120S | 142 |
| 20 | Exhibit 28 | Balancing Acts, Inc. 2019 1120S | 143 |
| 21 | Exhibit 29 | Balancing Acts, Inc. 2020 1120S | 144 |
| 22 | Exhibit 36 | Bates Numbers Cusato_00603 through 657 | 146 |

1  Exhibit 30     Subpoena to Produce Documents,                148
2                 Information, or Objects or to Permit
3                 Inspection of Premises in a Civil Action
4         (*Exhibits attached to transcript.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 6

```
 1                     P R O C E E D I N G S
 2                         *  *  *  *  *
 3         Whereupon,
 4                   NICHOLAS P. CUSATO, CPA
 5         was called as a witness and, having been first duly
 6         sworn, was examined and testified as follows:
 7                EXAMINATION BY COUNSEL FOR PLAINTIFF
 8         BY MR. NANOV:
 9              Q    Mr. Cusato, could you please state
10         your full name for the record, please?
11              A    Nicholas Paul Cusato.
12              Q    Thank you again for joining us today.
13         I have a number of questions that I would like to
14         go through with you, but before I start with that,
15         I'd like to set a few ground rules.
16                   Have you ever been deposed before?
17              A    I have not.
18              Q    Okay.  So basically I'm going to be
19         asking you some questions, you're going to be
20         responding.  When you do respond, I'd ask that you
21         provide a verbal response, no head nods, no
22         "huh-uhs," you know, that kind of thing.
```

1    A    Well, Jennifer Izumi, and previously
2    Marcel Hall, but I believe now Tara Hall has
3    probably assumed his percent.
4    Q    Okay.  And have you ever seen any
5    documents to reflect that ownership?
6    A    Yes.
7    Q    And do you recall what those
8    documents were?
9    A    2553.  That's the document that gets
10   filed when an S corp is created.
11   Q    Okay.  And do you know -- strike
12   that.
13        Was the ownership of Biz Markie ever
14   discussed on the phone calls that you were a party
15   to?
16   A    Yes.
17   Q    How so?
18   A    So initially, when I first was
19   beginning to understand them and work with them,
20   Biz had -- or Marcel had begun the process of
21   searching for a new home, and the three of us were
22   on a phone call discussing things.  I was just more

1    listening at the time to get an understanding of
2    what was going on.  And they discussed the
3    percentage, how it was set up at 51/49.  And
4    Marcel, due to -- I don't know if you've ever been
5    involved with this as a business owner, but when
6    you attempt to obtain a loan, it's very difficult
7    when you have self-employment income.
8              And so that was kind of like they
9    were running into some difficulties there.  And so
10   Marcel suggested to Jenni, essentially, I can't
11   remember word for word, but he had suggested, "Why
12   don't we just make you 100 percent owner and just
13   keep me on payroll."  Because his interest was not
14   in really owning the business, you know, he just
15   wants to get paid.  I got the impression -- and
16   this was just the impression that I got from
17   hearing these words that he's more interested in
18   just receiving money and being taken care of rather
19   than the business.
20             And he had always stated in the calls
21   that we had been on that the business was for her
22   and to make sure she was taken care of.  So

Page 22

```
 1         that's -- that's my exposure to that.
 2               Q     Do you know if that ownership
 3         arrangement percentage ever changed?
 4               A     Not during my time.
 5               Q     Okay.  Do you know how many
 6         employees, if any, other than Mr. Hall and
 7         Ms. Izumi, Biz Markie, Inc. had?
 8               A     So they would occasionally have
 9         interns.  The one most stable employee that I would
10         call an employee was Elizabeth, who -- you know, it
11         was like sometimes she was, like, definitely always
12         there and then other times she wasn't, so -- but
13         she was pretty stable throughout a good portion,
14         through the beginning until probably around COVID.
15         She just wasn't always actively in the office for
16         whatever reason.  I don't know that.  I mean, they
17         weren't -- they weren't really like a button-down
18         business, so they kind of fluctuated more like by
19         needs of what was going on at the time.
20               Q     Got you.  Okay.
21                     Do you know if Biz Markie, Inc.
22         possessed any assets?
```

Page 23

1  A   They did, but it wasn't many.  And
2  from my understanding, with interactions with the
3  prior attorney -- or attorney -- accountant, the
4  type of like record, equipment, things like that,
5  stereos and DJ boards, and all that, had been
6  depreciated by the time I came on.  So that was
7  really, like, the only outside cash and things of
8  that nature.  There wasn't a lot of hard assets.
9  Q   Okay.  And if I refer to "Biz Markie,
10 Inc." throughout this conversation as "BMI," please
11 forgive me, that is what I am referring to.  It's
12 just easier for me to operate that way.
13 A   Okay.
14 Q   Okay.  How about the entity of
15 Balancing Acts, Incorporated, are you familiar with
16 that entity?
17 A   Yes.
18 Q   And do you know what kind of entity
19 that is?
20 A   Similar.  Essentially the same as
21 BMI, it was just smaller, if you will.
22 Q   Okay.  Do you have an understanding

Page 24

1      of the ownership of Balancing Acts?
2            A     Yes.
3            Q     And what is that understanding?
4            A     100 percent Jenni.
5            Q     Okay.  And, again, you mean Jennifer
6      Izumi?
7            A     Sorry.  Yes.
8            Q     Okay.  And do you know if that
9      ownership percentage ever changed?
10           A     It never did.
11           Q     Okay.  Did Balancing Acts have any
12     employees?
13           A     No.
14           Q     Do you know if Balancing Acts had any
15     assets?
16           A     They did not really have any assets
17     outside of cash.
18           Q     Okay.
19           A     They might have had a computer.  I
20     can't remember.  You know, small stuff, but not
21     like a computer or anything of that nature.
22           Q     What was your understanding of the

Page 26

1      A    I'm not 100 percent sure if I would
2   say did work.  Again, it's just that, you know,
3   concerts and kind of tandem.  I don't know if it
4   was directly like a contract was signed between the
5   two to specifically do it more.  It might have just
6   been more like a joint venture type of situations,
7   like both were doing things at the same concert
8   maybe.  And that's -- and I can't even say for
9   certain that that's exactly what was going on.  You
10  know what I mean?
11            I mean, I don't know.  It's kind of
12  vague.  Like they definitely did some things
13  together, I just can't say like they signed a
14  contract and decided to do X, X, and X.  Like, I
15  can't say that.
16       Q    Understood.  Okay.
17            Do you know if Balancing Acts ever
18  loaned money to BMI?
19       A    Yes, there was definitely a loan.
20  And I believe occasionally they could, like, if a
21  tax -- if taxes came up and say Marcel's taxes were
22  due, Jenni would just -- and there was no cash in

Page 27

1   BMI for some reason, she would send money from BAI
2   to cover that liability.
3           Q   Okay.  Do you know if BMI ever loaned
4   money to BAI?
5           A   That, I don't recall off the top of
6   my head.  I don't -- I genuinely don't remember if
7   BMI ever gave anything to BAI.  I think it was
8   probably more in the reverse.
9           Q   Okay.  And just for clarity, by
10  "BAI," we both understand that to mean Balancing
11  Acts --
12          A   Right.
13          Q   -- Incorporated?
14          A   Yes.
15          Q   Okay.
16              Okay.  Do you -- we talked about how
17  you got to know Ms. Izumi and how you were
18  initially hired.  Do you recall when exactly you
19  were first retained by either BMI or BAI?
20          A   I cannot recall the exact date.  I
21  know exactly where I was standing.  I happen to be
22  in Sanibel, Florida in a pool at a hotel.  And my

1    phone rang and I accepted the call.  It was
2    probably April or March of 2015, is what I'm
3    thinking.
4         Q    Okay.
5         A    And I -- yeah.  Yeah, that's all.
6         Q    In that initial conversation, do you
7    recall if you were hired specifically for one
8    entity versus the other or one person versus the
9    other or was it specified?  Was it wide open?
10        A    It was specifically at that point in
11   time for BMI, because if memory serves, BAI was not
12   in existence at the time.  That's what I was going
13   to say before, but just stopped.
14        Q    Okay.  And do you recall if you were
15   retained for any specific tasks or was that fairly
16   wide open as well?
17        A    It was pretty open, but I can give
18   you the general overview of why they wanted to make
19   a change, which was the prior accountant and --
20   yeah, I guess the owner who had passed, of the
21   prior, kind of the way they had it structured had
22   gotten them not audited, but kind of a hands-off

Page 30

1   because the prior accountant tended to do things
2   off the cuff.  So I said to them, "Go ahead,
3   purchase the QuickBooks software for the company
4   and then we will set up a process moving forward,"
5   which if we go further, I can explain.
6          Q    Okay.  So not necessarily purchased
7   for you, but purchased for BMI at your
8   recommendation?
9          A    Correct.
10         Q    Okay. All right.  I'd like to
11  specifically talk about your work for Marcel Hall.
12         A    Okay.
13         Q    What type of accounting services did
14  you provide to him personally, if any?
15         A    Tax prep at the end of year.  It was
16  part of just doing their business taxes, and then
17  it just made sense for them, and they were
18  comfortable with me then, to do their personal
19  taxes.
20         Q    And do you recall what type of
21  documents you may have received from Mr. Hall to be
22  able to prepare those tax returns?

Page 33

1  documents were, what the source of that income was?
2       A    Well, the 1095s, that's your health
3  insurance notice.
4       Q    Okay.
5       A    The 1099s, some were BMI, some were
6  other entertainment groups.  I cannot recall off
7  the top of my head.  I think GEP might be one, but
8  genuinely they're -- I can't remember exactly the
9  senders.
10      Q    Okay.  And did Mr. Hall receive both
11 1099s and W-2s from BMI?
12      A    He did.
13      Q    And do you recall what -- to me, that
14 sounds strange.  Do you recall why that was?
15      A    I can't tell you exactly why that
16 was.  Normally you would just do the W-2, but in --
17 like to protect his 49 percent, like they -- they
18 both had kind of said, "Well, all right, since it's
19 51/49, let's keep it here."  So instead of drawing
20 on his capital account, because Marcel tended to
21 take more money out of the business, we wouldn't
22 draw on his capital account, we would do it through

Page 34

1   1099s so it wouldn't affect his capital account,
2   because had it been done that way, his capital
3   account would actually be a lot lower and he would
4   have less ownership.  So in the sake of keeping
5   them where he was at, that is why that was done
6   that way.  Because I think if you were to go back
7   through, and those had been draws, his ownership
8   percentage would have dwindled quite a bit.
9          Q    I'm trying to follow that and
10  understand it.
11         A    So when you have a flow-through
12  business, it's not like a corporation or a C corp
13  or a publicly traded company, when your
14  flow-through entity, when the owners take money out
15  of the business, they have what's called a capital
16  account.  And if, say, let's look at 51/49, Jenni
17  Izumi and Marcel Hall, technically he's supposed to
18  stay in those parameters of the 49 percent no
19  matter -- you know, no matter what.  And if he
20  exceeds it, his percentage of ownership in the
21  company then begins to dwindle because he has now
22  taken it out above what he should have been based

Page 35

1     on the ownership percentages.
2               So in order to just keep them steady,
3     knowing that Marcel was going to always be taking
4     more out, it was -- it was like, okay, we'll put
5     that in 1099 rather than a capital draw and make
6     it, you know, so he's doing side work for the
7     company rather than him losing ownership in any
8     way.
9               And he didn't ask that, that was more
10    of let's just keep it this way so he doesn't lose
11    ownership.  It was kind of just a courtesy really.
12    But, you know, that's why it was done that way.
13         Q    Okay.  I'm going to shift gears here
14    a little at and I'm going to show you what I have
15    marked a Cusato Exhibit 2.
16             (Cusato Deposition Exhibit Number 2
17             marked for identification.)
18    BY MR. NANOV:
19         Q    And do you see that?
20         A    Yes.
21         Q    And scrolling through here to the
22    second page, do you recognize this document?