# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TARA HALL AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF MARCEL THEO HALL,

        Plaintiff,

        v.

BIZ MARKIE, INC., *et al.*,

        Defendants.

Case No.: 1:22-cv-00806 (CKK)

**PLAINTIFF, TARA HALL'S,
AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARCEL THEO HALL,
OPPOSITION TO
<u>DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     COUNTER-STATEMENT OF FACTS ............................................................... 2

III.    LEGAL STANDARD........................................................................................... 4

IV.     ARGUMENT ....................................................................................................... 5

      A.     Marcel Hall and Izumi Never Reached An Agreement On Izumi's
           Compensation ............................................................................................. 5

           1.     Defendants Have Not Produced An Agreement ......................................... 6

           2.     Even If There Were An Agreement As to The Ownership Structure
                of BMI, There is No Evidence Of Record Of An Agreement As To
                Izumi's Compensation ............................................................................. 7

      B.     In The Absence of An Agreement to The Contrary, Izumi Was Entitled
           Only To Reasonable Compensation And Is Liable For Having Breached
           Her Fiduciary Duty By Taking More Than She Was Entitled............................. 10

           1.     As A Business Manager in the Entertainment Industry, As A
                Holder of a General Power of Attorney, And As (Allegedly) The
                Majority Shareholder of BMI, Izumi Owed Fiduciary Duties to Mr.
                Hall........................................................................................................ 10

                a.     Mr. Hall Placed Special Trust and Confidence in Izumi,
                     Making Izumi a Fiduciary to Mr. Hall.......................................... 10

                b.     Mr. Hall Gave Izumi a General Power of Attorney, Making
                     Izumi a Fiduciary to Mr. Hall ...................................................... 11

                c.     Izumi Claims to Have Been Majority Shareholder of BMI,
                    Making Izumi a Fiduciary to Mr. Hall, Whom She Has
                    Claimed was the Minority Shareholder ........................................ 13

            2.     As Mr. Hall's Manager and Fiduciary, Izumi was Entitled Only to
                a Limited Portion of Mr. Hall's Income ................................................... 14

           3.     The Evidence of Record Demonstrates a Triable Issue of Fact As
                To Whether Izumi Paid Herself Excess Compensation In Breach of
                Her Fiduciary Duties.................................................................................. 15

      C.     Marcel Hall Made First Use of the Trademark "Biz Markie" And Never
           Assigned It, And Consequently The Trademark Belongs to His Estate ............... 18

      1.     Trademark Law Establishes Clear Rules for Initial Ownership of a Mark and Requires Strong evidence of Assignment or Abandonment ................................................................................. 18

      2.     Mr. Hall Owned the "Biz Markie" Mark .................................................. 19

      3.     No Evidence of Record—Let Alone Any "Strong Evidence"—Establishes BMI's Ownership of the "Biz Markie" Mark ....................... 20

      4.     In Any Event, The Estate's Name, Image, and Likeness Claims do not Depend on Mr. Hall's Ownership of the Mark .................................. 23

D.     There is No Contractual Agreement that Bars the Estate's Claims ..................... 25

E.     The Estate's Claims are Not Barred by Laches .................................................... 27

      1.     Defendants Have Failed to Demonstrate the Required Elements of the Defense of Laches ................................................................................. 27

            a.     The Continuing Tort Doctrine, the Discovery Rule, and the Effect of a Fiduciary Relationship Defeat a Laches Defense. ...................................................................................... 28

            b.     Defendants Have Not Demonstrated Lack of Diligence by the Estate with Respect to its Non-Trademark Claims ................ 29

            c.     Defendants Have Not Demonstrated Lack of Diligence by the Estate with Respect to its Trademark Claims ........................ 31

            d.     Defendants Have Not Demonstrated That They Have Been Prejudiced ................................................................................... 33

      2.     Laches Does Not Apply Because The Estate Has Sought Injunctive Relief ....................................................................................................... 36

F.     The Estate's Claims are Not Barred by "Corporate Law" ................................... 37

      1.     The Legal Principles Cited by Defendants Do Not Apply to This Matter ...................................................................................................... 37

      2.     Defendants Failed to Identify Acquiescence as an Affirmative Defense and Have Forfeited Any Such Defense....................................... 39

      3.     Defendants Have Failed to Present Adequate Facts to Establish Their Defense ............................................................................................ 40

G.     The Estate Has Disclosed Its Damages Claims .................................................. 42

H.     Defendants Are Not Entitled to Attorney Fees .................................................... 43

V.    CONCLUSION .................................................................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d Cir. 1983) .............................. 11

*AmBrit, Inc. v. Kraft, Inc*., 812 F.2d 1531 (11th Cir. 1986) ........................................................ 32

*Ashraf v. Fernandez*, 193 A.3d 129 (D.C.2018) ......................................................................... 26

*Bacardi & Co. v. Empresa Cubana Exportadora De Alimentos y Productos Varios*, No. 1:04-cv-00519, 2023 U.S. Dist. LEXIS 36993, 2023 WL 2384145 (D.D.C. Mar. 6, 2023) .......................................................................................................................................... 19

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co*., 417 U.S. 703 (1974)....................... 37, 38

*Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354 (D.C. Cir. 2013) ........................................... 5

*BDO Seidman, LLP v. Morgan, Lewis & Bockius LLP*, 89 A.3d 492 (D.C. 2014) ...................... 28

*Beard v. Edmondson & Gallagher*, 790 A.2d 541 (D.C. 2002) ........................................... 28, 31

*Borgo v. Goldin*, 204 F.3d 251 (D.C. Cir. 2000) .......................................................................... 5

*Cagle v. Hybner*, No. M2006-02073-COA-R3-CV, 2008 Tenn. App. LEXIS 389, 2008 WL 2649643 (Tenn. Ct. App. July 3, 2008) .............................................................................. 11

*Carey Canada, Inc. v. Columbia Casualty Co*., 940 F.2d 1548 (D.C. Cir. 1991) ...................... 14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) ................................................... 5

*Chubb Integrated Sys. v. Nat'l Bank of Wash.*, 658 F. Supp. 1043 (D.D.C. 1987)...................... 32

*Collins v. Collins*, 752 S.W.2d 636 (Tex.App.1988) ...................................................................... 6

*Crocker v. Piedmont Aviation*, 696 F. Supp. 685 (D.D.C. 1988) ................................................ 31

*Diamond v. Hogan Lovells US LLP*, 224 A.3d 1007 (D.C. 2020) ............................................... 14

*Digital Camera Int'l, Ltd. v. Antebi*, No. 11-cv-1823, 2017 U.S. Dist. LEXIS 109648, 2017 WL 2992719 (E.D.N.Y. July 14, 2017)........................................................... 38, 40, 41

*Drake v. McNair*, 993 A.2d 607 (D.C. 2010) .............................................................................. 29

*Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341 (D.C. Cir. 2008)............... 18, 19

*Estate of Elvis Presley v. Russen*, 513 F. Supp. 1339 (D.N.J. 1981) .......................................... 18

*Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413 (2d Cir. 2018) ......................................................................................................................................... 32

*Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550 (D.C. 2016) ...................................... 24

*Figgins v. Cochrane*, 403 Md. 392 (2008) ........................................................................ 11, 12, 30

*First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10 (D.D.C. 1998) ................................................ 38

*Flynn v. Fischer Tile & Marble, Inc.*, 246 F. Supp. 2d 48 (D.D.C. 2003) ................................... 19

*Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152 (D.D.C. 2007) ................ passim

*Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958 (D.C. Cir. 2016) .............. 4

*Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173 (Minn. App. 2001) ............. 41

*Hobbs v. Eichler*, 164 Cal. App. 3d 174 Cal. Rptr. 387 (Cal. Ct. App. 2d Dist. 1985) ............... 29

*In re Cannon*, 278 A.3d 726 (D.C. 2022) ..................................................................................... 14

*In re Porter*, 498 B.R. 609 (Bankr. E.D. La. 2013) ..................................................................... 11

*Ins. Co. of N. Am. v. Miller*, 765 A.2d 587 (Md. 2001) ............................................................... 10

*Island Insteel Sys. v. Waters*, 296 F.3d 200 (3d Cir. 2022) ........................................................ 32

*Jenkins v. Strauss*, 931 A.2d 1026 (Md. 2007) ................................................................. 11, 12, 30

*Johnson v. Perez*, 823 F.3d 701 (D.C. Cir. 2016) ......................................................................... 4

*Kemp v. Eiland*, 139 F. Supp. 3d 329 (D.D.C. 2015) ................................................................... 27

*Kilbourn v. Sunderland*, 130 U.S. 505 9 S. Ct. 594 (1889) ........................................... 28, 29, 36

*Lane v. Random House*, 985 F. Supp. 141 (D.D.C. 1995) ............................................................ 24

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001) ............................... 36

*Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095 (D.D.C. 2019) ..................................... 39, 40

*Massow v. Gianaclis*, 120 Cal. App. 2d 24, 260 P.2d 655 (1953) ............................................... 11

*Mathy v. Republic Metalware Co.*, 35 App. D.C. 151 1910 Dec. Comm'r Pat. 387 (D.C. Cir. 1910) ..................................................................................................................... 19, 22

*Miller v. Dees*, 95 Va.Cir. 101 (Cir.Ct.2017) ............................................................................... 6

*Momenian v. Davidson*, 878 F.3d 381 (D.C. Cir. 2017) ......................................................... 29, 31

*Mullin v. Wash. Free Weekly*, 785 A.2d 296 (D.C. 2001) ........................................................... 28

*Mullins v. Reitz Coal Co.,* 105 L.R.R.M. 2776, 1979 U.S. Dist. LEXIS 13524 (D.D.C. 1979) ..................................................................................................................... 39

*Nat'l Assn. for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1 (D.D.C. 2016) ................................. 14

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 79 F. Supp. 3d 60 (D.D.C. 2015) ............................................................................................... 39

*Perkins v. Nash*, 697 F. Supp. 527 (D.D.C. 1988) ......................................................... 31

*Pro-Football, Inc. v. Harjo*, 415 F.3d 44 (D.C. Cir. 2005) ............................................... 27, 31, 33

*Ramirez v. Navarro*, No. 23-55112, 2024 U.S.P.Q.2D (BNA) 809, 2024 U.S. App. LEXIS 10419, 2024 WL 1874993 (9th Cir. 2024) ................................................... 32

*Ray v. Queen*, 747 A.2d 1137 (D.C. 2000) ............................................................. 29, 31

*Rea Express, Inc. v. Travelers Ins. Co.*, 406 F. Supp. 1389 (D.D.C. 1976) ................................. 38

*Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc.*, 80 F.4th 607 (5th Cir. 2023)........................... 19

*Reznor v. J. Artist Mgmt., Inc.*, 365 F. Supp. 2d 565 (S.D.N.Y. 2005) ...................................... 11

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328 (2017) ........ 28

*Schinnerer v. Maryland Ins. Admin.*, 809 A.2d 709 (Md. App. 2002) ..................... 10, 11, 12, 30

*Silberberg v. Becker*, 191 A.3d 324 (D.C. 2018) .......................................................... 13

*Steele v. Schafer*, 535 F.3d 689, 383 U.S. App. D.C. 74 (D.C. Cir. 2008) ................................... 5

*Strauss v. NewMarket Global Consulting Group, LLC*, 5 A.3d 1027 (D.C.2010) ...................... 26

*Strawn v. Jones*, 285 A.2d 659 (Md. 1972) ............................................................. 12, 13

*Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362 (6th Cir. 1985)........................................... 32

*Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33 (D.D.C. 2010) ................................. 24

*TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876 (7th Cir. 1997).............................. 19, 22

*\*United States v. Project on Gov't Oversight*, 454 F.3d 306 (D.D.C. 2006) ................................. 5

*\*Washington Post Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320 (D.C. Cir. 1989) ....................................................................................... passim

*Willis v. Maverick*, 760 S.W.2d 642 (Tex. 1988) ......................................................... 29

*Wood v. Milyard*, 566 U.S. 463 132 S. Ct. 1826 (2012).................................................... 39

**Statutes**

D.C. Code Ann. § 12-301(8) ........................................................................ 33

D.C. Code Ann. § 21-2060(a) ...................................................................... 14

Fed. R. Civ. P § 8(c) .................................................................................... 39

Md. Code Ann. Estates & Trusts § 17-114(b) ............................................ 14

Md. Code Ann., Bus. Regs. § 1-414 ............................................................ 33

Md. Code, Courts and Judicial Proceedings § 5-101 .................................. 33

**Other Authorities**

Hal I. Gilenson, Badlands: Artist-Personal Manager Conflicts of Interest in the Music
    Industry, 9 Cardozo Arts & Ent. L.J. 501, 519 (1991) ......................... 11

Restatement (Second) of Torts, § 652C (1977) .......................................... 25

Trademarks and Tradenames, 74 Am.Jur.2d 325 (1974) ............................ 19

## I.    INTRODUCTION[1]

This matter arises out of Izumi's wrongful actions toward Marcel Theo Hall ("Hall"), the famous entertainer professionally known as "Biz Markie."  Despite claiming to have been acting as his "manager" or even "business partner," Izumi treated Hall more like her personal ATM.  Defendants have presented various meritless arguments to try to prevent a jury from ever hearing the Estate's claims.  The evidence, however, reflects that many of those arguments are simply *post hoc* justifications to attempt to whitewash her wrongful behavior.  Defendants have also ludicrously asserted that an artist would knowingly and willingly agree to a compensation structure by which the artist received less compensation than the artist's manager ***for the artist's work***.

Defendants also malign the relationship between Tara Hall and her now-deceased husband Hall, apparently in an attempt to paint the Estate's personal representative as a grasping and desperate widow seeking to insinuate herself into her husband's business affairs.  That line of attack is as irrelevant as it is unseemly.  The Estate's causes of action do not depend, in any measure, on the health of the marital relationship between Marcel and Tara Hall, and this Opposition will say no more about it.  Instead the viability of its causes of action depend on the law and the evidence of record, and it is on those points that this Opposition will focus.

Defendants' Motion for Summary Judgment fails for these primary reasons: (1) the evidence of record demonstrates that Marcel Hall and Izumi never reached any agreement on

---

[1] The Opposition focuses only on the grounds for summary judgment raised by Defendants, and as a result will avoid a count-by-count analysis of the elements necessary to prove each count and the evidence of record that supports them.  Defendants' Motion effectively concedes the viability of each of these claims except to the extent it expressly raises grounds on which it moves for summary judgment.  Of course, this Court should reject any attempt by Defendants to raise new grounds in any reply they submit.

compensation, a fact that defeats many of Izumi's arguments; (2) in the absence of an agreement to the contrary, Izumi was entitled to no more than reasonable compensation yet, as the evidence of record shows, paid herself well more than she was entitled to receive while failing to cause BMI to distribute money to Hall to which he was entitled, even under her own compensation theory; (3) Hall, and not Defendant Biz Markie, Inc. ("BMI"), indisputably owned the trademark "Biz Markie" throughout his life, and merely licensed use of that trademark to BMI while he was alive; and (4) the record amply demonstrates the existence of disputed material facts.  This Court should deny Defendant's Motion for Summary Judgment.

## II.    COUNTER-STATEMENT OF FACTS

Hall is recognized by his stage name "Biz Markie" and was and continues to be internationally known as an iconic rapper, actor, musical artist, DJ, and record producer.  The Estate's Counter-Statement of Disputed Facts to Which There is a Genuine Issue ("CSDF") at ¶¶ 89, 91.  Hall first used the "Biz Markie" name and mark in 1986 and his first album, released under the name "Biz Markie," was released in 1988.  CSDF at ¶ 90.  His career in the entertainment industry spanned decades and various facets.  From 1998 through 2009, Hall released five studio albums and seven compilation albums.  CSDF at ¶ 92.  From the 1990's through the 2010's, Hall appeared in television and film in various capacities.  CSDF at ¶ 93-95.  Hall performed under his stage name "Biz Markie" for his entire career.  CSDF at ¶ 96.

Throughout his career, Hall focused on his art and left the business component to his two managers, Izumi and her predecessor, Lamont Wanzer ("Wanzer").  SOF at ¶ 4; CSDF at ¶ 35.  Hall was not particularly interested in the business side of the entertainment industry; he just wanted to be compensated for his work.  SOF at ¶ 33; CSDF at ¶¶ 33, 35.  Hall and Izumi

founded a company, Biz Markie, Inc. which operated as a "loan out" company[2] for Hall's professional services.  CSDF at ¶ 15.  Hall put his trust in Izumi to operate as his manager and run the business side of his work as Biz Markie.  SOF at ¶¶ 12, 14; CSDF at ¶¶ 34, 103-104. Hall even executed a power of attorney providing Izumi with authority to act on his behalf. Defendants' Exhibit 9 ("Power of Attorney").  That Power of Attorney, however, contained limitations against self-dealing and compensation, and required Izumi to act in Hall's best interest.  *See id.* at 1, 12, 15.

 Izumi abused the trust and power that Hall gave her and breached her obligation to act in Hall's best interest and avoid self-dealing.  Izumi kept no financial records for the business, which had the effect of concealing her actions.  CSDF at ¶¶ 108-110.  Izumi acted liberally in signing documents with Hall's name, including tax returns, payment directive letters, and loan documents, frequently without Hall's' consultation or approval.  CSDF at ¶¶ 15, 21, 35, 40, 84. Eventually, Izumi began directing payments for Hall's services to her wholly-owned company, Balancing Acts, Inc. ("Balancing Acts"), using letters to which she signed Hall's name.  SOF at ¶¶ 37, 85.  Izumi even engaged in such actions after Hall had suffered complications from diabetes, causing him to become incapacitated.  CSDF at ¶¶ 114-115.  In particular, while Hall was incapacitated and only a couple months prior to his death, Izumi drafted and signed a stockholder agreement for BMI, to "memorialize" her now-claimed majority share ownership of BMI, yet admits she never discussed the agreement with him.  CSDF at ¶¶ 15, 114-115. No agreement existed dictating what percentage of Hall's income Izumi was entitled to as his manager.  CSDF at ¶ 121.  The industry standard compensation for a manager is ten to

---

[2] "Artist loan out companies are usually limited liability companies or corporations that artists form to collect their royalties and enter into agreements for their personal services."  Exhibit C, Exhibit 1 thereto, at 4-5.

twenty percent (10-20%).  CSDF at ¶ 120.  Izumi compensated herself far more than the industry standard amount.  CSDF at ¶ 69.  Through her actions, Izumi caused Hall monetary harm in various ways:  (1) income reported to, but never received, by Hall; (2) paying herself far more than the industry standard ten to twenty percent; (3) directing payments for Hall's services or royalties to a company wholly owned by Izumi which Hall did not receive; and (4) personal expenses charged by Izumi to BMI, but not repaid by Izumi ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████.  CSDF at ¶ 69.

Finally, it must also be pointed out that the majority of Defendants' allegedly undisputed facts are supported only by Izumi's testimony.  In fact, almost all of the allegedly undisputed facts concerning the structure and actions of the relevant business entities are supported exclusively by Izumi's testimony.  *See* SOF[3] at ¶¶ 3-5, 15-17, 23-29, 35-44, 74, 76-78, 83-86, 88. Given Izumi's lack of formal business training, failure to maintain financial or any other records of the business, and Izumi's lack of understanding of trademark or corporate law, her statements regarding these subjects cannot be taken as undisputed or legally dispositive.  CSDF at ¶¶ 101-102, 104-113.

## III.    LEGAL STANDARD

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 969 (D.C. Cir. 2016) (quoting *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).  "A fact is material if it might affect the outcome of the suit under the

---

[3] The Estate has adopted Defendants' "SOF" abbreviation to refer to Defendants' Statement of Undisputed Facts (ECF No. 72-1).

governing law, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692, 383 U.S. App. D.C. 74 (D.C. Cir. 2008) (internal quotations and citations omitted). The moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).

"[T]he court must view the evidence in the light most favorable to the nonmoving party and must not assess witness credibility." *Borgo v. Goldin*, 204 F.3d 251, 254 (D.C. Cir. 2000). "Evaluation of the credibility of witnesses must be left to the factfinder." *United States v. Project on Gov't Oversight*, 454 F.3d 306, 313 (D.C. Cir. 2006). In fact, "the need to assess the credibility of witnesses is precisely what places this dispute outside the proper realm of summary judgment." *Washington Post Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320, 326 n.8 (D.C. Cir. 1989). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013).

## IV.   ARGUMENT

### A.   Marcel Hall and Izumi Never Reached An Agreement On Izumi's Compensation

Defendants' argument that a compensation agreement bars the Estate's non-intellectual property claims (Counts VII-XIII of the Estate's Second Amended Complaint (ECF No. 61)[4]) fails for two reasons: (1) there is no agreement; and (2) even to the extent that Defendants can demonstrate an agreement as to ***ownership percentage*** of BMI, Defendants have not, and cannot, demonstrate any agreement regarding ***compensation***. In fact, the evidence demonstrates that

---

[4] Cited herein throughout by its ECF No. only.

Hall and Izumi's compensation was not consistent with the alleged ownership percentage and

Izumi herself has denied that any agreement as to compensation existed.

### 1.    Defendants Have Not Produced An Agreement.

Defendants have alleged that "Marcel and Izumi agreed to split the profits of BMI with

Marcel getting 49% and Izumi getting 51%," and referred the Court to Paragraphs 15, 21-22, and

31 of their Statement of Undisputed Facts.  *See* Defendants' Memorandum at 7.[5]  Those

Paragraphs, however, do not refer to any such agreement.  Paragraph 15 cites to Izumi's

deposition testimony.  Paragraphs 21 and 22 refer to a loan application and tax returns.

Paragraph 31 refers to the deposition of BMI's tax preparer.  None of those documents is an

"agreement."

Defendants have not explained how this deposition testimony, tax returns, or a loan

application constitute an agreement as to the compensation structure under which BMI operated.

Undersigned counsel has been unable to find any authority supporting the contention that tax

returns constitute an express written contract.  State courts that have addressed the issue have

rejected this notion because, even if signed by both parties, tax returns contain no terms and no

promises of performance.[6]  This Court should reject Defendants' contention that these

documents somehow constitute an agreement.

---

[5] The Estate has cited to the file-stamped page numbers of Defendants' Memorandum (ECF No. 72-2).

[6] *Miller v. Dees*, 95 Va.Cir. 101, 103–04 (Cir.Ct.2017) ("Here I do not find that the amended tax return served as a written contract between the parties. . . [a tax return] contains no terms, conditions, remedies, or other obligations and/or benefits resulting from a bargained-for exchange."); *Collins v. Collins*, 752 S.W.2d 636, 637 (Tex.App.1988) (ruling that tax returns did not constitute a partition agreement because "the tax returns are just that, i.e., tax returns, and are not agreements to partition since they contain no language of agreement to partition").

In fact, ***after Hall was incapacitated***, Izumi signed, as Hall's attorney-in-fact, what purports to be a "Stockholders' Agreement" to reflect the 49%-51% ownership split to which she says Hall agreed.  CSDF at ¶¶ 15, 114-115.  That Stockholder Agreement was dated May 19, 2021.  Exhibit F.  Schedule A to that Agreement sets out—and would be the only written agreement to do so—Izumi's 51 percent and Hall's 49 percent ownership of BMI.  *See id.* at Hall_JRH_01539.  This draft was prepared only two months before Hall died, while he was incapacitated.  CSDF at ¶¶ 15, 114-115.  Given that Hall was incapacitated at the time, Izumi could not have obtained Hall's approval to sign it.  CSDF at ¶¶ 15, 114-115.  ***In fact, Izumi admitted that she never spoke to Hall about the Stockholders Agreement and that she does not know if Hall knew that she signed it on his behalf.***  *Id*.  At minimum, Izumi's efforts to create a paper trail to justify some of her prior conduct, while Hall lay incapacitated and on his deathbed, raises an inference that she was very well aware that during his life he had never agreed to the ownership split she now insists governed BMI.  Certainly a reasonable jury could infer from this that no such agreement ever existed.

> **2.    Even If There Were An Agreement As to The Ownership Structure of BMI, There is No Evidence Of Record Of An Agreement As To Izumi's Compensation**.

Even were there an agreement as to the ***ownership*** of BMI, Defendants' own evidence demonstrates that Hall did not agree to any connection between ownership and ***compensation*** percentage or structure.  In fact, Izumi ***specifically denied*** any agreement between her and Hall regarding a compensation split, much less one that was consistent with her claimed ownership percentage of BMI.  When asked whether she ensured that Hall received even 49% of profits, Izumi testified:

> Biz and I weren't -- ***Biz and I never discussed a percentage***.  It wasn't – that's not how -- so that's not how we functioned in our company.  It wasn't how you

> just broke it down, where you said after all of the expenses were paid, he got 49 percent.  Sometimes we didn't even have enough money in our account to pay bills or we may have only had $500 or $5,000 left in our account, so it was really just us trying to get to a place where we were comfortable, and when we could pay the -- pay Biz, or pay Hall, pay myself, company overhead, expenses, that's how we would function in our company.

*See* CSDF at ¶ 121 (emphasis added).  When asked whether her claimed ownership share had anything to do with, or any relationship to, the amount of income that she and Hall received, Izumi testified:

> I think it depended on where we were in that month or that time of finances and what we had… Again, it was -- that wasn't our focus and how we functioned in our company… We were -- literally, we weren't making a lot of money.  We were literally trying to make sure that all of our bills were paid.

*See* CSDF at ¶ 121.  Izumi explained the intended significance of their ownership shares as having no relation to compensation at all:

> The significance was that in the event that -- the significance was that I would have majority ownership.  I had been with Biz for, again, over two decades, and so knew how to help run the business while he was alive in the event that something happened to him or in his passing, but Biz wanted me to have control of those things.

*See* CSDF at ¶ 123.  No agreement existed as to Izumi's compensation; she simply paid herself whatever she wanted (and as shown below, in doing so she breached her fiduciary duty to Hall).

Further, the evidence shows that Hall was unconcerned about the ownership structure so long as he was paid for his art, demonstrating (or at least raising an inference) that he viewed the compensation arrangement between Izumi and himself as distinct from BMI's ownership structure.  Contrary to Defendant's disingenuous assertion that "Marcel and Izumi agreed to ***split the profits*** of BMI with Marcel getting 49% and Izumi getting 51%," none of the citations offered by Defendants reflect anything other than a 51/49 ***ownership*** split; they are silent as to ***compensation*** split.  *See* Defendants' Memorandum at 7; SOF at ¶¶ 15, 21-22, 31.

8

Paragraph 15 of Defendants' Statement of Undisputed Facts mentions nothing about profit splitting or distribution; it states only ownership percentages.  Paragraph 21 refers to a BMI tax return that reflects a 51/49 percent split among Izumi and Hall, respectively, but also compensation to Hall in a greater amount, ███████, than Izumi, in the amount of ████.  *See* Defendants' Exhibit 5, Declaration of Jennifer Izumi, Exhibit C thereto, at Hall_JRH_02463.  That is a compensation split of 60% for Hall and 40 % for Izumi.  Additionally, BMI's tax returns from 2018 reflect greater compensation to Hall than Izumi, in a 62% to 38% split.  *See* CSDF at ¶ 122; Exhibit I at Cusato_00108.  If tax returns were agreements, as Defendants insist, then the agreement reflected by these returns was clearly that Hall would earn significantly more than Izumi.

Paragraph 31 also mentions nothing about profit splitting or distribution.  In fact, Cusato's testimony also made clear that Hall did not agree to any connection between ownership percentage and compensation structure or percentage.  Cusato testified that

> [Hall] … had suggested, "Why don't we just make [Izumi] 100 percent owner and just keep me on payroll."  ***Because his interest was not in really owning the business, you know, he just wants to get paid.***

*See* CSDF at ¶ 33; Defendants' Exhibit 6 at 21:11-15 (emphasis added).  Hall clearly did not believe, or agree, that Izumi was entitled to 100 percent of the income from BMI.  Consequently, Hall did not agree, or believe, that ownership percentage had any connection to compensation percentage.

Defendants' assertions in their own Memorandum echo this conclusion.  Defendants have claimed that Wanzer owned 100 percent of the "Bizmont" entity, and that Hall "focused 100% of [*sic*] the art side of his work."  Defendants' Memorandum of Points and Authorities in support of their Motion for Summary Judgment ("Defendants' Memorandum") at 15 (ECF No. 72-2).  Yet

Defendants surely do not suggest that Hall earned nothing while Bizmont functioned as his loan-out company and Wanzer earned every penny generated by Hall's past and on-going work. According to Defendants, Hall wanted to "focus[] exclusively on art, with Izumi handling the business."  Defendants' Memorandum at 15.  Perhaps, but as Cusato's testimony reflects, Hall did not agree, or believe, that ownership percentage had any connection to compensation percentage.  To paraphrase Cusato, Hall did not care who owned BMI, ***so long as he was appropriately paid for his art***.  *See* Defendants' Exhibit 6 at 21:11-15.

Defendants, therefore, have not, and cannot, demonstrate an agreement as to compensation that bars any of the Estate's claims.  At the very least, the Estate has demonstrated a genuine dispute of material fact that must be left to the jury, particularly given the credibility issues presented by Izumi's inconsistent assertions and her conduct while Hall lay dying.  *See Washington Post*, 865 F.2d at 326 n.8.  Consequently, this Court should reject Defendants' arguments and deny their Motion for Summary Judgment as to these counts.

    **B.**    **In The Absence of An Agreement to The Contrary, Izumi Was Entitled Only To Reasonable Compensation And Is Liable For Having Breached Her Fiduciary Duty By Taking More Than She Was Entitled To Take**

        **1.**    **As A Business Manager in the Entertainment Industry, As A Holder of a General Power of Attorney, And As (Allegedly) The Majority Shareholder of BMI, Izumi Owed Fiduciary Duties to Hall**.

            **a.**    **Hall Placed Special Trust and Confidence in Izumi, Making Izumi a Fiduciary to Hall**.

"An agency is 'the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act.'"  *Schinnerer v. Maryland Ins. Admin.*, 809 A.2d 709, 716 (Md. App. 2002) (quoting *Ins. Co. of N. Am. v. Miller*, 765 A.2d 587 (Md. 2001) (emphasis in *Schinnerer*; alterations in *Miller*)).  "This agency relationship 'creates the agent's

fiduciary obligation as a matter of law' and the fiduciary 'must act loyally in the principal's interest as well as on the principal's behalf.'" *Jenkins v. Strauss*, 931 A.2d 1026, 1033 (Md. 2007). Various courts that have considered the issue, applying agency law consistent with that of the District of Columbia and Maryland, have concluded that an artist's manager owes a fiduciary duty to the artist.[7]

Here, Hall and Izumi had a long-standing relationship and Hall trusted Izumi. SOF at ¶ 12. When Wanzer passed away, Hall placed his trust in Izumi as his business manager. CSDF at ¶ 103. He entrusted the "day-to-day business" of BMI to Izumi. CSDF at ¶ 35. As a result, Hall and Izumi had a principal-agent relationship, respectively. *See*, *supra*, Note 3. Izumi, therefore, as a matter of law, owed Hall a fiduciary duty in all aspects of her work as Hall's manager. *See Schinnerer*, 809 A.2d at 716; *Jenkins*, 931 A.2d at 1033.

> **b.    Hall Gave Izumi a General Power of Attorney, Making Izumi a Fiduciary to Hall**.

"Powers of attorney, which create a principal-agent relationship, are written documents by which one party, a principal, appoints another as attorney-in-fact and confers upon the latter the authority to perform certain specified acts on behalf of the principal." *Figgins v. Cochrane*, 403 Md. 392, 415 (2008). As noted above, a principal-agent relationship establishes a fiduciary duty. *Schinnerer*, 147 Md. App. at 486; *Jenkins*, 931 A.2d at 1033.

---

[7] *See, e.g.*, *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983); *Reznor v. J. Artist Mgmt., Inc.*, 365 F. Supp. 2d 565, 568-70 (S.D.N.Y. 2005), *In re Porter*, 498 B.R. 609, 657 (Bankr. E.D. La. 2013); *Cagle v. Hybner*, No. M2006-02073-COA-R3-CV, 2008 Tenn. App. LEXIS 389, *19-23, 2008 WL 2649643 (Tenn. Ct. App. July 3, 2008); *Massow v. Gianaclis*, 120 Cal. App. 2d 24, 260 P.2d 655 (1953); *see also* Hal I. Gilenson, Badlands: Artist-Personal Manager Conflicts of Interest in the Music Industry, 9 Cardozo Arts & Ent. L.J. 501, 519 (1991) (instructing that the "fiduciary relationship" exists when "one party confides to another the management of some business to be transacted in the former's name or on his account, and by which such other assumes to do the business and render an account of it.").

In the music entertainment business, an artist's grant of a general—as opposed to a limited—power of attorney is unusual.  Exhibit C, Exhibit 1 thereto, at 4.  Nonetheless, Izumi agreed to act under such a general power of attorney, which granted her unusually broad— although not unlimited—power to act on Hall's behalf.  *See* Defendants' Exhibit 9.  In doing so, as a matter of law she took on a fiduciary obligation to him to use that power-of-attorney only for his benefit, and never for her own.  *Figgins*, 403 Md. at 415; *Schinnerer*, 147 Md. App. at 486; *Jenkins*, 931 A.2d at 1033

Izumi spills considerable ink attempting to distinguish between documents she signed purportedly on Hall's behalf under the Power of Attorney (none, she says, other than the Stockholders' Agreement) and documents she signed purportedly based on Hall's consent, *see* Defendants' Memorandum at 23-25, but apart from her self-serving say-so, she offers no evidence at all that Hall understood, or operated consistent with, any such distinction, or even that she obtained the specific consent from him that she claims.  Whether a jury might credit her hair-splitting and *ex post* assertions that she had his consent—despite maintaining no contemporaneous records to reflect it—goes to credibility, a question uniquely reserved for the fact-finder.  A reasonable jury could conclude that, when Izumi took any of the kinds of actions contemplated by the power-of-attorney, she did so pursuant to that power-of-attorney, and therefore owed Hall a fiduciary duty when she acted.

As broad as it was, Hall's grant of authority to Izumi under the Power of Attorney was limited, in that it excluded authority to dispose of his intellectual property.  *See* Defendants' Exhibit 9 at *passim*.  Izumi's agency argument, *see* Defendants' Memorandum at 24-25, offered to support her claim that she was not acting as a fiduciary when she redirected Hall's royalties to Balancing Acts but instead was acting as Hall's authorized agent, fails.  Defendants cited *Strawn*

*v. Jones*, 285 A.2d 659 (Md. 1972) to establish the ability of an agent to sign on behalf of a principal. Defendants' Memorandum at 25. *Strawn*, however, also states that "vague references" that the agent "had been given permission" by the principal and that the principal "was very much interested in that piece of property" "are insufficient to exhibit the scope of [the agent's] authority." 285 A.2d at 662. Here, Izumi has offered nothing more than vague references that, according to the law she has cited, are insufficient to exhibit her authority to act on behalf of Hall with respect to his intellectual property rights. *See id.*; SOF at ¶¶ 25, 27, 35, 36, 76, 83 (providing only vague assertions of "agree[ment]" or "discuss[ions]"). To the contrary, the fact that Hall granted a written Power of Attorney that conspicuously excluded the power to dispose of his intellectual property supports an inference, which a reasonable jury could certainly credit, that Hall never consented to the redirection of his royalty payments to a company controlled entirely by Izumi.

>        c.    **Izumi Claims to Have Been Majority Shareholder of BMI,
>              Making Izumi a Fiduciary to Hall, Whom She Has Claimed
>              was the Minority Shareholder**.

BMI is a closely-held corporation; it had only two shareholders, one of whom is Izumi. Although Izumi offers no actual evidence that Hall ever agreed to the 51%-49% ownership split she asserts, assuming *arguendo* the truth of this assertion, that placed Izumi in a fiduciary relationship to Hall with respect to the management of BMI's business. "Especially in closely held corporations, the majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) 'not to exercise [their] control to the disadvantage of minority stockholders.'" *Silberberg v. Becker*, 191 A.3d 324, 337 (D.C. 2018) (internal citations omitted).

### 2.    As Hall's Manager and Fiduciary, Izumi was Entitled Only to a Limited Portion of Hall's Income.

Fiduciaries, to the extent they are allowed compensation, are limited to reasonable compensation for their services.[8]  Where the terms of a contract are ambiguous, vague, or indefinite, a court should consider industry standards or industry practice to construe those terms. *Carey Canada, Inc. v. Columbia Casualty Co.*, 940 F.2d 1548, 1556-1557 (D.C. Cir. 1991).

Here, while it is undisputed that Izumi was Hall's manager, no agreement existed as to her compensation.  *See, supra,* Section IV(A).  Hall's Power of Attorney prohibits Izumi from receiving compensation.  Defendants' Exhibit 9 at 1, 12 (prohibiting compensation unless otherwise indicated in the "Special Instructions," which contained no such indication).  The Estate has never claimed that Izumi was not entitled to *anything*, though.  In the absence of a compensation agreement and given the restriction of the Power of Attorney, the industry standard is relevant.  *See Carey Canada*, 940 F.2d at 1556-1557.  In the music entertainment business, a business manager typically receives 10% to 20% of the artist's gross income.  CSDF at ¶ 120.  Given Izumi's lack of experience, *see* CSDF at ¶¶ 101-102, 104-113, she was entitled to no more than 15% of the income from Hall's income.  Exhibit C, Exhibit 1 thereto, at 9.

---

[8] *See* Md. Code Ann., Estates & Trusts § 17-114(b) ("If the principal indicates in the power of attorney that the agent is entitled to compensation, the agent may receive compensation based on what is reasonable under the circumstances"); *Diamond v. Hogan Lovells US LLP*, 224 A.3d 1007, 1015 (D.C. 2020) (noting that a lawyer owes a duty to his client arising from the fiduciary relationship between them and, in return, the client owes the lawyer fair and reasonable compensation for completed services); *In re Cannon*, 278 A.3d 726, 727 (D.C. 2022) (finding that under D.C. Code Ann. § 21-2060(a), court-appointed fiduciaries are entitled to reasonable payment for their work); *Nat'l Assn. for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 38 (D.D.C. 2016) (discussing ERISA regulations limiting fiduciaries to reasonable compensation);

### 3. The Evidence of Record Demonstrates a Triable Issue of Fact As To Whether Izumi Paid Herself Excess Compensation In Breach of Her Fiduciary Duties.

Izumi does not dispute in her motion that she took more than 10% to 20% of the gross income Hall earned, or that she redirected royalty payments away from BMI to Balancing Acts, of which she is the sole shareholder. Instead, she argues only that she was entitled to do so by agreement of the parties. That argument, though, as discussed above, confuses any agreement about ownership of BMI with an agreement about Izumi's compensation. Even assuming Izumi could proffer evidence that she and Hall agreed to a specific ownership structure for BMI—and again, she cannot—she offers no evidence at all of any agreement about her compensation. Instead, she makes the remarkable assertion that Hall freely agreed to give her ***more than he himself would earn*** for his own art. The sheer implausibility of that assertion demonstrates its susceptibility to rejection by a reasonable jury.

Izumi also overlooks the conclusions of the Estate's expert, Christopher Williams, CFE, CPA, MBA ("Williams"), to the effect that ***even pretending*** Izumi were entitled to 51% of Hall's gross earnings, she failed to distribute to him even all of the 49% of income to which she says he was entitled. As Williams opines, even if Izumi were entitled to 51% of BMI's net earnings, she failed to distribute $251,180.00 to Hall to which he was entitled. Exhibit D, Exhibit 1 thereto, at 2. At minimum, this constitutes breach of the fiduciary duty she owed Hall as majority shareholder of BMI, not to mention the terms of the agreement she claims existed between the parties.

Izumi, in an effort to avoid this obvious conclusion, launches an attack on the admissibility of both Williams' and Rosario-Richardson's expert opinions. That attack misses its mark.

Defendants assert that Williams' opinions are inadmissible for exactly one reason: they all depend, they say, on Rosario-Richardson's opinions, which they also attack as inadmissible. *See* Defendants' Memorandum at 11-13.  Holding aside the fact that Rosario-Richardson's opinions ***are*** admissible, as discussed below, only one of the three categories of damages about which Williams opines turns on Rosario-Richardson's opinions.  Williams identified three categories of damages to the Estate: (1) at least $251,180.00 of reported income to Hall that Hall never received; (2) at least $318,002.00 of income to which Hall was entitled because Izumi compensated herself in excess of the industry standard fifteen percent; and (3) at least $46,150.00, but possibly as much as $204,608.00 of income that was due to Hall but he never received because Izumi directed it to Balancing Acts.  *See* CSDF at ¶¶ 72-73; Exhibit D, Exhibit 1 thereto, at 2-3.  Only the second depends on Rosario-Richardson's opinions, yet Izumi argues that Williams' opinions are entirely inadmissible solely because, she says, Rosario-Richardson's are.

Williams calculated the first category of damages solely by comparing Hall's income as reported on his tax returns to the income he actually received.  *See* CSDF at ¶¶ 72-73; Exhibit D, Exhibit 1 thereto, at 2.  This category, therefore, does not, as Defendants argue, depend on Ms. Rosario-Richardson's conclusion regarding the percentage of income to which Izumi was entitled.  It is based entirely on what was reported versus what was received.  Even if Ms. Rosario-Richardson's conclusions were inadmissible (and they are not), this category of damages would remain, because they reflect income Izumi (who *de facto* controlled BMI) caused to be reported as income to Hall yet that she failed actually to distribute to him.  Consequently, Plaintiff's argument, based on the inadmissibility of Ms. Rosario-Richardson's conclusions, fails with respect to this category.

16

Further, the third category consists of money that Izumi diverted to her solely-owned company, Balancing Acts.  *See* CSDF at ¶¶ 72-73; Exhibit D, Exhibit 1 thereto, at 3.  The final calculations contained in Williams' report factor in Ms. Rosario-Richardson's conclusions.  But this category of damages, like the first category, consists of money to which Hall (or BMI, on whose behalf the Estate sues derivatively) was entitled but did not receive, regardless of any compensation agreement between Hall and Izumi.  This category, therefore, also does not depend entirely on  Ms. Rosario-Richardson's conclusions.  Even absent Ms. Rosario-Richardson's conclusions, this category of damages would also remain (either payable to BMI for distribution to Hall's estate and to Izumi to the extent to which she is entitled to any portion of it, or entirely to Hall as a result of Izumi's breach of fiduciary duty in exceeding her authority under the Power of Attorney).

Moreover, Ms. Rosario-Richardson's conclusions are admissible.  Defendants' sole argument to the contrary is that Ms. Rosario-Richardson's conclusions are, they say, irrelevant.  *See* Defendants' Memorandum at 7.  They base this only on the assertion that "there is an actual agreement."  *Id.*  As demonstrated *supra*, however, there *is* no actual agreement as to Izumi's compensation.  *See* Section IV(A).  Defendants' argument that Ms. Rosario-Richardson's conclusions are irrelevant is, therefore, baseless, and because this alleged "irrelevance" is the only challenge Izumi levels against the admissibility of Rosario-Richardson's opinions, that challenge fails.

The Estate has proffered evidence on which a reasonable jury could find that Izumi paid herself more than she was entitled to receive as Hall's fiduciary.  This evidence presents a triable issue of fact, and this Court should deny Izumi's Motion for Summary Judgment.

**C.    Marcel Hall Made First Use of the Trademark "Biz Markie" And Never Assigned It, And Consequently The Trademark Belongs to His Estate**

With respect to the Estate's intellectual property claims (Counts I-VI), Defendants' Motion for Summary Judgment turns on the astonishing argument that Hall did not own the trademark "Biz Markie," despite having been the first to make use of it as his own stage name and using it professionally and continuously throughout his adult life until he became incapacitated.  The law, and the evidence of record, is to the contrary.  While Hall may well have granted BMI permission to *use* the trademark, that grant of permission constitutes no more than a license absent clear evidence to the contrary, and Izumi has presented no such evidence.  Izumi's argument conflates the concept of a license to use a trademark with ownership of that trademark.  Upon Hall's death, ownership of the trademark passed to his estate, and absent any evidence to the contrary the estate retains the power to terminate any license previously granted by Hall.  *See Estate of Elvis Presley v. Russen*, 513 F. Supp. 1339, 1365 (D.N.J. 1981) ("We find that after Presley's death, the rights to use the service marks and trademarks identifying the entertainment services of Elvis Presley and the merchandise licensed by him passed to Presley's legal representative as a part of the assets of his estate.") (citing Trademarks and Tradenames, 74 Am.Jur.2d 325 (1974)).

Hall's demonstrated ownership of the mark is fatal to all of Izumi's arguments regarding the viability of Hall's intellectual property claims.

**1.    Trademark Law Establishes Clear Rules for Initial Ownership of a Mark and Requires Strong evidence of Assignment or Abandonment**.

"Ordinarily, a party establishes ownership of a mark by being the first to use the mark in commerce."  *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1347 (D.C. Cir. 2008).  "While assignment by writing is not necessary to transfer ownership of a trademark

under common law, an assignment is still necessary." *Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc.*, 80 F.4th 607, 618 (5th Cir. 2023). "***Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the marks they employ.***" *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997) (emphasis added).

[A]bandonment [of a mark] is essentially a forfeiture." *Bacardi & Co. v. Empresa Cubana Exportadora De Alimentos y Productos Varios*, No. 1:04-cv-00519, 2023 U.S. Dist. LEXIS 36993, *44, 2023 WL 2384145 (D.D.C. Mar. 6, 2023). A party alleging abandonment must "prove by ***clear and convincing*** evidence that the right claimed has been relinquished." *Id.* (quoting *Mathy v. Republic Metalware Co.*, 35 App. D.C. 151, 156, 1910 Dec. Comm'r Pat. 387 (D.C. Cir. 1910) (emphasis added). "The question of abandonment must be decided by the facts in each particular case; but a mark will never be held abandoned, unless a clear intention to do so appears." *Id.* "Questions of intent, which involve intangible factors including witness credibility, ***are matters for consideration of the fact finder after a full trial***." *Id.* (quoting *Flynn v. Fischer Tile & Marble, Inc.*, 246 F. Supp. 2d 48, 55-56 (D.D.C. 2003)) (emphasis added).

## 2.     Hall Owned the "Biz Markie" Mark.

Indisputably, Hall, whose usage of the "Biz Markie" mark dates back to at least 1986, was the first to use that mark in commerce. CSDF at ¶¶ 89-90. Defendant BMI has claimed to have used the mark only since 2015. Defendants' Memorandum at 23. Hall, therefore, was the first to use the "Biz Markie" mark, and, therefore, owned the mark. *See Estate of Coll-Monge*, 524 F.3d at 1347. It is also undisputed, and directly admitted by Defendants, that Hall used his stage name and attendant mark consistently from the late 1980's until his death in 2021. *See*

CSDF at ¶¶ 89, 91-96. Those admissions alone establish Hall's ownership. *See id.* Hall never signed a written agreement granting BMI the right to use or register his trademarks. CSDF at ¶ 74.

The Estate has more than complied with its discovery obligations and either disclosed or directed Defendants to various documents and records reflecting Hall's ownership of the mark. For example, the Estate disclosed Tara Hall's submission in support of a trademark application that reflected Hall's use of the "Biz Markie" mark in connection with his name, image, and likeness, in and on music, stickers, trading cards, clothing, office supplies, action figures, clocks, and collectibles. *See* Exhibit A, Exhibit 3 thereto (authenticated at Exhibit A at ¶ 9) *see also* CSDF at ¶¶ 79-80. Defendants' assertion that the Estate has not disclosed any evidence reflecting Hall's ownership of the mark is disingenuous, and this Court should rejected it.

### 3. No Evidence of Record—Let Alone Any "Strong Evidence"— Establishes BMI's Ownership of the "Biz Markie" Mark.

Izumi's own conduct belies her assertion that Hall assigned the "Biz Markie" mark to BMI. In *May 2020*, after Balancing Acts allegedly took over all "Biz Markie" business, Defendant BMI, still being operated by Izumi, applied to register the "Biz Markie" trademark. CSDF at ¶ 97. Later, in support of BMI's registration application, Izumi completed and signed, purportedly as attorney-in-fact for Hall, a consent form stating: "I, Marcel Theo Hall (also known by the stage name and nickname of BIZ MARKIE), consent to the use and registration of *my name, BIZ MARKIE*, as a trademark and/or service mark with the USPTO." CSDF at ¶ 98. The date of that consent form is January 2021, *while Hall was incapacitated* and mere months before he passed away. *Id.*; Exhibit E, Exhibit 2 thereto, at P000390. Contrary to her blanket assertion, *see* SOF at ¶ 84, Izumi could not have obtained authorization from Hall to sign this "consent" form while he was incapacitated. Her attempt, while Hall was incapacitated, to

register the mark in BMI's name strongly supports an inference that she knew full well that BMI did not own the mark. At a bare minimum, this creates an issue of fact for a jury.

Izumi's conduct aside, Defendants' sole argument that Defendant BMI owns the "Biz Markie" mark is that since 2015, BMI "evinced the signs of ownership" by doing nothing more than operating as Hall's "loan out" company. Defendants' Memorandum at 23. The law, and the evidence, are to the contrary. In fact, Izumi's argument that BMI owns the "Biz Markie" mark is inconsistent with itself and would require the Court to believe the astonishing proposition that Hall needed BMI's permission to appear under his own stage name, having abandoned that trademark to his loan-out companies. *See* Defendants' Memorandum at 22-23.

Prior to the creation of BMI, "the business affairs associated with 'Biz Markie'" were run through Bizmont Entertainment ("Bizmont").[9] SOF at ¶¶ 3-4. If, as Izumi posits, Hall "abandoned [the 'Biz Markie' mark] long before BMI started using it" that would mean that Bizmont "evinced the signs of ownership" up to and immediately prior to the formation of BMI in 2015. Accordingly, under Defendants' theory, Bizmont owned the "Biz Markie" mark (suggesting that Hall also needed Bizmont's permission to appear under his own stage name, because he no longer owned the trademark), and did so within the three year period prior to Defendant BMI's alleged use of the mark, making Defendants' argument about Hall's alleged abandonment irrelevant.

Bizmont was owned entirely by Lamont Wanzer. SOF at ¶ 5. When Mr. Wanzer passed away, his ownership interest in Bizmont passed to his estate, although Defendants have not identified to whom that was. We know that ownership of Bizmont did not pass to either

---

[9] Bizmont operated as Hall's loan out company prior to BMI fulfilling that role.

Defendant; they would have claimed so if it did.  If Izumi's theory were correct, Defendant BMI, therefore, must have somehow acquired ownership of the "Biz Markie" mark from Bizmont.

Defendants, however, have offered absolutely no evidence—or even a theory—as to how BMI acquired ownership of the mark from Bizmont.  Presumably Defendants would argue that Bizmont too—like Hall (conveniently)—"abandoned" use of the mark.  Defendants bear the burden to prove such abandonment by clear and convincing evidence—which they have failed to do.  *See Mathy*, 35 App. D.C. at 156.  Defendants have not claimed any assignment of the mark and, even if they had, have failed to establish "strong evidence" of an assignment of ownership of the mark from Bizmont to BMI (let alone from Hall to Bizmont).  *See TMT N. Am.*, 124 F.3d at 884.  Defendants have also not claimed that they purchased the Bizmont entity, or any of its assets.  Even pretending for the sake of argument that Hall transferred ownership of the "Biz Markie" mark to Bizmont—and Izumi offers no evidence at all that this happened—nothing in the record suggests that Bizmont then transferred ownership to BMI.  To the contrary, the evidence establishes that Hall owned the mark commencing with first use, continued to use it throughout his life, and merely permitted Bizmont and BMI to use the mark while they acted as his loan-out companies.

Indeed, Defendants have also claimed that since 2019, "all of the business operations relating to 'Biz Markie' … would [be done] through Balancing Acts."  SOF at ¶ 37.  Under Defendants' logic, Balancing Acts—rather than BMI—"evinced the signs of ownership," and, therefore, has owned the "Biz Markie" mark since 2019.  Yet, tellingly, Defendants have made no such claim.  *See* Defendants' Memorandum at *passim*.  To the contrary, they have claimed that BMI (somehow) retained ownership of the mark even after Balancing Acts "evinced the signs of ownership."  *See id.*

Put simply, Izumi's argument makes no sense, is inconsistent even with itself, would require acceptance of the preposterous notion that Hall gave up the right to use his own stage name and trademark despite continuing to use them during his entire adult life, and collides with the evidence and the law.  Defendants have failed to prove by clear and convincing evidence that Hall ever abandoned or assigned the mark.  All Defendants have shown is that Hall orally licensed or otherwise permitted Bizmont and BMI to use the mark while each operated as Hall's "loan-out" company.[10]  But a license or permitted use is not ownership.

Defendants, therefore, have failed to demonstrate that Defendant BMI owns the "Biz Markie" mark.  Without the foundation that BMI owns the "Biz Markie" mark, Defendants' trademark argument collapses.  At the very least, the Estate has demonstrated a genuine dispute of material fact that must be left to the jury.  *See Washington Post*, 865 F.2d at 326 n.8.

### 4.    In Any Event, The Estate's Name, Image, and Likeness Claims do not Depend on Hall's Ownership of the Mark.

Defendants have argued that all of the Estate's intellectual property claims, including the Estate's claims for misappropriation of name, image, or likeness, and unjust enrichment claims "require[] Plaintiff to prove that [Hall] owned the 'Biz Makie' mark, or the right to use the related 'Biz Markie' intellectual property."  Defendants' Memorandum at 22.  Defendants have failed to define what they mean by "the related 'Biz Markie' intellectual property," but, in essence, they seem to be claiming that Defendant BMI also owned the rights to Hall's personal

---

[10] Defendants argued:

> "It is absurd to think Marcel was performing his professional activities through BMI (a company name which encompasses the very trademark in dispute), knowing BMI was using the intellectual property, but he did not give his own company permission to do so. The very fact that BMI was using Marcel's intellectual property shows his permission."

Defendants' Memorandum at 20.  The Estate agrees; the evidence shows nothing more than a license or permitted use.

name, image, and likeness.  *See id.*  Defendants have not cited any authority to support their contentions, explained how such claims could depend on ownership of a trademark, or offered any evidence to suggest how one of them came to own the rights to Hall's personal name, image, and likeness.  *See id.*  Defendants have not done so because they cannot do so.

In Count VI of its Second Amended Complaint, the Estate has asserted a claim for "misappropriation of name or likeness and violation of right of publicity."  ECF No. 61 at 18.  As Defendants have pointed out, in Count VII, the Estate has asserted a claim for unjust enrichment premised, in part, on profits earned from the use of Hall's name, image, and likeness.  *Id.* at 20.  "[I]nfringement of right of publicity, misappropriation of celebrity, and appropriation of personal identity -- are indistinguishable as a legal matter."  *Lane v. Random House*, 985 F. Supp. 141, 145-146 (D.D.C. 1995).  "[O]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.  The protected interest is that of 'the individual in the exclusive use of his own identity … in so far as the use may be of benefit to him or to others.'"  *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 55 (D.D.C. 2010) (quoting Restatement (Second) of Torts, § 652C (1977)) (internal citations omitted).

Nothing in the above definition of the tort(s) of misappropriation of celebrity or identity and infringement of right of publicity mentions a trademark.  *See Teltschik, PLLC*, 683 F. Supp. 2d at 55.  Similarly, nothing in the elements of unjust enrichment mentions trademark.  *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) ("The elements of an unjust enrichment claim are '(1) the plaintiff conferred a benefit on the defendant; (2) the defendant

retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.'"). These claims, therefore, do not require ownership of the mark.[11]

Further, the only "evidence" offered by Defendants to support their claim to ownership of "the related 'Biz Markie' intellectual property" is that "[p]rior to his hospitalization and death, Marcel and Izumi **discussed** BMI and BAI's **use** of his image, voice, likeness, and other intellectual property and BMI's ownership." *See* SOF at ¶¶ 83 (emphasis added), *passim*; Defendants' Memorandum at 22-23. This is insufficient evidence, on its face, to establish any type of ownership; mere "discussion" of "use" does not establish ownership rights, particularly in something like Hall's personal name, image, and likeness. This, however, is the best that Defendants can offer because Hall never signed a written agreement permanently assigning BMI the right to use his name, image, and likeness. CSDF at ¶ 83.

Defendants have failed to offer any evidence to establish ownership of Hall's name, image, and likeness. Again, at the very least, the Estate has demonstrated a genuine dispute of material fact that must be left to the jury, particularly given Defendants' unsubstantiated and baseless theory of ownership. *See Washington Post*, 865 F.2d at 326 n.8. Consequently, this Court should reject Defendants' intellectual property arguments and deny their Motion for Summary Judgment.

### D.    There is No Contract that Bars the Estate's Claims

Defendants have argued that the Estate's "intellectual property," and non-intellectual property claims, are barred by a contract between Hall and Izumi. Defendants, however, have failed to identify that agreement.

---

[11] Even if they did, for the reasons discussed above, Hall owned the mark.

"[T]he party asserting the existence of the oral contract has the burden of proving that an enforceable agreement exists." *Strauss v. NewMarket Global Consulting Group, LLC*, 5 A.3d 1027 (D.C.2010). A party alleging an oral contract must prove two elements: "(1) an agreement to all material terms and (2) intent of the parties to be bound." *Ashraf v. Fernandez*, 193 A.3d 129, 131 (D.C.2018). Defendants have proved neither.

Defendants' arguments as to the Estate's non-intellectual property claims fail because no agreement, particularly with respect to compensation, existed. *See, supra*, Section IV(A). Defendants' argument as to the Estate's intellectual property claims also fail. Defendants have argued that (1) BMI owns Hall's intellectual property, but (2) if it does not, then BMI was permitted to use Hall's intellectual property by Hall. As described in Section IV(C) above, BMI does not own Hall's intellectual property. As to BMI's permission, Defendants have created a straw man argument in which they argue that BMI obviously had permission to use Hall's intellectual property. Defendants' argument is incomplete, though, because it addresses only Defendants' use of Hall's intellectual property **while Hall was alive**. The Estate does not dispute that Hall, quite obviously, permitted or licensed the use of his intellectual property to BMI during his lifetime. The Estate's intellectual property claims, however, concern Izumi's use of Hall's intellectual property through Balancing Acts during his lifetime and Defendants' continued use of Hall's intellectual property after Hall's death.[12] Defendants have produced no evidence that whatever oral license or permission they had continued after Hall's death. Defendants' straw man argument, therefore, does not actually address the Estate's intellectual

---

[12] The Estate's contract, conversion, breach of fiduciary duty, and *quantum meruit* claims all encompass, among other things, the Estate's damages claims from Defendants' failure to compensate Hall for his percentage of income derived from Hall's intellectual property.

property claims.  As a result, Defendants have presented no "agreement" that bars the Estate's intellectual property claims.

### E.    The Estate's Claims are Not Barred by Laches

In Defendant's Opposition to the Estate's Motion for Leave to Further Amend Complaint, Defendants argued that various of the Estate's claims were barred by the statute of limitations.  *See* ECF No. 54 at *passim*.  Now, Defendants have revised that argument in name, but not substance, asserting a blanket argument that all of the Estate's claims are barred by laches, rather than any formal statute of limitations.  *See* Defendants' Memorandum at 17-19. The only claims that Defendants address with any detail beyond a single case citation—many of which are not even applicable because they concern other states' common law—are the Estate's trademark related claims.  *See id.*  Defendants have also argued that they have been prejudiced by Hall's absence when, in fact, they attempt to benefit from that absence; it is they, not the Estate, who predicate much of their position on what a deceased person allegedly said to Izumi in the presence of no witnesses.  The Estate's claims are not barred by laches because: (1) Defendants cannot establish the elements of the laches defense, and (2) the Estate has sought prospective injunctive relief to which a laches defense does not apply in any event.

### 1.    Defendants Have Failed to Demonstrate the Required Elements of the Defense of Laches.

The defense of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005).  Despite Defendants' efforts to invert the burden of proof, *see* Defendants' Memorandum at 18, Defendants bear the burden of establishing the elements of laches.  *See Kemp v. Eiland*, 139 F. Supp. 3d 329, 349 (D.D.C. 2015).  Here, Defendants have established neither element.

a.    **The Continuing Tort Doctrine, the Discovery Rule, and the Effect of a Fiduciary Relationship Defeat a Laches Defense**.

"Laches provides a shield against untimely claims, and statutes of limitations serve a similar function." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 334 (2017) (internal citations omitted). In the District of Columbia, a "continuing tort" can be established for statute of limitations or laches purposes by showing "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act . . . within the limitation period." *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 547-548 (D.C. 2002).

> [W]hen the relationship between the fact of injury and the alleged tortious conduct is obscure, the Court of Appeals of the District of Columbia determines when the claim accrues through application of the discovery rule, *i.e.*, the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing.

*Mullin v. Wash. Free Weekly*, 785 A.2d 296, 297 (D.C. 2001). The analysis [of the discovery rule] is ***highly fact-bound*** and requires an evaluation of all the circumstances, including the conduct and misrepresentations of the defendant, the reasonableness of plaintiff's reliance on the defendant, ***and the existence of a fiduciary relationship between the parties***." *BDO Seidman, LLP v. Morgan, Lewis & Bockius LLP*, 89 A.3d 492, 500 (D.C. 2014) (quotation marks omitted, emphasis added)).

In applying the discovery rule to parties in a fiduciary relationship, the Supreme Court of the United States has ruled that:

> although, reposing confidence in their agents, [the complainants] may have neglected availing themselves of some source of knowledge . . . ***the defendants cannot be allowed to say that complainants ought to have suspected them***, and are chargeable with what they might have found out upon inquiry aroused by such suspicion.

*Kilbourn v. Sunderland*, 130 U.S. 505, 519, 9 S. Ct. 594 (1889)) (alteration in original, emphasis

added)).  The United States Court of Appeals for the District of Columbia Circuit ("D.C.

Circuit") has held that "[t]he existence and nature of a fiduciary relationship are important

aspects of the relevant circumstances a court assesses to determine whether a plaintiff exercised

reasonable diligence investigating claims against her fiduciary."  *Momenian v. Davidson*, 878

F.3d 381, 389 (D.C. Cir. 2017).  The District of Columbia Court of Appeals ("D.C. Court of

Appeals") has found that "[a] fiduciary relationship … is indeed '***highly relevant*** to whether

inquiry notice existed.'"  *Ray v. Queen*, 747 A.2d 1137, 1141 n.6 (D.C. 2000) (emphasis added).

In application of the discovery rule, the D.C. Circuit has ruled that "[a] fiduciary relationship

between a plaintiff and defendant may 'reduce the significance of[] any lack of diligence on [a

plaintiff's] part…'"  *Momenian,* 878 F.3d at 389 (quoting *Drake v. McNair*, 993 A.2d 607, 620

(D.C. 2010) and citing *Ray*, 747 A.2d at 1142 (collecting cases)).[13]

> ### b.    Defendants Have Not Demonstrated Lack of Diligence by the Estate with Respect to its Non-Trademark Claims.

Despite having the burden to do so, Defendants have not even tried to establish lack of

diligence by the Estate.  *See* Defendant's Memo at 17-19.  Rather, Defendants have cited a ruling

from a federal court in Florida to establish a presumption of lack of diligence with respect to the

Estate's trademark claims.  *See id.* at 18.  Even if one assumes that the presumption applies—and

it does not, *see infra* at Section IV(E)(1)(c)—it would apply only to the Estate's trademark

claims.  Defendants have made no attempt to establish lack of diligence with respect to any of

---

[13] The D.C. Court of Appeals found the following cases persuasive: *Kilbourn*, 130 U.S. at 519 (cited above); *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988) ("The client must feel free to rely on his attorney's advice. ***Facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved***.") (emphasis added); *Hobbs v. Eichler*, 164 Cal. App. 3d 174, 210 Cal. Rptr. 387, 404 (Cal. Ct. App. 2d Dist. 1985) ("Where a fiduciary relationship exists, facts which ordinarily require investigation may not incite suspicion . . . and do not give rise to a duty of inquiry...") (citations omitted).  *Ray,* 747 A.2d at 1142.

the Estate's various other claims.  *See id.* at 17-19.  On this basis alone, Defendants' laches

argument fails with respect to the Estate's non-trademark claims.

In any event, Defendants cannot demonstrate lack of diligence because of the operation

of the continuing tort doctrine, the discovery rule, and the fiduciary relationship between Hall

and Izumi.  Izumi owed Hall a fiduciary duty.  *See, supra,* Section IV(B)(1). The record evidence

shows that: (a) Hall trusted Izumi, *see* SOF at ¶ 12; (b) Izumi and Hall created Defendant BMI to

receive income from Hall's entertainment goods and services, *see* SOF at ¶ 14; (c) Izumi

received at least roughly half of any of BMI's profits, *see* SOF at ¶ 28; (d) Izumi's company,

Balancing Acts, received royalties arising from Hall's work, *see* SOF at ¶¶ 39-40; (e) through

Izumi's management of BMI since 2015, Izumi failed to compensate Hall what he was owed and

reported compensation to Hall that he never received, *see* CSDF at ¶ 69; (f) Izumi used BMI

funds for personal use and expenses; *see id.*; Exhibit J; (g) Izumi paid Hall's expenses each

month, but no more, thereby obscuring and concealing her behavior, *see* CSDF at ¶¶ 105, 121;

(h) Izumi failed to keep detailed financial records of BMI activities and transactions during her

management of BMI, which obscured and concealed her wrongful actions, *see* CSDF at ¶¶ 108-

110; Exhibit D, Exhibit 1 thereto, at 4; and (i) various royalties and other payments due to Hall's

Estate continue to be paid to Balancing Acts as a result of Izumi's actions, *see* SOF at ¶ 37;

CSDF at ¶ 124.

The evidence reflects the following: (1) Izumi owed Hall a fiduciary duty upon which

Hall reasonably relied, *see Figgins*, 403 Md. at 415; *Schinnerer*, 147 Md. App. at 486; *Jenkins*,

931 A.2d at 1033; (2) a continuous and repetitious wrong arising from Izumi's management of

BMI and attendant failure to pay Hall what he was entitled to receive and diversion of BMI

funds to herself for personal use, with damages flowing from the cumulative effect of her

conduct which continues to this day; and (3) Defendant Izumi's concealment and obscuring of her actions, which precluded discovery of her wrongdoing until the power-of-attorney expired upon Hall's death.

Consequently, the above facts reflect a continuing tort, concealment by Izumi, a fiduciary duty owed to Hall by Izumi, as well as reasonable reliance by Hall on Izumi, which combine to excuse and/or override any possible lack of diligence on Hall's part. *See Beard*, 790 A.2d at 547-548; *Perkins v. Nash*, 697 F. Supp. 527, 533 (D.D.C. 1988); *Momenian*, 878 F.3d at 389; *Ray*, 747 A.2d at 1141-42; *Diamond*, 680 A.2d at 365. Defendants, therefore, have failed to establish the first element of a laches defense with respect to the Estate's non-trademark claims. *See Pro-Football*, 415 F.3d at 47. At the very least, the Estate has demonstrated a genuine dispute of material fact for the jury given "the flexible and fact intensive nature of laches." *Crocker v. Piedmont Aviation*, 696 F. Supp. 685, 692 (D.D.C. 1988).

### c. Defendants Have Not Demonstrated Lack of Diligence by the Estate with Respect to its Trademark Claims.

Despite having the burden to do so, Defendants have also not even tried to establish lack of diligence by the Estate with respect to the Estate's trademark claims. *See* Defendant's Memo at 17-19. Defendants have relied entirely on a presumption applied by the United States District Court for the Southern District of Florida. *See id.* at 18. Defendants' argument fails on the law and the facts.

Based on undersigned counsel's research, this Court has ***never*** applied the presumption argued by Defendants.[14] In *Gaudreau*, this Court was presented with an argument by a

---

[14] Defendants have presented this "presumption" as akin to a four-year statute of limitations. *See* Defendant's Memo at 18. That construction of the presumption is incorrect. No federal circuit court has established a blanket four-year rule for the application of laches to a trademark matter. The D.C. Circuit, as well as the United States Courts of Appeals for the Federal, First, Fourth,

defendant that the District of Columbia's general three-year statute of limitations was the most analogous applicable state law and the court should, therefore, apply a laches presumption to a claim not brought within three years. *Gaudreau*, 511 F. Supp. 2d at 157-58. This Court found the argument "unpersuasive." *Id.* at 158. Ultimately, this Court rejected the application of laches because of the plaintiff's opposition to the defendant's trademark in the United States Patent and Trademark Office and, "[m]oreover" because the plaintiff sought injunctive relief, which precluded the application of laches. *Id.* at 158-159.

Even if the Court were inclined to consider the application of a laches presumption, Defendants' argument still fails on the facts. Defendants mischaracterize the Estate's Complaint, suggesting that the Estate has alleged that BMI started using the "Biz Markie" mark without Hall's approval in 2015. *See* Defendants' Memorandum at 18. The Estate has never made such an allegation. Rather, the Estate's trademark use and ownership claims—not to be confused with the Estate's claims that Izumi and BMI failed to compensate Hall appropriately—arise from Defendants' use of the mark beginning after Hall's death on July 16, 2021.[15] Regardless of

---

Fifth, Seventh, Eighth, and Tenth Circuits, have never applied a presumption regarding laches in a trademark matter. On the other hand, the United States Court of Appeals for the Second, Third, Sixth, Ninth, and Eleventh Circuit have applied a presumption regarding laches in a trademark matter according to the statute of limitations period for the most analogous applicable state law. *See Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018); *Island Insteel Sys. v. Waters*, 296 F.3d 200, 209 (3d Cir. 2022); *Tandy Corp. v. Malone & Hyde, Inc*., 769 F.2d 362, 366 (6th Cir. 1985); *Ramirez v. Navarro*, No. 23-55112, 2024 U.S.P.Q.2D (BNA) 809, 2024 U.S. App. LEXIS 10419, *2, 2024 WL 1874993 (9th Cir. 2024); *AmBrit, Inc. v. Kraft, Inc*., 812 F.2d 1531, 1546 (11th Cir. 1986). This Court has, however, applied a presumption in patent matters if an action is not filed within six years after having sufficient knowledge to file suit, but not in a trademark matter. *See, e.g.*, *Chubb Integrated Sys. v. Nat'l Bank of Wash.*, 658 F. Supp. 1043, 1047 (D.D.C. 1987).

[15] To clarify, the Estate is not relinquishing any claims for damages arising from Defendants' use of the "Biz Markie" mark prior to Hall's death. BMI's use of the mark prior to Hall's death, however, was permitted by Hall and, therefore, he remained entitled to his rightful portion of the income derived from such use.

whether District of Columbia or Maryland law applies, the applicable limitations period would be three years.[16]  This action was filed on March 23, 2022, within a year after Hall's death, well within the three-year limitations period.[17]  Consequently, there is no basis on which to apply a presumption of lack of diligence for purposes of laches.

> **d.      Defendants Have Not Demonstrated That They Have Been Prejudiced**.

As noted above, the second element of laches is "prejudice to the party asserting the defense." *Pro-Football*, 415 F.3d at 47.  Defendants have failed to establish this element as well. Defendants have attempted to argue that they have been prejudiced because Hall is no longer alive and he, therefore, is unable to confirm Izumi's assertions.  Defendants have it backwards. Defendants have not been prejudiced by Hall's absence; the Estate has.

In support of their Motion for Summary Judgment, Defendants have asserted eighty-eight allegedly undisputed facts.  Thirty-one of those, more than a third, are allegations supported

---

[16] As explained by this Court in *Gaudreau*:

> [T]he District of Columbia has no specific statute of limitations for a trademark infringement claim, and the Court has not found any D.C. case law addressing the question. However, the D.C. Code provides for a three-year limitations period for all causes of action "for which a limitation is not otherwise specially prescribed" by statute.  D.C. Code Ann. § 12-301(8).  Absent any contrary indication from the D.C. courts that some more specific statute of limitations applies to a trademark infringement case, the Court concludes that the District of Columbia's three-year general statute of limitations applies to plaintiffs' state law claims.

*Gaudreau*, 511 F. Supp. 2d at 157.  Maryland has an analogous statute for trademark infringement, but it does not contain its own statute of limitation.  *See* Md. Code Ann., Bus. Regs. § 1-414.  Consequently, Maryland's general three-year statute of limitations seems to apply.  *See* Md. Code, Cts. & Jud. Proc. § 5-101.

[17] Even if the relevant date were 2015 rather than 2021, the operation of the continuing tort doctrine, the discovery rule, and the fiduciary relationship between Hall and Izumi apply equally to the Estate's trademark claims as the Estate's non-trademark claims and preclude the operation of laches generally.

almost exclusively by Izumi's own testimony that Hall would be best able to dispute because they are either (a) derived from statements allegedly made by Hall to Izumi, *see* SOF at ¶¶ 8, 13-14, 25-29, 35-38, 40-41, 46, 49-50, 55, 57, 76, 83, 86; or (b) derived from Hall's alleged state of mind, *see* SOF at ¶¶ 16-21, 44, 74, 84, 88.  Many of those allegations concern BMI's structure and function, a central component of this case.  The undisputed evidence in this matter establishes that Izumi, despite her claims to have managed BMI, effectively kept no records of the business.  CSDF at ¶¶ 108-110; Exhibit D, Exhibit 1 thereto, at 4.  As a result, Izumi can claim that Hall said anything she wants—or more accurately anything she needs to defend herself—without fear of contradiction by Hall or by any documentation (because she kept none).  Izumi is certainly not prejudiced by being able to freely claim Hall said whatever she needs him to have said to posthumously ratify her behavior.

For example, Izumi claims to have possessed a digital copy of Hall's signature and has admitted that she signed Hall's name on documents, attempting to copy his signature.  SOF at ¶ 84; CSDF at ¶ 21.  Izumi **claims** that prior to signing anything on Hall's behalf, she first obtained his approval.  *See id.*  But Izumi kept no records, such as an email from her to Hall, confirming such authorizations.  Izumi has admitted that she applied Hall's alleged "digital signature" to a letter to Rhino Entertainment Company, a division of Warner Music, directing payment of royalties to Izumi's wholly-owned company, Balancing Acts.  SOF at ¶ 85.  Izumi has produced no evidence to verify that she was authorized to apply his signature to that letter.

Further, Izumi has testified that she had multiple versions of Hall's "digital signature" that were ***not his actual*** signature, in addition to when she simply tried to copy Hall's signature.  CSDF at ¶¶ 21, 40.  Hall's "digital signature," or a very similar signature, appears elsewhere in the documents relied upon by Izumi.  The business loan application that Hall allegedly signed

reflects a signature bearing a significant resemblance to Hall's alleged "digital signature" and the signature reflected on Hall's personal tax returns that Izumi may have herself written, copying Hall's signature. *See* Exhibit E, Exhibit 7 thereto. Those signatures look very different from Hall's witnessed signature on the loan agreement. *Id.* Those alleged "digital signatures" look different because they were not Hall's signatures; they were Izumi signing his name. *See id.;* CSDF at ¶¶ 21, 40.

Another example is the BMI Stockholder Agreement that Izumi prepared in 2021, and discussed *supra* at Section IV(A)(1). Izumi admitted that she had never even discussed this "Stockholder's Agreement" with Hall before he died. CSDF at ¶ 15. Izumi's assertion that she always had Hall's approval to sign documents on his behalf is patently false.[18]

Izumi has also alleged that "[i]n early 2019, Marcel Hall and Izumi agreed that Izumi would handle all of the business operations relating to 'Biz Markie' and that she would do so through Balancing Acts, Inc. ('BAI') instead of BMI." SOF at ¶ 37. If that is true, and all business activities were transferred to Balancing Acts instead of BMI, and BMI was effectively defunct, it begs the question of why Izumi felt the need to prepare and allegedly execute a Stockholders Agreement for BMI over two years later in May 2021. If Hall were alive, he could provide his perspective on these inconsistent actions. Instead, we are left only with Izumi's self-serving explanation.

In fact, Izumi's own testimony in this matter suggests that there never was an agreement to transfer all business operation to Balancing Acts. When asked if Balancing Acts ever performed services for Hall, she responded "Occasionally, yes." CSDF at ¶37. "Occasionally" is inconsistent with a full transfer of all business activities to Balancing Acts. Izumi's assertion

---

[18] *See also* Izumi's signature on the trademark application consent form. CSDF at ¶ 98.

that such a transfer occurred with Hall's blessing is just another example of Izumi's ever-changing self-serving statements that shift to meet her need at any given moment.

The evidence in this matter demonstrates that Izumi acted with impunity in applying Hall's signature to documents, that she failed to keep even the most basic of business records, effectively concealing her actions, and that Hall trusted her to manage the business side of his artistic endeavors.  Izumi's claims of prejudice ring hollow and she cannot wield such claims as a shield to be hide behind when doing so would allow her to benefit from her concealment and self-serving allegations concerning the statements and mental state of a dead man.  *See Kilbourn*, 130 U.S. at 519.  Izumi is here to defend herself.  Hall is not.

The Estate is the true party that has been prejudiced by Hall's absence.  Defendants have suffered none; to the contrary, Defendants benefit from Hall's absence.  Defendants, therefore, have failed to establish the second element of a laches defense.  *See Pro-Football*, 415 F.3d at 47.  At the very least, the Estate has demonstrated a genuine dispute of material fact for the jury given "the flexible and fact intensive nature of laches."  *Crocker*, 696 F. Supp. at 692.  Consequently, this Court should reject Defendants' laches arguments and deny Defendants' Motion for Summary Judgment.

### 2. Laches Does Not Apply Because The Estate Has Sought Injunctive Relief.

"[I]t is well established that laches generally does not apply to bar claims for prospective injunctive relief."  *Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152, 159 (D.D.C. 2007).  The reason for this is simple.  "A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm.  Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches."  *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001).

Here, the Estate has sought an injunction enjoining Defendants from, broadly speaking and among other things: continuing to use the "Biz Markie" mark or any similar such mark; using the name, image, and likeness of Hall; retaining any documents, materials, and products bearing the "Biz Markie" mark; continuing to receive recurring sources of income, including but not limited to royalties; retaining access to Hall's bank accounts, loan accounts, and the like.  *See* ECF No. 61 at 37-40.  This request for injunctive relief encompasses all aspects and counts of the Estate's claims against Defendants.  Defendants' laches defense, therefore, does not apply to the Estate's claims, *see Gaudreau*, 511 F. Supp. 2d at 159, and, therefore, must be rejected on its face.

### F.     The Estate's Claims are Not Barred by "Corporate Law"

Defendants have argued that the Estate's claims are barred by "corporate law." Defendants' arguments are, again, meritless.

#### 1.     The Legal Principles Cited by Defendants Do Not Apply to This Matter.

Defendants' lead citation to their argument does not apply to this matter.  Defendants have cited a 1974 Supreme Court case for the principle that "a shareholder may not complain of acts of corporate mismanagement *if he acquired his shares from those who participated or acquiesced* in the allegedly wrongful transactions."  *See* Defendants' Memorandum at 13 (citing *Bangor Punta Operations, Inc. v. Bangor & A. R. Co*., 417 U.S. 703, 710 (1974) (emphasis added).  The Supreme Court explained that this rule applies where: "a shareholder purchases all or substantially all the shares of a corporation *from a vendor* at a fair price, and then seeks to have the corporation recover *against that vendor* for prior corporate mismanagement."  *Bangor Punta*, 417 U.S. at 710.  The problem with allowing such an action is that it would allow suit where "shareholders of the plaintiff corporation in that case had sustained no injury since they

had acquired their shares … [and] would permit the shareholders to reap a profit from wrongs done to *others*." *Id.* at 711. In other words, the issue before the court was a standing issue and a question of whether the named plaintiffs were actually harmed. Ultimately, the Supreme Court determined that the then-current majority shareholder lacked standing to maintain the action. *Id.* at 712.

Here, there is no such "vendor." Hall did not purchase his shares of BMI from a vendor; he founded the entity. Similarly, there is no harm done to "others" for which Hall would reap a windfall; the harm was done to him, personally. Consequently there is no standing issue as was present in the *Bangor Punta* matter and its reasoning does not apply to this matter.

Further, Defendants' citation to a decision by the United States District Court for the Eastern District of New York—applying New Jersey law, and a Minnesota state appellate court decision—also citing New Jersey law, reflects that the principle relied upon by Defendants is known as the "doctrine of acquiescence*." See Digital Camera Int'l, Ltd. v. Antebi*, No. 11-cv-1823, 2017 U.S. Dist. LEXIS 109648, *16, 2017 WL 2992719 (E.D.N.Y. July 14, 2017). Undersigned counsel has been unable to find any instance of this Court, or the D.C. Circuit, ever applying the doctrine of acquiescence defense or the principle as construed by Defendants.[19]

Defendants also cited the "continuous ownership rule." *See* Defendants' Memorandum at 13. This Court has recognized that rule, albeit as the "*contemporaneous* ownership rule," which "requires that the plaintiff have been a shareholder at the time of alleged wrongful acts." *First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 20 (D.D.C. 1998). In other words, Defendants are arguing, simultaneously, that Hall was not a shareholder at the time of the wrongful acts, but that

---

[19] This Court, however, has applied the standing rule as stated by the United States Supreme Court in the *Bangor Punta* matter. *See Rea Express, Inc. v. Travelers Ins. Co.*, 406 F. Supp. 1389, 1395 (D.D.C. 1976). As described above, though, standing is not at issue in this matter.

he is also barred from making claims concerning those acts because he participated in or acquiesced to those acts, *as a shareholder*. *See* Defendants' Memorandum at 13. Obviously, these arguments are inconsistent. Defendants have not identified any facts to suggest that Hall lost his ownership stake in the BMI entity. *See* SOF at *passim*; Defendants' Memorandum at *passim*. The contemporaneous ownership rule, therefore, is not at issue in this matter.

2.     **Defendants Failed to Identify Acquiescence as an Affirmative Defense and Have Forfeited Any Such Defense**.

In any event, this Court should reject Defendants' argument for failure to present it as an affirmative defense in their Answer to the Estate's Second Amended Complaint. Federal Rule of Civil Procedure 8(c) states that "[i]n responding to a pleading, a party *must* affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c) (emphasis added). Failure to plead an affirmative defense constitutes forfeiture of the defense and it must be "excluded from the case." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1107 (D.D.C. 2019) (citing *Wood v. Milyard*, 566 U.S. 463, 470, 132 S. Ct. 1826 (2012)).

Despite Defendants' attempt to dress it up as a "corporate law" defense, *see* Defendants' Memorandum at 13-17, acquiescence is an affirmative defense.[20] Defendants, however, did not generally assert the equitable affirmative defense of acquiescence in their Answer. ECF No. 62 at *passim*. Rather, Defendants asserted the affirmative defense of acquiescence only with specific respect to Defendant BMI's use of the "Biz Markie" mark, *see* ECF No. 62 at 57. Defendants have not asserted the defense with respect to any other claim or issue. Defendants,

---

[20] *See Mullins v. Reitz Coal Co.,* 105 L.R.R.M. 2776, 1979 U.S. Dist. LEXIS 13524, *16 (D.D.C. 1979) (referring to acquiescence as an affirmative defense); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 79 F. Supp. 3d 60, 73 (D.D.C. 2015) (citing with approval a decision by the United States District Court for the Southern District of New York referring to the "affirmative defense of acquiescence").

therefore, have generally forfeited the defense of acquiescence and it must be excluded from this matter.[21]  *See Maalouf*, 923 F.3d at 1107.

### 3.  Defendants Have Failed to Present Adequate Facts to Establish Their Defense.

Even if the Court is willing to consider Defendants' "corporate law" argument, despite the facts that (a) it has never been applied by this Court and (b) Defendants failed to plead its affirmative defense, Defendants have still failed to establish undisputed facts to support their argument.  The lack of factual support is evident when compared to the cases on which Defendants rely.

In *Digital Camera*, the party that was determined to have participated in or acquiesced to the wrongful acts which he subsequently complained of was far more involved in the subject acts, with documentation to support that involvement, than Hall.  In that matter, the specific complainant of the corporate acts: (a) most importantly, "***was in charge of day-to-day operations***," *Digital Camera*, 2017 U.S. Dist. LEXIS 109648 at *2 (emphasis added); but also (b) had "mislabeled some charges as corporate that should have been labeled as personal," *id.* at *3-4; (c) "admitted that he misidentified some personal charges as corporate and some corporate charges as personal," but "could not prove which charges he mistakenly labeled as personal other than to conclusorily say as much," *id.* at *4; (d) purchased "tickets [that] were eventually billed to his due-to/due-from account as personal purchases," *id.*; an (e) used [corporate] assets to fund

---

[21] By Defendants' own admission, this "defense" applies only to Counts XIII and XIV, brought derivatively.  The principle relied upon by Defendants, as quoted by Defendants, is that '[a] shareholder has no standing to bring claims on behalf of the corporation if the shareholder participated or acquiesced or received benefits from . . . [the] acts about which the shareholder complains **in the derivative action.**") (emphasis added).  Defendants' Memorandum at 13.  This Court, therefore, should not consider Defendants' "corporate law" argument with respect to any of the Estate's other claims.

an extra-marital affair, splurging on luxury cars and international trips, among other purchases for his mistress," *id.* at *5.

In *Gunderson*, the other case relied upon by Defendants, the complainant of the corporate acts "drafted and filed the articles of incorporation, assumed ***responsibility for the company's day-to-day operations and financial affairs***, and became its marketing director." *Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 179 (Minn. App. 2001). The complainant's specific complaint arose out of a buy-sell agreement that the complainant (a) had personally signed, (b) taken "an active role in drafting," (c) selected the attorney who represented the company and had provided a form agreement from which the ultimate agreement was prepared, and (d) proposed the specific provision at issue. *Id.* at 179-80. In addition, the complainant had admitted to personal engagement in the behavior which was the subject of his complaint. *Id.* at 188.

Here, Defendants have asserted nothing close to this level of participation or acquiescence. Defendants have offered no record of Hall's participation or acquiescence to any of the wrongful acts committed by BMI with Izumi running the company. Defendants have only asserted, in blanket form, based solely on Izumi's self-serving and unsubstantiated testimony, that Hall approved, or was at least aware, of her actions. Izumi's assertions are inconsistent with her own testimony in this matter.

According to Izumi, unlike the claimants in *Digital Camera* and *Gunderson*: (a) Hall was "a performer," "an artist," whose "priority was being a performer;" (b) his focus was being an entertainer; (c) as such, Hall was not involved in the "day-to-day operations" of BMI; (d) Hall was not involved in the "day-to-day business" of BMI; (e) Hall did not "execut[e] all the day-to-day transactions" of BMI; (f) Hall had entrusted those day-to-day business operation tasks

41

actions to Izumi; and (g) Hall also had health issues and a lot going on in his life that prevented his involvement in the "day-to-day business." CSDF at ¶¶ 35-36. Based on Izumi's own words, therefore, Hall did not participate in or acquiesce to the wrongful acts of which his Estate now complains.

Further, as discussed at length above, Izumi concealed and obscured her actions through lack of record keeping, which precluded discovery of her wrongdoing. Hall did not participate or acquiesce to the wrongful acts of which his Estate now complains. At the very least, the Estate has demonstrated a genuine dispute of material fact that must be left to the jury, particularly given the credibility issues presented by Izumi's inconsistent assertions. *See Washington Post*, 865 F.2d at 326 n.8. Consequently, this Court should reject Defendants' trademark arguments and deny their Motion for Summary Judgment.

### G.  The Estate Has Disclosed Its Damages Claims

Defendants have argued that the Estate lacks admissible evidence to support the damages elements of its claims because the Estate's damages are based solely on inadmissible expert testimony. Defendants' Memorandum at 11-13. Defendants are mistaken. First, the opinions of the Estate's experts are admissible, as discussed *supra* at Section IV(B). Second, the Estate has disclosed its damages theories and calculations by directing Defendants to the Estate's expert reports, as well as the various financial records of Hall, BMI, and Izumi. *See* CSDF at ¶ 69.

Defendants never deposed the Estate or its experts. In the first two of seventeen interrogatories served upon the Estate, Defendants asked the Estate to identify the facts and evidence supporting the allegations that Izumi paid or distributed to herself more than 51% of the earnings earned by BMI. *See* CSDF at ¶ 69; Exhibit E, Exhibit 3 thereto at 3-4. In response, the Estate directed Defendants to Williams' Expert Report, as well as all exhibits thereto, comprising

financial records of Hall, Izumi, BMI, and Balancing Acts, including but not limited to tax returns and bank statements, some of which specifically reflected "various personal expenses." *Id.* Defendants were already in possession of those financial records. Additionally, as demonstrated above, the Estate has identified the personal expenses charged by Izumi to BMI, but not repaid, as a source of damages. *See* CSDF at ¶ 69; Exhibit E, Exhibit 3 thereto at 3-4.

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Additionally, the Estate has alleged a violation of the Anti-Cybersquatting Consumer Protection Act, which carries statutory damages of up to $100,000. *See* ECF No. 61 at ¶¶ 85-99; 15 U.S.C. § 1117(d). As statutory damages no discovery need have been disclosed. The Estate has disclosed all necessary information concerning its damages.

### H. Defendants Are Not Entitled to Attorney Fees

Despite the countless holes identified in Defendants' trademark theory, they have asked this Court to award them attorney fees for the Estate's alleged lack of a factual basis to prove ownership of the "Biz Markie" mark. Again, the Defendants' foundation for this request is BMI's supposed uncontestable ownership and the straw man argument that the Estate claims Hall's loan out company used the mark without his permission. As explained at length above, the Estate has made no such claim. The Estate has demonstrated that BMI, under its own theory and logic, did not own, and could not have owned, the "Biz Markie" mark. Hall, professionally known as "Biz Markie" for over thirty years, and who performed and marketed himself under that name from 1988 until his death in 2021, owned the mark and never abandoned it. Like all of Defendant's argument, their request for attorney fees is meritless.

## V.    CONCLUSION

For the reasons stated above, Plaintiff, Tara Hall, As Personal Representative of The Estate of Marcel Theo Hall, and derivatively on behalf of Biz Markie, Inc., respectfully requests that this Court deny Defendants Jennifer Izumi's and Biz Markie, Inc.'s Motion for Partial Summary Judgment.

Dated: November 18, 2024                        Respectfully submitted,

_/s/ Peter C. Nanov_____
Peter C. Nanov (D.C. Bar No. 230021)
Vorys, Sater, Seymour and Pease LLP
1909 K Street, NW, 9th Floor
Washington, DC 20006
(202) 467-8831
(202) 533-9084 (Facsimile)
pcnanov@vorys.com

Michael J. Garvin, _pro hac vice_
Marcel C. Duhamel, _pro hac vice_
Aaron M. Williams, _pro hac vice_
Vorys, Sater, Seymour & Pease LLP
200 Public Square, Suite 1400
Cleveland, OH 44114-2327
(216) 479-6100
mjgarvin@vorys.com
mcduhamel@vorys.com
amwilliams@vorys.com

_Attorneys for Plaintiff_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2024, the foregoing was filed with the U.S. District Court for the District of Columbia, and served upon all parties of record via the Court's e-filing system or email.

*/s/ Peter C. Nanov*
Peter C. Nanov
