Exhibit B

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

 2

 3     --------------------------

       TARA HILL AS PERSONAL        :

 4     REPRESENTATIVE OF THE        :

       ESTATE OF MARCEL THEO HALL,  :

 5                                  :

           Plaintiff,              :

 6                                  :  Case No.:

       vs.                          :

 7                                  :  1:22-cv-00806(CKK)

       BIZ MARKIE, INC.,            :

 8     et al.,                      :

                                    :

 9        Defendant.                :

       --------------------------

10

11        VIDEO-RECORDED DEPOSITION OF JENNIFER IZUMI

12     DATE:           December 29, 2023

13     TIME:           9:55 a.m.

14     LOCATION:       Vorys Sater Seymour & Pease LLP

                       1909 K St NW Suite 900

15                     Washington, D.C. 20006

16

17     REPORTED BY:  Felicia A. Newland, CSR

18

19

20

21               Veritext Legal Solutions

             1250 Eye Street, N.W., Suite 350

22                 Washington, D.C. 20005
```

Page 2

```
 1          A P P E A R A N C E S
 2  On behalf of Plaintiff:
 3      MICHAEL J. GARVIN, ESQUIRE
 4      Vorys Sater Seymour & Pease, LLP
 5      200 Public Square
 6      Suite 1400
 7      Cleveland, Ohio 44114
 8      mjgarvin@vorys.com
 9  On behalf of Defendants:
10      DAYNA COOPER, ESQUIRE
11      Cooper Legal
12      1 Olympic Place
13      Suite 900
14      Towson, Maryland 21204
15      dayna@cooperlegalsolutions.com
16  Also Present:
17      Tara Hall (Via Zoom)
18      Videographer, Veritext Legal Solutions
19
20
21
22
```

Page 3

```
 1          C O N T E N T S
 2  EXAMINATION BY:                 PAGE
 3    Counsel for Plaintiff           7
 4      IZUMI DEPOSITION EXHIBITS
 5  NO.  DESCRIPTION                PAGE
 6   6  Bates Number Hall_JRH_01038      22
 7   2  District of Columbia Certificate, Bates    49
 8      Number D002185
 9   4  Bates Number Hall_JRH_01514 through 1543   59
10   7  Maryland Statutory Form, Power of    76
11      Attorney
12  10  Bates Numbers D004530 through 4545    124
13  11  Bates Numbers D00053 through 61      127
14  19  Bates Numbers D001292 through 1300   135
15  31  1040 Individual Income Tax Return 2017   141
16  38  Bates Number Hall_JRH_01511     143
17  29  1040 U.S. Individual Tax Return 2015    151
18  37  Bates Number D001990           156
19   8  Defendant's Biz Markie, Inc. and    158
20      Jennifer Izumi's Rule 26(a)(1)(A)
21      Initial Disclosures
22
```

Page 4

```
 1      IZUMI DEPOSITION EXHIBITS
 2  NO.  DESCRIPTION                PAGE
 3   9  Responses to Plaintiff's First Set of    163
 4      Interrogatories and Second Set of
 5      Requests for Production to
 6      Defendant/Counterclaimant Jennifer Izumi
 7  12  Bates Numbers D00008 through 14      165
 8  14  Bates Numbers D007216 through 7217    175
 9  16  Bates Number D000052            177
10
      (*Exhibits attached to transcript.)
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 5

```
 1          P R O C E E D I N G S
 2          * * * * * * *
 3      VIDEOGRAPHER:  Good morning.  We're
 4  going on the record at 9:55 a.m. on December 29th,
 5  2023.  Please note that the microphones are
 6  sensitive and may pick up whispering and private
 7  conversations.  Please mute your phones at this
 8  time.
 9      Audio and video recording will
10  continue to take place unless all parties agree
11  to go off the record.
12      This is Media Unit 1 of the
13  video-recorded deposition of Ms. Jennifer Izumi
14  in the matter of Tara Hall versus Biz Markie,
15  Inc., et al., filed in the United States District
16  Court for the District of Columbia, Case No.
17  1:22-cv-00806-CKK.
18      My name is Orson Braithwaite
19  representing Veritext Legal Solutions, and I'm
20  the videographer.  And the court reporter is
21  Felicia Newland from the firm Veritext Legal
22  Solutions.
```

2 (Pages 2 - 5)

1    Counsel will now state their
2  appearances and affiliations for the record.
3    MR. GARVIN:  Michael Garvin, Vorys,
4  Sater, Seymour, and Pease, on behalf of Tara Hall,
5  and as administrator of the Estate of Marcel Hall.
6    MS. COOPER:  Isn't co-counsel
7  going --
8    MR. GARVIN:  No.  They're not on.
9    MS. COOPER:  Okay.  So who's on
10  the --
11    MR. GARVIN:  Tara Hall is on both.
12    MS. COOPER:  Oh, okay.
13    Dayna Cooper of Cooper Legal,
14  counsel for the Defendants.
15    VIDEOGRAPHER:  Okay.  Thank you.
16    Will the court reporter please
17  swear in the witness.
18    (Witness duly sworn in.)
19    MS. COOPER:  Before we begin, I would
20  like to state for the record my objections to all
21  lines of questionings to Jenny Izumi -- Jennifer
22  Izumi in her individual capacity or in her capacity

1  as owner for -- owner of Biz Markie, Inc.
2    The notice of deposition -- the
3  notice of -- the notice deposition was for
4  Balancing Acts for today, but I see here that we
5  have exhibits for Jennifer Izumi in her
6  individual capacity -- potentially Jennifer Izumi
7  in her individual capacity or in her capacity as
8  owner of BMI.
9    MR. GARVIN:  Okay.
10    MS. COOPER:  Okay.
11        * * * * * *
12  Whereupon,
13    JENNIFER IZUMI
14  was called as a witness and, having been first duly
15  sworn, was examined and testified as follows:
16    EXAMINATION BY COUNSEL FOR PLAINTIFF
17  BY MR. GARVIN:
18    Q    Ms. Izumi, have you ever given
19  testimony of any sort before?
20    A    No.
21      It's Izumi.
22    Q    Izumi.  Excuse me.

1    A    No worries.
2    Q    So I'm going to ask you a number of
3  questions today.
4    A    Uh-huh.
5    Q    If you can't hear me, will you please
6  let me know?
7    A    Uh-huh.
8    Q    Okay.  It would be better if you
9  answer "yes" or "no" instead of "uh-huh" or
10  "huh-uh."  It's a lot easier for the court
11  reporter.  So if you could --
12    A    Okay.
13    Q    -- try to do that, that would be
14  great.
15    A    Okay.
16    Q    If you don't understand my question,
17  please let me know and I will try to clarify it.
18  Okay?
19    A    Okay.
20    Q    Great.
21      Within reason, if you need breaks,
22  let us know.  No problem.

1    A    Okay.
2    Q    Okay.  Are there any reasons why you
3  could not be -- would not be able to give testimony
4  today such as being ill or under medical conditions
5  or anything like that?
6    A    No.
7    Q    Okay.  Are you taking any medications
8  that would impair your ability to understand my
9  questions?
10    A    No.
11    Q    Okay.  All right.  Let's just start.
12  So what is your highest level of education?
13    A    Associate's.
14    Q    In what field?
15    A    General studies.
16    Q    Okay.  I'd like to understand your
17  job history first.  Since you -- well, yeah, since
18  you -- when did you receive your associate's?
19    A    I -- I don't remember.
20    Q    Decade?
21    A    I -- I don't know what year that was.
22  I don't remember what year that was.

1    Q    And you don't recall what decade that
2  was?
3    A    You are asking me what decade?
4    Q    Yes.
5    A    I don't -- I don't -- I don't
6  remember.  Let's see.  I don't know.  Maybe over a
7  decade ago.
8    Q    Fair.
9        Where do you presently reside?
10   A    Las Vegas and Washington, D.C.
11   Q    Okay.  And when you say Washington,
12  D.C., here in the District?
13   A    Correct.
14   Q    Okay.  You were manager of Marcel
15  Hall at one time?
16   A    Yes.
17   Q    Okay.  Prior to being Mr. Hall's
18  manager, what did you do for a living?
19   A    I worked in the entertainment
20  industry doing everything from promotions and
21  marketing to administrative in the entertainment
22  industry.

1    Q    Okay.  Were you working within a
2  particular sector of the entertainment industry
3  when you were doing this?
4    A    Music.
5    Q    Okay.  A particular genre of music?
6    A    Urban.
7    Q    Okay.  Prior to working in the
8  entertainment industry, what did you do for a
9  living?
10   A    I went -- where did I work prior?  I
11  was working for Verizon.
12   Q    Okay.  Doing what?
13   A    Customer service and retail sales.
14   Q    Okay.  And then prior to working for
15  Verizon, did you do anything for a living?
16   A    I don't remember anything
17  specifically.  This was a really long time ago.  I
18  don't remember what I did prior to Verizon.
19   Q    Okay.  Before you worked with
20  Mr. Hall, were you working full time in the
21  entertainment industry?
22   A    Yes.

1    Q    Did you do anything --
2    A    Wait.  I'm sorry.  Could you repeat
3  that again?
4    Q    Sure.  Sure.
5        Before you worked with Mr. Hall as
6  his manager --
7    A    Uh-huh.
8    Q    -- were you working full time in the
9  entertainment industry?
10   A    Yes.
11   Q    Okay.  So you weren't doing anything
12  to supplement your income in addition to your
13  working in the entertainment industry?
14   A    No.
15   Q    And just to be clear, you were never
16  a bartender?
17   A    No.
18   Q    Okay.  Or a server in an -- in a --
19  in a restaurant or a bar?
20   A    No.
21   Q    Okay.  Did you know Mr. Hall before
22  you began working with him?

1    A    Did I know Mr. Hall?  No.
2    Q    Okay.  So tell us how you came to be
3  working with Mr. Hall.
4    A    Through doing part-time
5  administrative work for him.
6    Q    Okay.  But you didn't know him when
7  you were doing that part-time administrative work?
8    A    I knew him.
9    Q    Okay.  Tell us how you came to meet
10  Mr. Hall.
11   A    I met him through mutual friends.
12   Q    Okay.  That sounds like plural.  So
13  more than one mutual friend?
14   A    Yes.  I mean, we are talking over two
15  decades ago, so I'm just trying to recall, but yes.
16   Q    Okay.  Can you --
17   A    In D.C.  You know, D.C. is small,
18  so . . .
19   Q    Uh-huh.
20        Do you recall the names of those
21  friends?
22   A    I don't.

4 (Pages 10 - 13)

Page 14

1   Q   Okay.  Were you working -- when you
2   were doing this administrative work, was it through
3   his prior business manager?
4   A   Yes.
5   Q   Okay.  And that was Lamont Wanzer?
6   A   Correct.
7   Q   Okay.  Describe the administrative
8   work that you were doing for him.
9   A   The administrative work would be
10  updating, creating, and editing contracts,
11  organizational administrative items to help get the
12  company organized.
13  Q   Was the company BizMont
14  Entertainment?
15  A   Yes.
16  Q   Okay.  Did you know Mr. Wanzer's
17  compensation arrangements with Mr. Hall?
18  A   No.
19  Q   Okay.  Can you describe -- and when I
20  say "Mr. Hall," it's Marcel Hall.
21  A   Yes, that's fine.
22  Q   Can you describe Mr. Hall's

Page 15

1   personality?
2   A   Comical, easygoing.  That's pretty
3   much it.
4   Q   Okay.  Did he place his trust in you
5   as his business manager?
6   A   He did.
7   Q   Okay.  Do you know how far Mr. Hall
8   got in formal education?
9   A   High school.
10  Q   Okay.  A graduate?
11  A   Yes.
12  Q   Okay.  Do you know if he had any
13  business training?
14  A   I do not.
15  Q   Okay.  Do you know if he had any
16  business experience?
17  A   I do not.
18  Q   Okay.  Would you agree that he wasn't
19  sophisticated, as far as being a business person?
20  A   Could you repeat the question?
21  Q   Sure.
22      Would you agree that he was not

Page 16

1   experienced -- let me just start over.
2       Would you agree that he was not
3   sophisticated with respect to business matters?
4   A   Would I agree that he was not?  No, I
5   would not agree.
6   Q   You think he was sophisticated
7   regarding business matters?
8   A   I think he was -- he was
9   knowledgeable.  Do I think it was his -- when you
10  say "sophisticated," he was an artist, an
11  entertainer, so . . .
12  Q   I can assume what you mean by that,
13  but I don't really know.  Can you expand on that,
14  please?
15  A   He was more like sophisticated.  I
16  mean, he was aware -- he knew of -- he was aware
17  of -- it wasn't his specialty.  So when you say
18  "sophisticated," what is your definition of
19  sophisticated?
20      MS. COOPER:  So "knowledgeable"
21  doesn't answer your question.  Are you -- it may
22  help -- I'm just trying to close the gaps here.

Page 17

1       MR. GARVIN:  I appreciate it.  I'm
2   thinking about it.
3       MS. COOPER:  Okay.
4       MR. GARVIN:  So it's all right.  No,
5   that's a fair question.  I'm not sure I can do
6   better, but let me give it a moment's thought.
7   BY MR. GARVIN:
8   Q   I will try to make it more tangible.
9   Was he directly involved in negotiating contracts
10  pertaining to his entertainment services?
11  A   Occasionally.
12  Q   Okay.  Do you know whether he had
13  done that prior to your becoming his manager?
14  A   I think occasionally with -- with --
15  well, you say Lamont, but with Monte, I think
16  occasionally.
17  Q   Okay.  I may -- I don't want to make
18  assumptions.  Monte and Lamont are the same person?
19  A   Correct.  That's why I said when you
20  say Lamont and I say Monte, but yes.
21  Q   Okay.  Before you became Mr. Hall's
22  manager, were you the manager of any other

5 (Pages 14 - 17)

Page 18

```
1    entertainers?
2        A    I would say co-management working
3    with Monte.
4        Q    Did Mr. Hall ever give you a digital
5    signature to use on his behalf?
6        A    Yes.
7        Q    Okay.  How did he do that?
8        A    Via conversations and -- via
9    conversations to -- so he wanted to do a stamp, but
10   that was archaic at the time.  Sorry.  And so we
11   said that you can just capture it via your laptop
12   or camera.
13       Q    Okay.  And I want to delve into the
14   details a little bit.
15       A    Uh-huh.
16       Q    So did he -- did he write out his
17   signature and then essentially capture that -- let
18   me start over.
19            Did that begin with his written
20   signature?
21       A    Some of that -- yes, some of them.
22       Q    What about ones that he didn't use
```

Page 19

```
1    his actual written signature?
2        A    Can you state that question again?
3        Q    Yeah.  We may not be understanding
4    each other, so let's kind of delve into that a
5    little bit.
6        A    Okay.
7        Q    Are you aware that, for example, with
8    a PDF document, you can use the program to create a
9    facsimile of a signature?
10       A    With a -- no.
11       Q    Okay.  How did Mr. Hall give you a
12   digital signature?
13       A    He signed on a piece of paper and
14   then captured an image.
15       Q    Okay.  Is that the only --
16       A    And that was --
17       Q    Sorry.
18       A    -- that was just different signatures
19   that we had.
20       Q    When you say different ones, you mean
21   he signed them at different times and captured
22   them?
```

Page 20

```
1        A    Yes.
2        Q    Okay.  Did he ever give you a digital
3    signature that wasn't originated by him making his
4    own handwritten signature?
5        A    Yes.
6        Q    Okay.  How did he do that?
7        A    Via verbal conversation and the one
8    that we had, I believe.
9        Q    Okay.
10           MS. COOPER:  He didn't ask if you --
11   if he authorized -- I'm sorry.
12           MR. GARVIN:  Yeah, I was going to
13   follow up, but I appreciate that.
14           MS. COOPER:  Okay.
15           MR. GARVIN:  Yeah.
16   BY MR. GARVIN:
17       Q    Yeah, I need to understand that a
18   little bit better.  So when you say -- strike that.
19           Did he ever authorize you to apply a
20   signature to a document?
21       A    Yes.
22       Q    Okay.  Can you give me an example?
```

Page 21

```
1        A    Give you an -- you would like for me
2    to give you an example of when he authorized me to
3    use his digital signature?
4        Q    Yeah, of a situation.
5        A    On an engagement contract.
6        Q    And was it ever a digital signature
7    that didn't originate with him writing a
8    handwritten signature?
9        A    Yes.
10           MS. COOPER:  Could you ask that
11   question again because I don't think I understood
12   it?
13   BY MR. GARVIN:
14       Q    Did you understand my question?
15       A    You're asking if he ever authorized
16   me to sign his digital signature that wasn't his
17   actual signature?
18       Q    That didn't start out as his actual
19   signature that was captured onto --
20       A    Uh-huh.
21           MS. COOPER:  Okay.
22
```

6 (Pages 18 - 21)

1  BY MR. GARVIN:
2      Q    So did he do that --
3      A    Yes.  Uh-huh.
4      Q    -- just for the record?
5          Okay.  Ms. Izumi, I am handing you --
6      A    Uh-huh.
7      Q    -- or pushing towards you a book of
8  exhibits and they are marked by the tabs --
9      A    Okay.
10     Q    -- that are in front of you.
11     A    So please turn to Tab 6.
12         (Izumi Deposition Exhibit Number 6 marked
13          for identification.)
14  BY MR. GARVIN:
15     A    Uh-huh.
16     Q    Okay.  Can you identify Tab 6,
17  please?
18     A    Shares certificate.
19     Q    Okay.  And what is this?
20     A    A share certificate that shows
21  percentage of ownership.
22     Q    Okay.  It has your -- it appears to

1  have your signature on it to the left at the
2  bottom.  Is that correct?
3      A    Correct.
4      Q    Okay.  Is that a handwritten
5  signature?
6      A    No.
7      Q    Okay.  And then to the right it says,
8  "Marcel Hall."  Is that a handwritten signature?
9      A    No.
10     Q    Okay.  Was that a signature that
11  Mr. Hall provided to you in handwriting and then
12  was digitized?
13     A    I don't remember, but -- I don't
14  remember, but I'm going to say -- wait.  I'm sorry.
15  What's your question?  Sorry.
16     Q    That's okay.
17         MR. GARVIN:  Can you read it back?
18      (The reporter read as requested.)
19         THE WITNESS:  I'd have to look at
20  other signatures, but --
21  BY MR. GARVIN:
22     Q    Okay.

1      A    -- I'd have to look at other
2  signatures, but I would say no.
3      Q    Okay.  If it wasn't -- if it didn't
4  originate -- that signature didn't originate in
5  Mr. Hall's handwriting, I'm trying to understand
6  how it got created.  Can you explain to me how it
7  would've gotten created?
8      A    Through -- so I don't know.  I don't
9  recall.  I mean, it's been -- we have been signing
10  using a digital signature for a really long time.
11  When I say a long time, because we worked together
12  for over 20 years, so definitely sometime during
13  that process is when it originated, but I can't
14  give you -- I don't know the exact.
15     Q    Okay.  That wasn't quite my question.
16         I'm trying to understand how it, you
17  know, got created.  What was the process where a
18  digital signature, like we see in Exhibit 6, got
19  created?
20     A    He gave approval.  So instead of --
21  because we lived -- he lived in Maryland, I lived
22  in D.C., we -- Biz traveled as well on a regular

1  basis, it didn't always make time -- I would say
2  time-wise, it didn't make sense for Biz and I to
3  connect over the years to get an actual signature,
4  and so he gave permission to use a signature to
5  then sign on his behalf.
6      Q    Okay.
7      A    And we would have -- but before
8  signing anything on a digital signature of his, we
9  would have conversations for him to approve
10  signing.
11     Q    Is this one of those signatures?
12     A    Is what one of these signatures?
13     Q    Where you had a conversation for him
14  to approve signing.
15     A    Yes.
16     Q    Okay.  So you created that signature?
17     A    I didn't create the signature.
18     Q    Who created it?
19     A    I don't remember who -- again, I
20  don't remember who created it.  It was over the
21  years.  It's definitely a digital signature that we
22  created sometime in the past over two decades that

7 (Pages 22 - 25)

Page 26

1  we worked with one another.
2      Q    Okay.  How was that done?
3          MS. COOPER: Objection.  Asked and
4  answered.  She already said she didn't know.
5  BY MR. GARVIN:
6      Q    How was that done?
7      A    I don't recall.  Again, it's been
8  20 -- so Biz -- so Mr. Hall and I worked together
9  for over 20 years.  I can't tell you specifically
10  how it was done.  I honestly don't recall.
11      Q    Well, you became Mr. Hall's manager
12  at the end of 2014?
13      A    No.  It's in 2015.
14      Q    Okay.  Fair.
15          The beginning of 2015, when in -- let
16  me -- I don't mean to get going too fast.  Do you
17  recall when in 2015 it was?
18      A    I don't recall when in 2015.  I can
19  say in 2015, we started a business together.
20      Q    Okay.  Did you have digital
21  signatures from Mr. Hall prior to 2015?
22      A    Yes.

Page 27

1      Q    So just to sum up so that I can make
2  sure that you and I understood each other, you
3  can't recall the process by which Mr. Hall's
4  digital signatures were created?
5      A    I can't remember specifically each
6  one.
7      Q    Were more than one digital signature
8  created in your work with Mr. Hall?
9          MS. COOPER: Objection.  Asked and
10  answered.
11          Go ahead.
12          THE WITNESS: Yes.  But I thought I
13  said that earlier.
14  BY MR. GARVIN:
15      Q    Okay.  So, for example, with
16  Exhibit 6, would there be any written communication
17  between you and Mr. Hall where he approved his
18  signature being applied to this document?
19      A    I don't recall.  Biz and I had --
20  Biz, meaning Mr. Hall, or Marcel Hall, so sometimes
21  if I say Biz, it is Marcel Hall --
22      Q    Fair.

Page 28

1      A    -- or Mr. Hall.
2          So what was the question again?
3          MR. GARVIN:  Could you repeat it?
4          (The reporter read as requested.)
5          THE WITNESS:  There may be some, but
6  I think in the extended period of time of working
7  with one another over two decades, a lot of our
8  conversations were verbal.  And that was, I guess,
9  how we functioned.  Like, we didn't e-mail or we're
10  not, like, corresponding and writing conversations
11  every day.  It's too fast paced.
12          So -- and also so that things, you
13  know, don't get lost in translation, I think it's
14  more efficient to have a verbal conversation as
15  opposed to something maybe being written and
16  being lost in translation, that we would just
17  pick up the phone and call one another.  Because,
18  again, we were working together for an extended
19  period of time that we just talked on the phone
20  with one another.
21  BY MR. GARVIN:
22      Q    Okay.  So, for instance, with

Page 29

1  Exhibit 6, it may be that you and Mr. Hall just
2  spoke with each other and you said he approved
3  having his signature put on this document, correct?
4      A    Yes.
5      Q    Okay.  Did you ever text each other
6  about business matters?
7      A    Occasionally.
8      Q    Okay.  Did you ever text each other
9  about putting his signatures on documents?
10      A    I don't recall.  But, again, I think
11  when you are talking about somebody's digital
12  signature, it's not something -- it's a verbal
13  conversation because you're using someone's
14  signature where they have to give you permission or
15  they are directing you -- instructing you to sign
16  on their behalf.
17          So it's not where I'm going to text
18  you and say, "Hey, Michael, we need to sign
19  whatever document or contract, can I sign?"  I
20  would call and say, "Hey, we need to do X, Y, and
21  Z."  It's whatever business.  He would either
22  agree, he would want to make -- or negotiate

8 (Pages 26 - 29)

Page 30

1    certain things, and then once we came to an
2    agreement, then he would say okay, and we would
3    sign off on things.
4        Q    Okay.  So just to square the circle,
5    if I'm following -- and I appreciate the
6    information.  It's helpful.  We are going to see a
7    lot of documents that appear to have Mr. Hall's
8    signature on this page.
9            We can go through them one by one,
10   but if I'm following you, with some of those
11   documents, he may have actually signed them with a
12   pen and with other documents, he may have approved
13   your putting his signature on them.  Is that
14   correct?
15       A    Correct.
16       Q    Okay.  Got it.
17           So tell us what all you did for
18   Mr. Hall as his manager.
19       A    So I know you keep referring as
20   manager, but I think we were more so business
21   partners.  I think the title that you use --
22           MR. GARVIN:  Your hand is covering

Page 31

1    the mic.
2            THE WITNESS:  Oh, sorry.  Thank you.
3            Okay.  Where do you want me to
4    start?
5    BY MR. GARVIN:
6        Q    Keep going.
7        A    Okay.  So I -- so within the
8    industry, while you may reference -- Biz may have
9    referenced to you, "Speak with Jenny, my manager,"
10   I think we more so were -- we considered each other
11   business partners.  So --
12       Q    I follow you.
13       A    Okay.
14       Q    So do you know whether Biz thought
15   that Monte Wanzer was his business partner?
16       A    I can't answer that --
17       Q    Okay.
18       A    -- for him.
19       Q    Okay.  Can you -- what would be
20   helpful to me is could you distinguish between what
21   you consider to be a manager and a business
22   partner?

Page 32

1        A    What I consider?
2        Q    Yeah.  What's your understanding of
3    the difference between the two of those titles?
4        A    I think with our relationship, they
5    kind of go hand in hand.  Again, I think it's a --
6    they're titles, right?  So while they -- I think
7    they go hand in hand.  Managing business partners
8    since we collaborated on things together.
9            When you say -- I mean, if you want
10   to say manager, I mean managing business and
11   personal affairs, business partner is business
12   partner.  But, again, I think they go hand in hand
13   for the amount of time that he and I worked with
14   one another.
15       Q    Okay.  So I'm -- I'm a little
16   confused by your answer.  And it's probably me and
17   not you.
18           I'm trying to understand whether you
19   view business partner and manager as different
20   things.  Let's just start with that.
21       A    Do I view them differently?
22       Q    Yes.

Page 33

1        A    Kind of.
2        Q    Okay.  Can you explain the
3    differences between the two as you understand them?
4        A    I -- again, I mean, when -- business
5    partner is handling business affairs, business
6    partner, business stuff.  Manager is both business
7    and personal.
8        Q    Okay.  What if we refer -- what if we
9    use the word "business manager," do you see a
10   distinction between business manager and business
11   partner?
12       A    Do I see a -- no, because business is
13   in front of both partner and manager, so it's
14   business partner management.  So a partner and
15   management, you are -- you are doing the same
16   things.  That's how our relationship was, we did
17   things together, we collaborated, we had
18   conversations.
19       Q    That's fair.
20           And just as -- we're going to talk
21   about this a little bit today.  What I understood
22   you to say -- and I may be wrong -- was that you

9 (Pages 30 - 33)

Page 34

1  view business partner and business manager to be
2  the same thing. Is that -- is that correct?
3      A    The way that Biz and I worked with
4  one another, they go hand in hand. I mean, it's
5  the same, yes, because you're talking business. So
6  yes, it's the same.
7      Q    Okay. And because this has to be put
8  in writing, I have to have it real clear. So from
9  your understanding, business manager and business
10 partner are the same thing, correct?
11     A    Depending on the context.
12     Q    Okay. In the context of your
13 relationship with -- with -- with Biz -- Marcel
14 Hall, do you believe that business partner and
15 business manager are the same thing?
16     A    Then I would have to say it would
17 depend on what -- it would depend on the item, the
18 contract, whatever we're working on. It may be
19 different for business partner and business
20 manager.
21     Q    Okay. Can you give me an example of
22 that?

Page 35

1      A    I -- I don't, but I'm sure you're
2  going to ask me, and I can probably say business
3  partner or business manager, but I don't have one
4  to specifically reference.
5      Q    So depending on the specific
6  situation, in one situation you might be Mr. Hall's
7  business partner and in another situation you might
8  be Mr. Hall's business manager. Is that your
9  testimony?
10     A    In what situation? No. So I guess
11 they would probably be -- I mean, they go hand in
12 hand, so they're the same.
13     Q    So I think when we started this, I
14 was -- I was asking you about the specifics of the
15 work you did with Mr. Hall. So explain in your
16 words what activities you engaged in on behalf of
17 Mr. Hall.
18     A    Could you say that -- I'm sorry.
19 Could you ask the question again?
20     Q    Sure.
21         Explain in your words what activities
22 you engaged in on behalf of Mr. Hall.

Page 36

1      A    I would help with his business and
2  personal affairs.
3      Q    Okay. Please give me examples of how
4  you would do that.
5      A    Negotiate and execute contracts, help
6  with personal requests from getting his roof
7  repaired, request, quotes, paying business and/or
8  personal expenses, getting his personal affairs as
9  well in order from advanced directive to power of
10 attorney, car maintenance.
11     Q    How would you describe what Mr. Hall
12 did for a living?
13     A    He was an artist, performer.
14     Q    Okay. And did his -- well, let me
15 just stop again.
16         Are those two different things or are
17 they the same thing?
18     A    Artist, performer, the same thing.
19     Q    Okay.
20     A    Artist, performer, yeah, artist.
21     Q    Okay. I just want to make sure so
22 when I ask questions, you know, you and I are on

Page 37

1  the same page.
2      A    Okay.
3      Q    So regarding his work as an artist,
4  did that work generate compensation?
5      A    Yes.
6      Q    Okay. And what services did you
7  perform on Mr. Hall's behalf regarding the
8  compensation that his work generated?
9      A    I think through my relationships,
10 referrals, negotiating contracts, advancing shows,
11 maintaining our business overhead, items.
12     Q    Okay. Did you do anything to keep
13 track of the -- the money that was generated
14 through Mr. Hall's artistic endeavors?
15     A    Yes.
16     Q    What did you do?
17     A    We had contracts, had bank
18 statements. That's -- I mean, we keep track of
19 them.
20     Q    Did you maintain any records
21 capturing the money that was received on behalf
22 of -- in light of Mr. Hall's performances?

10 (Pages 34 - 37)

Page 38

1      A    Yes.
2      Q    Okay.  What -- what how did you do
3  that?
4      A    The money on our -- like, so you --
5  whenever we would get a payment, it would come into
6  our bank account.
7      Q    Okay.  Did you do anything like keep
8  records of those payments on any kind of a
9  financial software program?
10     A    QuickBooks, but that was like through
11 our accountant.  So anything that comes in
12 through -- like anything that comes into the bank
13 account, which is reflected on our bank statements,
14 is how we would keep track of the money.
15     Q    Okay.  But when you received your
16 bank statements and it showed that you received --
17 you received, say, $2,000 for something, did you
18 record that $2,000 somewhere?
19     A    Yes, on our statements, on our bank
20 statements, which would reflect that.
21     Q    Okay.  No, but if -- let me just try
22 to clarify my question.

Page 39

1          So you received a bank statement and
2  it shows a payment of $2,000.  Okay?
3      A    Uh-huh.
4      Q    Did you take that information and
5  record it on some other document or software
6  system?
7      A    It would be on our bank statements or
8  QuickBooks, I believe.
9      Q    Okay.  So how did it get into
10 QuickBooks?
11     A    I'm not sure, because I think it just
12 goes through -- I think it's linked.  I don't know.
13 I don't -- like I didn't do our accounting, but I
14 believe it's linked, so it shows the money coming
15 in.
16     Q    Who did your accounting?
17     A    Nick -- well, we had two accountants,
18 so . . .
19     Q    Who were they?
20     A    Tina and Nick.
21     Q    Okay.  So I think I know their names,
22 but one is -- I may mispronounce it -- Nick Cusato?

Page 40

1      A    Correct.
2      Q    Tina Latimer?
3      A    Correct.
4      Q    Okay.  So did -- did they have access
5  to the bank statements?
6      A    Yes.
7      Q    Okay.  Did they ever provide you with
8  any kind of financial summaries pertaining to
9  Mr. Hall's work?
10     A    What -- what are financial summaries?
11     Q    Did they ever provide you with a
12 spreadsheet showing how much income Mr. Hall's work
13 generated?
14     A    I think occasionally we may have
15 done, like, profit and loss, but I don't recall
16 specifically.  When you say Mr. Hall's income, no.
17     Q    Okay.  I -- just to clarify, because
18 I may have said that, I meant to say income
19 pertaining to Mr. Hall's work.  So with that
20 definition, did you receive from the accountants
21 anything showing the income generated by Mr. Hall's
22 work?

Page 41

1      A    I don't recall.
2          When you say "Mr. Hall's work,"
3  you're saying his -- because work, you mean, you're
4  saying, like, if he's doing a performance?
5      Q    Yes.
6      A    Okay.  No, I didn't receive -- you're
7  saying -- what do you mean by like a generated
8  income?  Like a -- just money that came into the
9  account?
10         Like, the reason why I'm asking is
11 because when you say did I receive a report or a
12 listing from the accountants, no, it would be on
13 our bank statements.
14     Q    Okay.  Let's take a step back,
15 because I -- you -- you made a comment that I want
16 to make sure we're on the same -- we understand
17 each other.  When I refer to Mr. Hall's work, it
18 was a little bit of a shortcut, and so let's make
19 sure that you and I understand each other.
20         Mr. Hall was an entertainer, broadly
21 speaking, correct?
22     A    Yes.

11 (Pages 38 - 41)

Page 42

1    Q    And what -- what kinds of activities
2  did Mr. Hall engage in as an entertainer that
3  generated payments?
4    A    Performance services, acting.  Yeah,
5  so performance, acting -- performance and acting.
6    Q    Okay.
7    A    Performance and acting.
8    Q    And I think I understand you, but
9  when you say "performances," live performances in
10  front of an audience?
11    A    Yes.
12    Q    Okay.  Did he do any performances in
13  addition to live performances in front of
14  audiences?
15    A    Could you ask that question again?
16    MR. GARVIN:  Could you read it back?
17    (The reporter read as requested.)
18    THE WITNESS:  No.  I mean, like live
19  performances, no.  Acting, acting would be like on
20  a set or you could say acting in front of an
21  audience, but acting.
22  BY MR. GARVIN:

Page 43

1    Q    Sure.
2    Obviously everybody knows his iconic
3  song, "Just a Friend."  Did he receive royalties
4  for the song "Just a Friend"?
5    A    Yes.
6    Q    Okay.  So by the way, when you say --
7  let me go back.
8    You mentioned Mr. Cusato and
9  Ms. Latimer.  Did they ever send you annual income
10  statements?
11    A    Possibly.
12    Q    Okay.  Did they ever send you any
13  documentation describing the payments that were
14  made for business -- for business work over, say, a
15  year?
16    A    Could you ask that again?
17    (The reporter read as requested.)
18    THE WITNESS:  No, I don't think so.
19  BY MR. GARVIN:
20    Q    Okay.  So how did you know how much
21  money Biz's work generated over any particular
22  period of time?

Page 44

1    A    The -- the deposits, because you
2  could see the deposits coming in.  So you would
3  know if it's, like you said, royalties or
4  performance.
5    Q    Okay.  And that -- that's -- you
6  would see those coming in on the bank statements?
7    A    Yes.
8    Q    Okay.  And if I -- and I may have
9  asked, forgive me, but nothing was done to -- you
10  didn't at least do anything to record those
11  deposits on a document other than them being
12  already on the bank statements?
13    MS. COOPER:  Objection.  Asked and
14  answered.
15    Go ahead.
16    THE WITNESS:  No.  Everything was on
17  the bank statements.
18    MR. GARVIN:  Did you catch that?
19    COURT REPORTER:  Yes.
20    THE WITNESS:  Okay.  Yeah, everything
21  was recorded on the bank statements.
22  BY MR. GARVIN:

Page 45

1    Q    I'm sorry, Ms. Izumi, I didn't hear
2  you.
3    A    No.  You asked if everything was
4  recorded on the bank statements.  I said, yes,
5  everything was recorded on the bank statements.
6    Q    And you didn't do anything to -- to
7  transfer -- to provide that information on some
8  other document, just to square the circle?
9    A    No.  It was on the bank statements.
10    Q    Okay.  Did you or people working with
11  you use any accounting software of any sort?
12    MS. COOPER:  Objection.  Asked and
13  answered.
14    Go ahead.
15    THE WITNESS:  QuickBooks, I believe
16  is our software that we used.
17  BY MR. GARVIN:
18    Q    Okay.  What did you -- what did
19  you -- how did you use QuickBooks?
20    A    I didn't use QuickBooks, our
21  accountant uses it.
22    Q    Okay.  Did you purchase QuickBooks

12 (Pages 42 - 45)

Page 46

1  for your accountant?
2      A   Yes.
3      Q   Okay.  So the accountant didn't have
4  their own -- their own copy of QuickBooks?
5      A   I don't know.  I know that we
6  purchased it so that -- I mean, I don't know.  I'm
7  not an accountant, but I would think that you would
8  purchase a software that your accountant would use.
9  I don't know that -- I don't know what he -- that's
10 what he used with us, so that's what we purchased.
11     Q   Okay.  So the bank statements that
12 you have been testifying about, what -- what's the
13 name of the bank from which you received those
14 statements?
15     A   So Truist, formerly BB&T.
16     Q   Okay.  Got it.
17         And it was the same bank the entirety
18 of the time that you were working with Biz?
19     A   Correct.
20     Q   Okay.  Did you make copies of the
21 online statements?
22     A   We downloaded them.

Page 47

1      Q   You -- okay.
2          So when you say you downloaded them,
3  I need a little more -- not your fault, I need a
4  little more detail.  Downloaded them into just
5  copies of PDFs or something?
6      Q   Okay.  Have you kept those PDFs?
7      A   Yes.
8      Q   Okay.  Since 2015?
9
10     A   Yes.
11     Q   Okay.  Did -- I'm just going to call
12 them the accountants.  I'm talking about
13 Ms. Latimer and Mr. Cusato.  Did they prepare tax
14 returns for Biz Markie, Inc.?
15     A   Yes.
16     Q   Did you -- other than bank
17 statements, did you provide them any other
18 financial information to allow them to -- to
19 prepare those tax returns?
20     A   To provide them with any other
21 information?  Yes.
22     Q   Okay.  What else?

Page 48

1      A   I can't recall every document, but
2  whatever you need to file your tax returns, whether
3  it's 1099s, W-2s, any type of document that you --
4  financial document that you need to submit with
5  your tax returns.  So whatever was sent to us, we
6  provide to them.
7      Q   You formed Biz Markie, Inc. with
8  Mr. Hall?
9      A   Yes.
10     Q   Okay.  Whose idea was that?
11     A   Both of ours.
12     Q   Okay.  Ms. Izumi, would you please
13 open --
14     A   It's Izumi.
15     Q   I'm sorry.
16     A   It's like "zoom" with an "E" on the
17 beginning and the end.
18     Q   I mean, it's funny.  I have seen your
19 name in writing for months, and so it's in my head
20 as --
21     A   Uh-huh.
22     Q   -- Izumi.  So please take no offense,

Page 49

1  it's ignorance.
2      A   It's not.  I think you're not
3  ignorant at all.
4      Q   Well, I'm ignorant about that, fair.
5          So turn to -- turn to Tab 2,
6  Exhibit 2 in your book, please.
7          (Izumi Deposition Exhibit Number 2 marked
8          for identification.)
9  BY MR. GARVIN:
10     Q   Okay.
11         MS. COOPER:  This is marked highly
12 confidential.
13         MR. GARVIN:  A public document
14 from --
15         MS. COOPER:  Well, I didn't --
16         MR. GARVIN:  -- the District of
17 Columbia?
18         MS. COOPER:  -- I didn't look at it.
19 I just saw the marking on there.  And so this is
20 fine, that's -- we can take that.  That's fair.
21         MR. GARVIN:  Okay.
22         MS. COOPER:  But to that point about

13 (Pages 46 - 49)

Page 50

```
1    the confidential documents, does Mrs. Hall have a
2    copy of these exhibits?
3              MR. GARVIN:  No.
4              MS. COOPER:  Okay.
5              MR. GARVIN:  I mean, if they were
6    displayed, but they are not being displayed.
7              MS. COOPER:  Okay.  So, again, that
8    designation is wrong.
9              MR. GARVIN:  Let's go off the record
10   for real quick.
11             VIDEOGRAPHER:  The time is 10:46 a.m.
12   We're off the record.
13        (Recess from 10:46 a.m. to 10:47 a.m.)
14             VIDEOGRAPHER:  The time is 10:47 a.m.
15   We're on the record.
16             MR. GARVIN:  Okay.
17   BY MR. GARVIN:
18        Q    All right.  Ms. Izumi --
19        A    Yes.
20        Q    I got it right.
21        A    Thank you.
22        Q    I'm doing better.
```

Page 51

```
1         A    That's fine.
2         Q    -- have you seen Exhibit 2 before?
3         A    Yes.
4         Q    Okay.  How did you come to see
5    Exhibit 2?
6         A    We filed for -- we filed to be a
7    company in D.C.
8         Q    Okay.  So Biz Markie, Incorporated is
9    a District of Columbia corporation, correct?
10        A    Correct.
11        Q    Okay.  On the second page of
12   Exhibit 2, in about the middle of the page, there's
13   a box that starts with the word "Fifth" in
14   boldface.
15        A    Uh-huh.
16        Q    And the box refers to directors'
17   names and addresses.  And it says no directors.  Do
18   you see that?
19        A    I do.
20        Q    Did you intentionally decide not to
21   have directors?
22        A    I don't recall.  Tina filed this for
```

Page 52

```
1    us.
2         Q    Okay.  Do you know why Biz Markie
3    does not have directors?
4         A    I do not.
5         Q    Okay.  How was share ownership in Biz
6    Markie determined?
7         A    Through conversations between
8    Mr. Hall and myself.
9         Q    Okay.  What -- what is the share
10   ownership of Biz Markie, Incorporated?
11        A    51 percent myself and 49 percent
12   Mr. Hall.
13        Q    Okay.  And how did the two of you
14   come to agree on those share ownerships?
15        A    How did we agree on them?  So just
16   through conversation, also with his -- with Lamont
17   recently passing, how we wanted to set up the
18   company, and what we thought would make the most
19   sense and be in the best interest of Biz Markie's
20   brand.
21        Q    Just to make sure I followed your
22   testimony, you didn't make those determinations
```

Page 53

```
1    based on conversations with Mr. Wanzer in any way,
2    correct?
3         A    No.  He had already passed.
4         Q    Okay.  And you don't know what
5    Mr. Wanzer's compensation arrangements were with
6    Mr. Hall?
7              MS. COOPER:  Objection.  Asked and
8    answered.
9              Go ahead.
10             THE WITNESS:  I do not.
11   BY MR. GARVIN:
12        Q    Okay.  Mr. Hall was the performer
13   whose work generated income for Biz Markie, Inc.,
14   correct?
15        A    Yes.  And through his relationships
16   and my relationships over the years.
17        Q    Okay.  Why did -- why did Mr. Hall
18   agree that you would make more money on the company
19   than he would?
20        A    I think -- so in the over two decades
21   of us working together, I was his one constant
22   outside of Lamont.
```

14 (Pages 50 - 53)

1      Q    So that's why Mr. Hall agreed that
2  you should receive more compensation from Biz
3  Markie, Inc. than him?
4      A    Yeah.  So I mean, we had a -- a
5  long-standing, trusting relationship, and, again,
6  he -- as you and I have both said, he was a
7  performer, he's an artist.  And so in the
8  entertainment industry and, you know, I think
9  also -- but in the entertainment industry, I think
10 performers are performers, and Biz specifically
11 wasn't -- his priority wasn't -- his priority was
12 being a performer, it wasn't the day-to-day
13 business operations.
14            And because we had been working
15 together for so long, he trusted that -- he trusted
16 me to be his business partner and if anything
17 happened to him, that I would know how to then
18 handle the affairs if he were sick, if he passed,
19 and do it in the spirit of -- the correct spirit of
20 his brand.
21     Q    Okay.  How did you learn all of the
22 information that you just described?

1      A    Learned what information?
2      Q    The -- all the information that was
3  the basis for the answer that you just gave me.
4      A    What -- I -- what -- can you read my
5  answer back again?
6            And your question is what -- how did
7  I -- what was your question again?
8      Q    Look, if you would -- well, I will
9  answer -- I will ask you again, but if you want to
10 hear the prior answer, that's fine.
11           So you just described how you
12 understood that Mr. Hall wanted you to have
13 51 percent of the profits of Biz Markie, Inc.
14     A    Uh-huh.
15     Q    And my question was:  How did you
16 learn that information that you just described?
17     A    How did I learn the information?  The
18 information was -- I'm like a visual and auditory
19 learner, so that's why I was like -- the
20 information, what is the information that I gave?
21     Q    You just described -- you just
22 described the reasons why you understood Biz wanted

1  you to make 51 percent of the profits of Biz
2  Markie, Incorporated --
3      A    Uh-huh.
4      Q    -- and I just want to understand how
5  you came to understand those reasons.  I'll --
6      A    The --
7      Q    Was it through conversations with
8  him?
9      A    Yes, it was through conversations.
10 It was through, again, working together forever,
11 for over 20 years.
12     Q    Okay.  Is there a written, signed
13 shareholder's agreement for Biz Markie,
14 Incorporated?
15     A    Yes.
16     Q    Where is it?
17     A    We provided it.
18     Q    Okay.
19     A    So it was when he was incapacitated,
20 I had his POA, but yes, there's a signed agreement.
21     Q    Okay.  Well, we can look at a couple
22 of documents, but he became incapacitated when?

1      A    June -- late June 2020.
2      Q    Okay.  And when did -- when you say
3  he became incapacitated, did he enter the hospital
4  when he became incapacitated?
5      A    So let me say this:  I don't know
6  when he specifically became incapacitated.  He
7  entered the hospital late June.  He became
8  incapacitated, I believe, some time in late June.
9      Q    Okay.  I want to make sure I get the
10 years right.  As I --
11     A    Uh-huh.
12     Q    -- don't trust my memory, Mr. Hall
13 passed away in July of 2021?
14     A    Correct.
15     Q    Okay.  And -- but he entered the
16 hospital the prior year?
17     A    Correct.
18     Q    Okay.  So he was -- he was -- and his
19 medical condition was Type II diabetes, correct?
20     A    I don't know all of his medical
21 conditions.
22     Q    Okay.

15 (Pages 54 - 57)

Page 58

1    A    Was that one of them?  Yes.

2    Q    Okay.  Got it.

3        So this is just some -- strike what I

4    just said.

5        Mr. Hall entered the hospital in June

6    of 2020, and he never left the hospital until he

7    passed away.  Is that correct?

8        A    Correct.

9    Q    Okay.  Biz Markie, Incorporated was

10    created as a District of Columbia corporation in

11    2015, correct?

12    A    Correct.

13    Q    Okay.  Was there a written, signed

14    agreement signed by Mr. Hall -- let me start over

15    again.  Bad question.

16        Was there a written -- I'm going to

17    start one more time.

18        Was there a signed shareholder

19    agreement for Biz Markie, Inc. prior to 2020?

20    A    No.

21    Q    Okay.  Please turn to Exhibit 4 in

22    the book in front of you.

Page 59

1        (Izumi Deposition Exhibit Number 4 marked

2        for identification.)

3    BY MR. GARVIN:

4    Q    And Exhibit 4 is titled,

5    "Shareholders Agreement Among Biz Markie, Inc. and

6    Each Person Identified on Schedule A, dated as of

7    May 19, 2021."

8        Do you see that?

9    A    Yes.

10    Q    Is this the shareholders agreement

11    you were just referring to in your prior answers?

12    A    Yes.

13    Q    Okay.  Is it signed?

14    A    I don't know.  Let's take a look.  I

15    mean, this is a draft, so I don't believe that this

16    is going to be signed, but yes, this is the draft.

17    Q    Okay.  Is there a signed version of

18    it?

19    A    There is.

20    Q    We don't have it.

21    A    Okay.

22        MS. COOPER:  Okay.  We can provide

Page 60

1    it.

2        MR. GARVIN:  Okay.

3        MS. COOPER:  You guys didn't -- Oh,

4    I'm sorry, I will wait for an opportunity.

5        MR. GARVIN:  Yeah.

6    BY MR. GARVIN:

7    Q    Okay.  When was that agreement

8    signed?

9    A    I would have to look at the specific

10    document to tell you.

11    Q    Where was it signed?

12    A    What do you mean where was it signed?

13    Q    Where -- what location was Mr. Hall

14    in when -- when the agreement was signed?

15    A    I signed it as attorney-in-fact, so

16    Mr. Markie didn't sign it.

17    Q    Under his power of attorney?

18    A    Correct.

19    Q    Okay.  And that power of attorney

20    required you to act in his best interest, correct?

21    A    Correct.

22    Q    Okay.  Mr. Hall went into a coma

Page 61

1    before he passed away in 2021, correct?

2    A    I don't remember if he was in a coma.

3    I know he was incapacitated.

4    Q    When you say "incapacitated," what

5    was your understanding of that?

6    A    I don't know because I couldn't -- I

7    never saw Biz when he was -- I never physically saw

8    Biz in the hospital until probably a couple of

9    weeks before he passed.

10    Q    Okay.

11    A    So I don't know really what

12    incapacitated -- I heard you say "wow," so I

13    thought you were going to say something else.

14    Q    Well, I will move to another

15    question.

16        Did you ever discuss this shareholder

17    agreement with Mr. Hall?

18    A    No.

19    Q    Okay.  Do you know whether Mr. Hall

20    had any idea whether you signed it?

21    A    No.

22    Q    Why was it in Mr. Hall's best

16 (Pages 58 - 61)

Page 62

1    interest for you to have signed that agreement on
2    his behalf?
3        A    Because of previous conversations
4    that we had, also with the power of attorney and
5    advanced directives and conversations that I always
6    had majority ownership of the company. And so he
7    wanted to make sure that I was able to continue
8    to -- continue the business again if he were to get
9    sick or in the event that he passed. So it
10   wasn't -- so it was everything that we always
11   talked about.
12       Q    You mentioned advanced directives.
13       A    Uh-huh.
14       Q    Are you referring to a document?
15       A    I am.
16       Q    Okay. What's -- what does that
17   document provide?
18       A    The medical advanced directive of
19   Mr. Hall.
20       Q    Meaning what?
21       A    Meaning I have medical permission to
22   have conversations with his physicians, make

Page 63

1    decisions on his behalf.
2        Q    Okay. How -- what kind of decisions?
3        A    All decisions.
4        Q    Not just health related?
5        A    You asked about the advanced
6    directives?
7        Q    Yes.
8        A    So we're talking about the medical
9    directives -- or, I mean, the medical advanced
10   directives. So if it's a medical advanced
11   directive, then it's just medical.
12       Q    Okay.
13       A    The power of attorney is separate.
14   Is that what you're -- because you said --
15       Q    We're talking over each other. I
16   apologize. Finish your answer, ma'am.
17       A    So when you say "medical" -- when you
18   say "advanced directive," it's a medical advanced
19   directive. So it's for -- advanced directive, it's
20   medical.
21       Q    Okay. So did the medical advanced
22   directives have anything to do with your signing

Page 64

1    the shareholder agreement?
2        A    I don't know. I would have to
3    reference the advanced directive -- I don't
4    understand the question.
5        Q    Okay. In -- Mr. Hall got married to
6    Tara Hall in 2018?
7        A    Yes.
8        Q    Okay. And they were still married at
9    the time of his death?
10       A    Correct.
11       Q    And at the time you signed the
12   shareholders agreement, was it your understanding
13   that Mr. Hall wanted you to have 51 percent of the
14   income of his -- coming from his performing works
15   even though he was married to Tara Hall?
16       A    Yes.
17       Q    Okay. Did he ever tell you that
18   after he got married?
19       A    Yes, he wanted everything to stay the
20   same.
21       Q    Okay. And I take it that was an oral
22   discussion, not something that was captured in

Page 65

1    writing somehow?
2        A    Correct, but the advanced directive
3    and power of attorney, which Biz knew -- and yes,
4    we had a conversation that it would remain the same
5    unless he physically changed it, so yeah.
6        Q    Okay. Did he ever explain to you why
7    he wanted it to remain the same even though he had
8    in the interim gotten married to Tara Hall?
9        A    Why he wanted it to -- why he wanted
10   the business to stay the same?
11       Q    The ownership shares to stay the
12   same.
13       A    Yes, because that's the way --
14   because business was business. Tara was never a
15   part of our business.
16       Q    Okay. Did he ever say anything about
17   his relationship with Tara that influenced his
18   desire to maintain the 51/49 percent share
19   ownership split?
20       A    Did he ever say anything about his
21   relationship with Tara that he wanted the 51/49 to
22   remain the same?

17 (Pages 62 - 65)

Page 66

1    Q    Yes.
2    A    Is that what you are asking me?
3    Q    Yes.
4    A    Did he ever -- yes, through -- yes.
5    Just leaving everything the same, even just because
6    they were married, again, Tara was not a part of
7    the business. Also why he wanted to file married,
8    but separate on his tax returns, it was -- he
9    wanted to keep things separate.
10    Q    Okay. But he didn't say anything
11    specific about their relationship that caused him
12    to have those viewpoints, I take it?
13    A    Why -- yes, we had conversations
14    about a prenup, about a postnup, about divorce,
15    trust issues, having reservations and finances. He
16    wanted everything to remain the same. Just because
17    they were married, he wanted the business to remain
18    the same, he wanted his finances to stay in place.
19    Q    Okay.
20    A    His assets, et cetera.
21    Q    Did he have a prenup with Tara?
22    A    He did not.

Page 67

1    Q    Did he have a postnup with Tara?
2    A    He did not.
3    Q    And you were his business adviser,
4    right?
5    A    Business adviser, yes.
6    Q    Okay. You mentioned divorce. What
7    about divorce? What -- what were your
8    conversations with him about divorce?
9    A    There were -- there were several. I
10    can't recall all of them, but he wanted to get a
11    prenup because his business and personal is -- his
12    business flowed into his personal. Tara didn't
13    want a prenup. I had a conversation with both Biz
14    and Tara, and Tara said, "I don't want to live with
15    another man again and not be married. We just want
16    to be married."
17    And that was after the
18    conversation -- or that was in the conversation of
19    the same thing that I told Biz and her, that his
20    business flowed into his personal. And so it was
21    nothing personal, it was just that they should have
22    a prenup. It protects Biz, it protects her.

Page 68

1    And, again, she just said, "I don't
2    want to live with another man again and not be
3    married. We just want to be married." And I said,
4    "Okay."
5    Q    Okay.
6    A    And so then Biz and Tara went back
7    and forth about getting a prenup. He couldn't
8    change the court wedding date because Tara had
9    already set the date. And we then talked about --
10    Biz and I talked about a postnup and we could still
11    get a postnup done afterwards, and had
12    conversations also with a divorce or family
13    attorney that handles prenups, postnups, et cetera.
14    Q    Is there anything else about
15    Mr. Hall's relationship with Tara that factored
16    into your decision to sign the shareholders
17    agreement on his behalf as the power of attorney?
18    A    No. Tara was never a factor in our
19    business.
20    Q    Okay. But other than what you just
21    described about their marital relationship, was
22    there anything about their -- strike the question.

Page 69

1    You just described for me why --
2    strike it again. Bad question.
3    Were Mr. Hall and Tara having any
4    marital problems that bore on your decision to sign
5    the shareholders agreement?
6    A    No.
7    Q    Where is the signed shareholders
8    agreement right now?
9    A    I -- I don't know. But we have one.
10    I thought that we provided it.
11    Q    Is there a location where you keep
12    agreements involving Mr. Hall?
13    A    Yes.
14    Q    Where?
15    A    In my Dropbox.
16    Q    I'm thinking you're talking about the
17    software Dropbox?
18    A    Uh-huh.
19    Q    And those are -- there's copies of
20    signed agreements in your Dropbox?
21    A    Signed agreements?
22    Q    Yeah, original signed agreements.

18 (Pages 66 - 69)

Page 86

1    Q    It does. What do you mean?

2    A    Because we own the trademark, then it

3    allows us to.

4    Q    Did Mr. Hall ever provide Biz Markie,

5    Inc. a signed assignment of trademark rights?

6    A    I don't know what that is.

7    Q    A written document that he signed

8    agreeing that Biz Markie could exploit his

9    trademark rights.

10    A    We had conversations about it, and

11    then -- and then we executed it through our

12    trademark attorneys.

13    Q    Okay.

14    MS. COOPER: I need some

15    clarification. So from the -- the first question

16    was an assignment and then the next question was

17    exploitation.

18    Did I understand that correctly?

19    Could you read from the record? It was? That

20    was it?

21    COURT REPORTER: It was, but if you

22    want me to go back and read it, I can.

Page 87

1    MS. COOPER: No. I just needed

2    clarification. Thank you.

3    MR. GARVIN: But we may need

4    clarification.

5    BY MR. GARVIN:

6    Q    Did Mr. Markie ever sign a written

7    agreement granting Biz Markie, Inc. the right to

8    use his trademarks?

9    A    No.

10    Q    Okay. Did Mr. Markie -- excuse me,

11    did Mr. Mall --

12    A    I mean, you call him Markie or Hall,

13    it's the same -- it's one and the same.

14    Q    Yeah, it might be, but it's going to

15    be a confusing transcript if I switch between the

16    two.

17    Did Mr. Hall ever sign a written

18    agreement permitting Biz Markie, Inc. to exploit

19    his name, image, or likeness?

20    A    I would -- so when you say this --

21    when you're asking this question, sorry, the reason

22    why Mr. Hall and I agreed to 51 percent ownership,

Page 88

1    with me having 51 percent, is so that it gave me

2    the authority, but also in conversations with Biz,

3    to be able to sign documents on behalf of Biz

4    Markie, Incorporated, which would then transfer to

5    trademark -- you said, you know, filing for a

6    trademark, exploitation, assignment, if I am the

7    majority shareholder, that was the -- that was

8    under the umbrella and the understanding of me

9    having majority ownership of Biz Markie,

10    Incorporated.

11    Q    Okay.

12    A    So --

13    Q    Okay.

14    A    -- I -- so when signing documents, if

15    you're majority owner, it was to our understanding

16    that we did not need Mr. Hall to sign every

17    physical document while he was traveling and also

18    not -- not executing all of the day-to-day

19    transactions because that would then slow down the

20    efficiency of our workflow.

21    Q    Okay. I appreciate that answer. I

22    tried to ask a more specific question. I'm going

Page 89

1    to take another run at it.

2    Are you aware of a specific written

3    agreement signed by Mr. Hall expressly stating that

4    Biz Markie has the right to seek -- let me start it

5    again.

6    Are you aware of any agreement signed

7    by Mr. Hall expressly granting Biz Markie, Inc. the

8    right to obtain registered trademarks relating to

9    him?

10    A    No, because we were under the

11    impression that we need specific signatures for

12    every agreement --

13    Q    Okay.

14    A    -- when I had majority ownership.

15    Q    Okay. Are you aware of any specific

16    agreements signed by Mr. Hall granting Biz Markie,

17    Inc. the right to exploit his name, image, or

18    likeness?

19    A    No. Again, because Biz Markie,

20    Incorporated, we didn't think that we needed a

21    separate signature for every agreement.

22    Q    Okay. And Biz Markie, Inc. is

23 (Pages 86 - 89)

Page 98

1      MR. GARVIN:  Yeah, that's a terrible
2  question.
3           Sorry about that, Ms. Izumi.
4           THE WITNESS:  Izumi.
5  BY MR. GARVIN:
6      Q    The shareholders agreement you signed
7  expressly provides that you are the 51 percent
8  owner of Biz Markie, Inc., correct?
9      A    Correct.  I would have to look at it
10  since we don't have it, but yes.
11     Q    Who is the 49 percent owner of Biz
12  Markie, Inc.?
13     A    Currently?
14     Q    Yes.
15     A    I don't think -- I think I'm actually
16  100 percent owner of Biz Markie, Inc., but I don't
17  know because I don't have the actual -- so I
18  don't -- I can't answer that question.
19     Q    Is -- is Biz Markie, Inc. currently
20  receiving income?
21     A    Yes.
22     Q    Okay.  And have you provided any

Page 99

1  share of that income to anyone other than yourself?
2      A    No.
3      Q    Why not?
4      A    Why would I?
5      Q    I asked the question.
6      A    I mean, why not?  I don't know.  Why
7  would I?
8      Q    Do you consider yourself the
9  100 percent owner of Biz Markie, Inc. today?
10     A    Yes.
11     Q    Why?
12     A    Because -- well, let me say this:  I
13  don't know, you know, corporate law, but I would
14  think that if we haven't -- so, I mean, I don't --
15  so I don't know.  But I don't know corporate law,
16  so I don't know how the percentage -- where the
17  49 percent lies.  And if -- so I don't know where
18  the 49 percent lies, but I know as majority owner,
19  I'm -- it's the same pattern as when Mr. Hall was
20  alive, same business practice, pattern.
21     Q    When Mr. Hall was alive, I assume
22  that he received 49 percent of the income of Biz

Page 100

1  Markie, Inc.  Is that correct?
2      A    I would think so.
3      Q    Okay.  But since his death --
4      A    Well --
5      Q    Oops.  Sorry.
6      A    I mean, I don't know.  I don't have,
7  like, all of the financials in front of me, so I
8  mean, I guess, but I'm not sure.  I'm unsure.
9      Q    Okay.  When Mr. Hall was alive, he
10  received income as a shareholder of Biz Markie,
11  Inc., correct?
12     A    Yes.
13     Q    Okay.  And who made the decisions to
14  provide that income to Mr. Hall?
15     A    We did it together.
16     Q    Okay.
17     A    We both did.
18     Q    Okay.  Give me an example of how that
19  happened.
20     A    Through conversations, depending on
21  what may be going on in our business, as well as
22  personal.  Sometimes, you know, Biz would get --

Page 101

1  you know, Biz was applying for a loan, and so
2  depending -- you know, for his house that he -- I
3  was going to say -- so for the house that he was
4  residing in.  And so he and I would talk finances
5  and make sure whichever bills were a priority, get
6  paid first.  So sometimes you may see a difference
7  in payments, I guess.
8           So -- but, I mean, just
9  conversations, whatever -- whatever bills were a
10  priority at the time.  We were a small company,
11  didn't have a consistent amount of income at all
12  times, and so, again, paying whatever bills and
13  overhead expenses that were a priority first.
14     Q    And all of that were tasks that you
15  had to take care of as part of your role in the
16  company, right?
17     A    Correct.
18     Q    So did you do anything to make sure
19  that after all of the bills were paid, Mr. Hall got
20  49 percent of the leftover?
21     A    Biz and I weren't -- Biz and I never
22  discussed a percentage.  It wasn't -- that's not

26 (Pages 98 - 101)

Page 102

1  how -- so that's not how we functioned in our
2  company.  It wasn't how you just broke it down,
3  where you said after all of the expenses were paid,
4  he got 49 percent.
5          Sometimes we didn't even have enough
6  money in our account to pay bills or we may have
7  only had $500 or $5,000 left in our account, so it
8  was really just us trying to get to a place where
9  we were comfortable, and when we could pay the --
10  pay Biz, or pay Mr. Hall, pay myself, company
11  overhead, expenses, that's how we would function in
12  our company.
13          Q    Then what was the significance of the
14  share ownership between the two of you?
15          A    The significance was that in the
16  event that -- the significance was that I would
17  have majority ownership.  I had been with Biz for,
18  again, over two decades, and so knew how to help
19  run the business while he was alive in the event
20  that something happened to him or in his passing,
21  but Biz wanted me to have control of those things.
22          Q    Okay.  Did your relative share

Page 103

1  ownerships have anything to do -- to income to be
2  paid to you and Mr. Markie?
3          A    I think it depended on where we were
4  in that month or that time of finances and what we
5  had.
6          Q    Did you do anything to track how much
7  income was paid to Mr. Hall versus how much income
8  was paid to you?
9          A    You would see that on the tax
10  returns.  You would see that in our bank
11  statements.  You would see that in individual
12  payments if we -- you know, again, whatever money
13  left the bank account, if there was payment to
14  Mr. Hall or myself or anyone, so that's how we
15  would keep track of it.
16          But, again, it was -- we were set up
17  the way we were set up for me to have majority
18  ownership so that I would have control in the
19  company.
20          Q    Okay.  So did you see any
21  relationship between the share portions each of you
22  had and the amount of income to which the two of

Page 104

1  you were entitled?
2          A    Again, it was -- that wasn't our
3  focus and how we functioned in our company.
4          Q    Okay.
5          A    We were -- literally, we weren't
6  making a lot of money.  We were literally trying to
7  make sure that all of our bills were paid.
8          Q    Okay.
9          A    Not a lot of money there.
10          Q    Did you do anything -- did you take
11  any steps to make sure that Mr. Hall received
12  49 percent of whatever was left over after all the
13  bills were paid?
14          A    That's not how we functioned.  That's
15  not what he and I discussed.  The way that we
16  functioned was to make sure that all of our --
17  our -- our expenses were taken care of.  And,
18  again, the majority ownership was because Biz and I
19  agreed that I would have majority ownership.
20          Q    Okay.  That's not quite what I asked,
21  but we can break it down.
22          Can you answer me yes or no, did you

Page 105

1  take any steps to make sure that when all the bills
2  were paid, Mr. Hall obtained 49 percent of what was
3  left over?
4          A    It's not how our system was set up,
5  so I can't -- so if I look at the bank statements,
6  I might be able to tell you if that's maybe what we
7  did, but -- and at what time, but I don't -- I
8  can't say when.
9          Q    Okay.
10          A    Or if or how.
11          Q    So as I understand your answer, the
12  short answer would be no, you didn't take any steps
13  to make sure that Mr. Hall received 49 percent of
14  whatever was left over with the company after all
15  the bills were paid.  Is that correct?
16          A    No, because no is definitive, and I'm
17  saying I can't tell you at what time when we would
18  go over to say, "Hey, let's go over the finances to
19  do X, Y, and Z."
20          That's not how we -- I can't -- I
21  can't give you a yes or a no answer because that's
22  not how we functioned.  And it wasn't a specific

27 (Pages 102 - 105)

Page 118

1   doesn't have to sign and/or I both don't have to
2   sign off on a document.
3   BY MR. GARVIN:
4       Q    Okay.  So if I understand your
5   answer, it's no, he didn't sign off on a document
6   giving you that right, correct?
7           MS. COOPER:  Objection that you're
8   putting words.  That is not what the stenographer
9   read back.
10          MR. GARVIN:  I --
11          MS. COOPER:  Ask the question.
12          MR. GARVIN:  You're welcome to have
13  the stenographer ask her -- no, I'm going to ask
14  again.
15          MS. COOPER:  That's fine.  And --
16  that's fine.
17  BY MR. GARVIN:
18      Q    Can you identify a written agreement
19  Marcel Hall signed giving you the right to use the
20  name Biz Markie, Inc.?
21          MS. COOPER:  Answer the question --
22  BY MR. GARVIN:

Page 119

1       Q    Just a written agreement.
2           MS. COOPER:  -- but I'm going to
3   object.  Asked and answered.
4           Go ahead.
5           THE WITNESS:  Yes.  Those would be
6   our business documents and agreements over the --
7   yes.
8   BY MR. GARVIN:
9       Q    Can you identify a specific agreement
10  he signed that you're talking about here?
11      A    I would think tax returns through the
12  IRS, or government, is considered an agreement or
13  something that's valid that shows his agreement of
14  51/49 percent.  And also in, like, business
15  operations practices.
16      Q    Okay.  What is Balancing Acts,
17  Incorporated?
18      A    It is a booking and management
19  company.
20      Q    Who are the shareholders?
21      A    Myself.
22      Q    Anybody else?

Page 120

1       A    No.
2       Q    Does it hold bank accounts?
3       A    Yes.
4       Q    Where?
5       A    Truist, formerly BB&T.
6       Q    Okay.  Did Balancing Acts ever
7   perform services for Mr. Hall?
8       A    Occasionally, yes.
9       Q    What?
10      A    Different performance -- different
11  performance or acting, merchandise agreements,
12  regular -- you know, those same type of agreements.
13      Q    Did Balancing Acts ever perform
14  services for Biz Markie, Incorporated?
15      A    Yes.
16      Q    What?
17      A    Negotiating, executing contracts,
18  advancing shows.  Yeah, that's it.
19      Q    Are there any written agreements
20  between Balancing Acts, Inc. and Biz Markie, Inc.?
21      A    No.
22      Q    Are there any written agreements

Page 121

1   between Balancing Acts, Inc. and Marcel Hall?
2       A    What was the last -- not this
3   question, what was the last question?
4       Q    The last question was whether there
5   were any written agreements between Balancing Acts,
6   Incorporated and Biz Markie, Incorporated.
7       A    Oh, I'm sorry.  I'm sorry.  I thought
8   you said Biz Markie.  So can we go back to that
9   question?
10      Q    Sure.  Sure.
11      A    So your question was, are there any
12  agreements between Balancing Acts and Biz Markie,
13  Incorporated?
14      Q    Yes.
15      A    BAI and BMI?
16      Q    Yes.
17      A    Yes.
18      Q    What are they?
19      A    Some may have been some performance
20  agreements, promissory notes, yes.  Uh-huh.
21      Q    Are there any written agreements
22  between Balancing Acts, Inc. and Marcel Hall?

31 (Pages 118 - 121)

Page 122

1       A    No.
2       Q    Okay.  What were the promissory notes
3   for?
4       A    Promissory notes between -- you're
5   saying promissory notes for --
6       Q    You mentioned promissory notes, so
7   I'm just trying to get some information on those.
8       A    Between BMI and BAI, correct?
9       Q    Yes.
10      A    Money loaned to -- from BAI to BMI.
11      Q    Okay.
12      A    From Balancing Acts, Incorporated to
13  Biz Markie, Incorporated.
14      Q    Do you have any idea how much money
15  was ever loaned from Balancing Acts to Biz Markie,
16  Incorporated?
17      A    I don't know off the top of my head.
18      Q    Okay.  Yeah, I don't -- if you know,
19  you know.  If you don't, you don't.
20      A    Well, it's actually, I believe, in
21  my -- but I don't recall off the top of my head.
22          MS. COOPER:  Let's not waste time

Page 123

1   going through that.
2          THE WITNESS:  Okay.  I'm sorry.
3          But yes, I don't recall.  Me, I
4   honestly don't recall.
5   BY MR. GARVIN:
6       Q    Okay.
7       A    I don't recall the exact amount,
8   sorry.
9       Q    Did Biz Markie, Inc. ever repay
10  Balancing Acts for any loans?
11      A    Did Biz Markie, Incorporated ever pay
12  Balancing Acts, Incorporated for any loans?  I
13  think so.
14      Q    Okay.  In fall?
15      A    In fall?
16      Q    In full.  Sorry.
17      A    No.
18      Q    Okay.  Did Mr. Hall ever agree that
19  payments related to his -- his creative works
20  should be made -- let me start over again.
21          Did Mr. Hall ever agree that
22  Balancing Acts should be paid for his artistic

Page 124

1   endeavors?
2       A    Yes.
3       Q    Okay.  Was that -- was that agreement
4   ever in writing?
5       A    No.
6       Q    Ms. Izumi -- I told you I would get
7   it right -- please turn to Exhibit 10 in the book
8   in front of you.
9          (Izumi Deposition Exhibit Number 10
10          marked for identification.)
11          THE WITNESS:  Yes.  Uh-huh.
12          MR. GARVIN:  There are some -- so we
13  have to take Mrs. Hall off Zoom for a while.  I
14  think we're going to go through a few, so . . .
15          MS. COOPER:  Okay.
16  BY MR. GARVIN:
17      Q    Okay.  So do you have Exhibit 10 in
18  front of you?
19      A    I do.
20      Q    Do you recognize it?
21      A    I do.
22      Q    What is Exhibit 10?

Page 125

1       A    Letter of direction for payment.
2       Q    Okay.  And who is -- what is Rhino
3   Entertainment Company?
4       A    A music label, a division of Warner
5   Music.
6       Q    Okay.  The signature of Mr. Hall at
7   the bottom looks like the digital signature that
8   we've seen.  Is that -- is it in fact that?
9       A    It is.
10      Q    Okay.  Why was Rhino being paid this
11  money instead of Biz Markie, Incorporated?
12          MS. COOPER:  I think you want to
13  reask that question.  You said why was Rhino being
14  paid?  You meant why was --
15          MR. GARVIN:  Yeah, I do.  Thank you.
16          MS. COOPER:  Uh-huh.
17  BY MR. GARVIN:
18      Q    Why was Balancing Acts being paid
19  rather than Biz Markie, Incorporated?
20      A    So Mr. Hall, entertainer, artist.
21  Really that was his focus, what he enjoyed doing.
22  And the day-to-day business -- the day-to-day

32 (Pages 122 - 125)

Page 126

1 business, which is what he entrusted me in. And
2 also a good balance of roles for us, he had had
3 some health issues, which is -- you know, just a
4 lot going on in his life, health issues, health
5 concerns.
6        I would say prenup conversations,
7 marriage conversations, postnup conversations,
8 divorce conversations, and also business items that
9 we had in our pipeline over the past years and
10 really wanted to start a shift from Biz Markie,
11 Incorporated to Balancing Acts, Incorporated in the
12 event that he got sick, in the event of his
13 passing, and so decided that if -- like I said, if
14 something were to happen, that I would be able to
15 then continue the affairs -- the business affairs,
16 so -- but just wanted a shift. He didn't want to
17 be -- he didn't want to have to deal with all of
18 the business affairs day to day.
19        Q    So as 51 percent share owner of Biz
20 Markie, Inc., you would have been able to continue
21 to work with Rhino on behalf of Biz Markie,
22 correct?

Page 127

1        A    Correct.
2        Q    Okay. So what this document does is
3 it shifts payments from Rhino, from a company where
4 Mr. Hall had 49 percent interest, to a company in
5 which he had 0 percent interest. Is that correct?
6        A    That's correct.
7        Q    Okay. Let's move on.
8        A    Okay.
9        Q    Exhibit 11.
10       (Izumi Deposition Exhibit Number 11
11       marked for identification.)
12 BY MR. GARVIN:
13       Q    Can you identify that document,
14 please?
15       A    It reads, "Retail Distribution Brand
16 Licensing Agreement."
17       Q    Let me -- I'm going to step back to
18 the prior document for a second.
19       A    Okay.
20       Q    Do you know how much money Rhino
21 Entertainment has paid Balancing Acts?
22       A    That has paid Balancing Acts?

Page 128

1        Q    Yes.
2        A    No.
3        Q    Are there records that would show
4 that?
5        A    Yes.
6        Q    Okay. Who has those records?
7        A    You do.
8        Q    Okay.
9        A    It's in our bank statements, so it
10 will show. And also Mrs. Hall has all access to
11 all of Biz's royalties, Rhino being one of them,
12 and has all of the log-in information as the estate
13 and is getting -- or I'm sorry, and is receiving
14 payments from all of the royalty companies, so she
15 can provide those to you. And you guys have also
16 subpoenaed those as well. And they are reflected
17 on our bank statements.
18       Q    So Mrs. Hall has access to
19 information provided by companies that Biz Markie,
20 Inc. -- let me start over again.
21       A    Okay.
22       Q    So -- so Mrs. Hall has information

Page 129

1 pertaining to payments from companies who have
2 agreements with Balancing Acts. Is that -- is that
3 right?
4        A    That's correct.
5        Q    Okay. Why would she have that
6 access?
7        A    Because she's the -- oh, sorry.
8 Because she's on the -- so she's the estate -- the
9 representative of the estate.
10       Q    But the Estate of Marcel Hall has no
11 rights and agreements between -- with Balancing
12 Acts and others, does it?
13       A    So you're saying that -- so the
14 question you're asking about is you want to -- you
15 asked me about payments that Balancing Acts has
16 received, correct?
17       Q    Yes.
18       A    Okay. And so Rhino or Warner --
19       Q    I'm listening.
20       A    No. I know. I'm -- while you're
21 writing, so you have it.
22       Q    Yeah.

33 (Pages 126 - 129)

Page 138

1    Q    Right. Fair.
2         To the left is another column that
3    says "Semi Monthly," and then it shows payments to
4    you -- I mean, something to do with payments to you
5    and Mr. Hall.
6    A    Uh-huh.
7    Q    I'll get to the bottom line if you
8    have to work through this. This appears to me that
9    if it represents the actual payments, you were
10   being paid a lot more than 51 percent of the
11   company's income and Mr. Hall was paid a lot less
12   than 49 percent.
13   A    So --
14   Q    Is that factual?
15   A    Hang on one second. Okay. Hold on.
16        Okay. So that's incorrect.
17   Q    Okay. Help me understand why it's
18   incorrect, please.
19   A    Because if you look at the second
20   line --
21   Q    What page are you on?
22   A    The same one that you're on --

Page 139

1    Q    Okay.
2    A    -- ending in 1267.
3    Q    And the second line in one of the
4    cells?
5    A    So the second line is Marcel Hall,
6    second cell, second column, semi monthly,
7    year-to-date wages and tips is 29.
8    Q    Uh-huh.
9    A    And then if you go to the last page,
10   which is 1300 -- or it ends in 1300, and you look
11   at his net pay, year to date.
12        Do you see it?
13   Q    I'm on the page. But can you --
14   A    May I point it out to you?
15   Q    Yeah, yeah, yeah.
16   A    So here is $20,601.38, also in the
17   lower right-hand corner, year to date.
18   Q    Uh-huh.
19   A    Okay. Actually -- no, no. So yeah,
20   you're right, because when you look at it -- so
21   fair. So you're correct. So here's the earnings,
22   right?

Page 140

1    Q    Uh-huh.
2    A    So that does match this, yes. But
3    that is also the middle of the year. So while that
4    may be the case, as of 5/29/18, it's technically
5    not the last month of the year, which is -- would
6    be 12/31/18. So I don't know what the end
7    year-to-date pay is.
8    Q    Right.
9    A    So if -- are you just picking a
10   specific month to focus on or are we --
11   Q    We're working on what we have, so.
12   A    Okay. I know that we provided more
13   than just this specific month, that's why I was
14   asking.
15   Q    What would be the best documentary
16   source that would show us how much Mr. Hall was
17   being paid year over year from Biz Markie and how
18   much you were?
19   A    Bank statements, tax returns, W-2s,
20   1099s.
21   Q    Are there any additional documents
22   relevant to what the two of you were actually being

Page 141

1    paid that would show that?
2    A    No.
3    Q    Okay. Ms. Izumi, please turn to
4    Exhibit 31.
5         (Izumi Deposition Exhibit Number 31
6         marked for identification.)
7    BY MR. GARVIN:
8    Q    Actually, before I ask you anything
9    about the documents specifically, were you involved
10   in assisting Mr. Hall in getting his taxes done?
11   A    Yes.
12   Q    Tell me how you did that.
13   A    He and I would -- how would I assist
14   him in doing that? So through our bank statements,
15   our 1099s, our W-2s, we would provide that
16   information to our accountant, who would then
17   prepare our tax returns.
18   Q    When you say "we," I'm interested in
19   sort of the physical part of that.
20   A    Uh-huh.
21   Q    Did -- did Marcel separately send
22   information to the accountants?

36 (Pages 138 - 141)

Page 142

1    A    No.
2    Q    Okay.  How did Mr. Hall's relevant
3    information get delivered to the accountants?
4    A    Well, let me just go back to the last
5    question when you say "did he provide."  So yes,
6    some -- I think some W -- no, not think, let me not
7    say that.
8         Some of his -- some of his 1099s, or
9    even like 1098 mortgage statements, et cetera,
10   investments, that you receive at his home address,
11   he would give to me, and we would scan them and
12   give them to our accountant.  So that was the last
13   question.
14        I apologize.  I wanted to --
15   Q    No, no, no.  Thanks.
16   A    -- answer that.
17   Q    That's helpful.
18        Okay.  So back to Exhibit 31, and
19   this is Mr. Hall's 2017 individual tax return.
20   A    Uh-huh.
21   Q    If you will turn for me to the second
22   page.

Page 143

1    A    Uh-huh.
2    Q    And it shows his signature.
3    A    Uh-huh.
4    Q    To the right of his signature is a
5    date.  It's 04.16.18.  Is that date written by
6    Mr. Hall?
7    A    No.
8    Q    Okay.  Is -- did Mr. Hall write his
9    signature in ink?
10   A    I think so, yes.  Yes.
11   Q    Would you turn to Exhibit 38?
12   A    38, yes.  No -- yes.
13        (Izumi Deposition Exhibit Number 38
14        marked for identification.)
15   BY MR. GARVIN:
16   Q    And I will represent to you that
17   Exhibit 38 is a photocopy of two pages from
18   Mr. Hall's -- one of his passports.
19   A    Uh-huh.
20   Q    And on the top part, it shows his
21   signature.  Do you see his signature?
22   A    I do.

Page 144

1    Q    And the bottom part shows the date of
2    issuance of the -- of the passport as April 24,
3    2018.  Do you see that?
4    A    Yes.
5    Q    Okay.  Does Mr. Hall's signature on
6    his passport look similar to the signature on the
7    tax return?
8    A    No.
9    Q    Okay.  Can you account for the
10   difference?
11        MS. COOPER:  I'm going to object.
12        So you're going to have to answer
13   it, but I'm just going to -- well, no, it's a
14   fair question.  He said can you --
15        THE WITNESS:  Yes.
16        MS. COOPER:  -- account from your
17   personal knowledge.  Uh-huh.
18        THE WITNESS:  So that may have been
19   me signing on his behalf with his approval.
20   BY MR. GARVIN:
21   Q    On the tax return?
22   A    Correct.

Page 145

1    Q    Okay.  Would you say that the
2    signature that's signed looks similar to the
3    digital signatures that we've reviewed earlier?
4    A    I'm just going to pull them up.
5    Q    Yeah, we can find one.
6        MS. COOPER:  Look at those dates on
7    that certificate.  I think they're five or
8    something, five or six.
9        MR. GARVIN:  Good memory.  Five and
10   six, both.
11   BY MR. GARVIN:
12   Q    And feel free to take them out if
13   it's easier.
14   A    No, I can see.
15        MS. COOPER:  He asked about the tax
16   return and the signature.  Do --
17        THE WITNESS:  They look -- yeah, some
18   part of it looks -- I'm sorry.  What's your
19   question again?
20   BY MR. GARVIN:
21   Q    Let's -- let's be concrete.  And I'm
22   going to direct you to Exhibit 6.

37 (Pages 142 - 145)

Page 154

1   specific.
2       A    I'm sorry.  It was.  I apologize.
3       Q    No, no worries.
4           The stock certificates we looked at
5   were signed digitally, correct?
6       A    Uh-huh.
7       Q    Okay.  And that was not his ink
8   signature, right?
9       A    Correct.
10      Q    Okay.  The ledgers, I may have seen
11  them.  I could have overlooked them.  Were they
12  signed by anybody?
13      A    I don't recall.  I believe -- I
14  don't -- I don't recall.  I would have to see it --
15      Q    Okay.
16      A    -- but --
17      Q    So -- so back -- back to my question.
18      A    Uh-huh.
19      Q    And I'm only referring to documents
20  that Mr. Hall physically signed.
21      A    Yeah.
22      Q    Other than the tax returns, can you

Page 155

1   think of any documents he physically signed that
2   showed his 49 percent interest in Biz Markie,
3   Incorporated?
4       A    It would be his tax returns.  And --
5   I would have to think to try and recall, but
6   definitely tax documents that reflected the
7   49 percent.  That would be our -- again, the same
8   thing as before, it was our understanding that
9   51/49.  And the way it worked, even through, like,
10  our tax documents and how we registered with D.C.,
11  that that was our overarching agreement.
12      Q    What do you mean how you registered
13  with D.C.?
14      A    In our -- how Biz Markie,
15  Incorporated is registered.
16      Q    Is there a document filed with the
17  District of Columbia showing those share
18  ownership -- that share ownership information?
19      A    I don't know --
20      Q    Okay.
21      A    -- because Tina drafted up everything
22  for us.

Page 156

1       Q    Got it.
2           Do you know whether BizMont
3   Entertainment is receiving royalties related to
4   Marcel Hall's artistic works?
5       A    I do not.
6       Q    Do you have any affiliation with
7   BizMont Entertainment?
8       A    I do not.
9           But I would also direct you to the --
10  if that's a -- if -- but you could ask -- so any
11  royalties that are being paid, the estate would be
12  able to know if BizMont Entertainment was receiving
13  any royalties.
14      Q    Ms. Izumi, would you please turn to
15  Exhibit 37?
16      A    Uh-huh.
17      (Izumi Deposition Exhibit Number 37
18       marked for identification.)
19  BY MR. GARVIN:
20      Q    Are you familiar with Exhibit 37?
21      A    I am.
22      Q    Can you identify it?

Page 157

1       A    It is a spreadsheet that I drafted
2   per the direction of my attorney to provide to, at
3   the time, Mrs. Hall's guardianship attorney for all
4   of Biz's assets.  And so this way you would have
5   all of the creditor names, information, account
6   name, et cetera.
7           I mean, it's listed.  So creditor
8   name, phone number, account name, account number,
9   monthly payment, due date, website, user name, and
10  password.  All the monies that were paid directly
11  to Tara Hall and the assets that were held in his
12  name and the amount.
13      Q    Okay.  Thank you.
14      A    You're welcome.
15      MR. GARVIN:  All right.  Let's go off
16  the record for a bit.  I think if I have a chance
17  to look over my notes, I can be a little more
18  organized and get us -- get us through here a
19  little bit quicker than if I was just sitting here
20  without being organized.  So why don't we take ten
21  minutes.
22      VIDEOGRAPHER:  The time is 2:15 p.m.

40 (Pages 154 - 157)

Page 170

1    A    Okay.  And then Epic Rights has
2  different relationships with different companies
3  that they then -- that they then present to us, so
4  you just agree to the terms.
5    Q    Well --
6    A    And I don't want to say agree.  Like,
7  you don't just agree, but that's why I was saying
8  like, "Hey, I want to make sure that this makes
9  sense."  So they'll send you the terms where you
10  see, like, royalty, wholesale, what is your advance
11  or your guarantee.
12    Q    Why would the deal matter to Biz
13  Markie's family if Biz Markie's family is not going
14  to get anything out of the deal?
15    A    Because I still have conversations
16  with his family and -- and others, right, like even
17  like friends, like, they want to -- they know that
18  Biz and I's long-term relationship, Biz trusted me
19  to, again, make sure that he was represented in a
20  way that showed who Biz is and was.  And so that's
21  important, that was important to him, it's
22  important to me.

Page 171

1    And so when you have those
2  conversations, if it comes up -- because there are
3  different -- you know, like I said, there may have
4  been different opportunities where it's like let's
5  do a deal with something that Biz had no interest
6  in whatsoever just because.
7    And let's say, for example, I agreed
8  to the deal, and then it comes out and it's like,
9  "Oh, Biz did a Funko doll," but people would be
10  like, "Oh, this isn't even along the lines of what
11  Biz had."
12    His family, friends, even, like, the
13  industry community, our colleagues and peers, would
14  be like, "This doesn't even make sense.  Like why
15  would you even do this doll?  Biz didn't even like
16  dolls."
17    And so in those, you know,
18  conversations that you may have with his family,
19  friends, colleagues, if something comes out, a
20  Funko doll, they will be like, "Oh, I saw this,"
21  like at least you know it's authentically Biz.
22    Q    Right.

Page 172

1    So the thought is the deal could be
2  important to the family even though they're not
3  going to get any economic benefit out of it.  Is
4  that right?
5    A    I'm sorry.  Say the first part --
6    Q    The deal could be important to the
7  family even though they're not going to make any
8  money off of it, right?
9    A    Correct.
10    Q    Okay.
11    A    It's like your -- just because your
12  paycheck -- you're not paying your -- or your
13  family doesn't benefit from your paycheck in the
14  sense of like his family is not just -- let me ask
15  you a question.  What is your definition of family?
16  That's what I should have asked.  I'm sorry.
17    Q    Blood relations.
18    A    Blood relations.
19    Q    Or marriage.
20    A    So blood relations because that's,
21  again, who I would speak with.  Yeah, you still
22  have those conversations where you want there

Page 173

1  things to be authentically Biz, but his blood
2  relations, family-wise, doesn't always
3  financially -- didn't always financially benefit
4  from Biz's paycheck.
5    Q    But his estate would, wouldn't it?
6    A    It depends on what the -- who the
7  arrangement is with.
8    Q    Sure.
9    If this agreement had been with Biz
10  Markie, Incorporated, and it resulted in money, his
11  estate would be entitled to a portion of that
12  money, right?
13    A    Not if he -- no.  Because of the --
14  because if Biz is no longer -- to my -- let me say
15  this, I don't know estate law, so I don't know how
16  they would benefit from business of Biz Markie,
17  Incorporated.
18    Q    So, for instance, you don't know
19  whether Biz Markie's estate owns 49 percent of Biz
20  Markie, Incorporated.  Is that your testimony?
21    A    Yes.
22    Q    Okay.  Please turn to Exhibit 13.

44 (Pages 170 - 173)

Page 198

1    We are off the record.

2        (Whereupon, at 3:23 p.m., the

3    video-recorded deposition of JENNIFER

4    IZUMI was concluded for the day,

5    signature reserved.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 199

1       CERTIFICATE OF NOTARY PUBLIC

2    I, FELICIA A. NEWLAND, CSR, the officer before

3  whom the foregoing video-recorded deposition was

4  taken, do hereby certify that the witness whose

5  testimony appears in the foregoing deposition was

6  duly sworn by me; that the testimony of said witness

7  was taken by me in stenotype and thereafter reduced

8  to typewriting under my direction; that said

9  deposition is a true record of the testimony given

10  by said witness; that I am neither counsel for,

11  related to, nor employed by any of the parties to

12  the action in which this deposition was taken; and,

13  further, that I am not a relative or employee of any

14  counsel or attorney employed by the parties hereto,

15  nor financially or otherwise interested in the

16  outcome of this action.

17

18

19

20     FELICIA A. NEWLAND, CSR

         Notary Public

21

  My commission expires:

22  September 15, 2024

Page 200

1       Veritext Legal Solutions

         1100 Superior Ave

2         Suite 1820

        Cleveland, Ohio 44114

3       Phone: 216-523-1313

4  January 15, 2024

5  To: DAYNA COOPER

6  Case Name: Hall, Tara, etc. v. Biz Markie, Inc., et al.

7  Veritext Reference Number: 6348734

8  Witness: Jennifer Izumi    Deposition Date: 12/29/2023

9  Dear Sir/Madam:

10  Enclosed please find a deposition transcript.  Please have the witness

11  review the transcript and note any changes or corrections on the

12  included errata sheet, indicating the page, line number, change, and

13  the reason for the change.  Have the witness' signature notarized and

14  forward the completed page(s) back to us at the Production address

    shown

15

    above, or email to production-midwest@veritext.com.

16

    If the errata is not returned within thirty days of your receipt of

17

    this letter, the reading and signing will be deemed waived.

18

    Sincerely,

19

20  Production Department

21

22  NO NOTARY REQUIRED IN CA

Page 201

1       DEPOSITION REVIEW

       CERTIFICATION OF WITNESS

2

    ASSIGNMENT REFERENCE NO: 6348734

3    CASE NAME: Hall, Tara, etc. v. Biz Markie, Inc., et al.

    DATE OF DEPOSITION: 12/29/2023

4    WITNESS' NAME: Jennifer Izumi

5    In accordance with the Rules of Civil

    Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7    I have made no changes to the testimony

    as transcribed by the court reporter.

8

    _____

9  Date       Jennifer Izumi

10    Sworn to and subscribed before me, a

    Notary Public in and for the State and County,

11  the referenced witness did personally appear

    and acknowledge that:

12

    They have read the transcript;

13    They signed the foregoing Sworn

      Statement; and

14    Their execution of this Statement is of

      their free act and deed.

15

    I have affixed my name and official seal

16

    this _____ day of_____, 20____.

17

18    _____

    Notary Public

19

    Commission Expiration Date

20

21

22

23

24

25

51 (Pages 198 - 201)

Page 202

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 6348734
3    CASE NAME: Hall, Tara, etc. v. Biz Markie, Inc., et al.
     DATE OF DEPOSITION: 12/29/2023
4    WITNESS' NAME: Jennifer Izumi
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7       I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9       I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____     _____
     Date             Jennifer Izumi
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18         in the appended Errata Sheet;
        They signed the foregoing Sworn
19         Statement; and
        Their execution of this Statement is of
20         their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
     Notary Public
24
25   Commission Expiration Date
```

Page 203

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 6348734
3    PAGE/LINE(S) /     CHANGE     /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____     _____
20   Date             Jennifer Izumi
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
     Notary Public
24
25   _____
     Commission Expiration Date
```

52 (Pages 202 - 203)