# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TARA HALL AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARCEL THEO HALL, <br><br> Plaintiff, <br><br> v. <br><br> BIZ MARKIE, INC., *et al.*, <br><br> Defendants. | Case No.: 1:22-cv-00806 (CKK) |

### DECLARATION OF LITA ROSARIO-RICHARDSON

I, Lita Rosario-Richardson, hereby declare:

1. I am over the age of 18 years old and have personal knowledge of the facts stated herein and could and would competently testify thereto if called as a witness.

2. Exhibit 1 to this Declaration is a true and accurate copy of my expert report in this action ("Report").

3. If called to testify, I would testify to the opinions set forth in the Report.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 14, 2024

_____
Lita Rosario-Richardson

# Exhibit 1
## to Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TARA HALL AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARCEL THEO HALL, <br><br> Plaintiff, <br><br> v. <br><br> BIZ MARKIE, INC., *et al.*, <br><br> Defendants. | Case No.: 1:22-cv-00806 (CKK) |

**EXPERT REPORT OF LITA ROSARIO-RICHARDSON, ESQ.**

**SHULMAN ROGERS, P.A.**

**Dated:  February 16, 2024**

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| I. | **BACKGROUND FACTS** | 1 |
| | A.  Biz Markie's Music History | 2 |
| | B.  Izumi Experience in the Music Industry | 2 |
| II. | **ARTIST MANAGEMENT SERVICES** | 2 |
| | A.  Personal Manager's Power of Attorney | 4 |
| | B.  Artist Loan Out Companies | 4 |
| III. | **INDUSTRY STANDARD MANAGEMENT FEES/COMMISSIONS** | 5 |
| | A.  Artist Managers Commission 10-20% of Gross Monies | 5 |
| | B.  Oral v. Written Management Agreements | 6 |
| |     1.  Interest in Biz Markie's Copyrights, Trademarks, Name & Likeness Rights | 7 |
| |     2.  Interest in Biz Markie's Entertainment Related Companies | 7 |
| |         a.  Artist Royalties | 7 |
| |         b.  Music Publishing Royalties | 8 |
| IV. | **DETERMINING THE RELEVANT PEROD FOR COMMISSIONS** | 9 |
| V. | **FINDINGS & CONCLUSIONS** | 9 |

## LIST OF EXHIBITS

**EXHIBIT A**    Biz Markie Discography

**EXHIBIT B**    Rosario-Richardson, *Personal Representatives; Economics and Private Ordering in the New Music Ecosystem*, The Oxford Handbook of Music Law and Policy, 2020

## LIST OF APPENDICES

**Appendix A**        **Lita Rosario-Richardson Curriculum Vitae**

**Appendix B**        **Statement of Compensation**

**Appendix C**        **List of Cases --Expert Testified for Previous Four Years**

## DOCUMENTS AND INFORMATION CONSIDERED

1. Amended Complaint

2. Depositions Transcripts
   A. Jennifer Izumi dated December 29, 2023
   B. Nicholas P. Cusato, CPA dated January 31, 2024

3. Wikipedia, Biz Markie

4. ASCAP, www.ASCAP.com or BMI, www.BMI.com

   5. DCRA & Maryland Office of Tax & Revenue online research

The Expert Report is based upon my review of the Amended Complaint dated June 21, 2022 [ECF#17], the Deposition Transcript of Jennifer Izumi dated December 29, 2023 (herein "Izumi Dep.") and the Exhibits thereto, the Deposition Transcript of Nicholas P. Cusato, CPA dated January 31, 2024, and the Exhibits thereto, and online research of Biz Markie's music career, BizMont Entertainment, Inc., Biz Markie, Inc., and Balancing Acts, Inc.

## I.   BACKGROUND FACTS

Marcel Hall professionally known as "Biz Markie" (herein "Biz Markie" or "Hall," as the context shall require) is a renowned music personality whose career as a professional recording artist began at least as far back as 1986. *See* Exhibit A hereto –[Biz Markie Discography][1]. Hall was a high school graduate but did not attend college. [Izumi Dep. at p.15, lns. 7-11.]

From Defendant Izumi's testimony it appears that prior to her assuming any management responsibilities for Hall, she worked for his prior manager, Lamont Wanzer (also known as "Monte").[2] [Izumi Dep. at p. 14, lns 1-12.] At that time, Izumi performed administrative services that she described as: "updating, creating, and editing contracts, organizational administration items to help get the company organized." *Id*.

Defendant Izumi began working directly with Hall in 2015 [Izumi Dep. at p.26, lns 11-19], long after he had established himself as a professional recording and performing artist, DJ and songwriter. Izumi indicates that her prior experience with artist management was only working with Monte for Biz Markie. [Izumi Dep. at p.17, ln 21 - p.18, ln 3.]

BizMont Entertainment, Inc. was Hall's so-called "loan out company," the entity that Hall conducted his entertainment business through when he met Izumi. [Izumi Dep. at p. 14, lns 13-14.] Izumi indicated that she had no relationship with Biz Mont Entertainment, Inc. [Izumi Dep. at p. 156, lns 6-8] According to Izumi, Biz Markie, Inc. was incorporated in the District of Columbia by an accountant working for Hall on February 2, 2015. *See* [Izumi Dep. at p. 51, lns 2-10] and Exhibit 2. Izumi has presented a stock certificate to establish her alleged 51% ownership of Biz Markie, Inc. [Izumi Dep. at p. 51, lns 2-3 and Exhibit 6]. There is a Power of Attorney dated May 23, 2018 ("POA"), that was executed by Hall appointing Izumi as his power of attorney. [Izumi Dep. at p. 60, lns 15-18] Izumi has also presented a "draft" Shareholders' Agreement for Biz Markie, Inc., which she testified in her deposition was actually executed by her under the POA, after Hall was incapacitated in 2020. I have not been provided with a signed copy of that document.

Izumi indicates that she and Hall "worked together" for over 20 year. [Izumi Dep. at p. 26, lns 7-10] But, she also indicates that they began working together directly in 2015 when Biz Markie, Inc. was formed.

---

[1] Biz Markie was involved in an iconic law suit that set the legal standard for the so called master "sampling" a process by which elements of an existing recording are incorporated into a new musical works. *See* https://www.npr.org/sections/therecord/2013/05/01/180375856/20-years-ago-biz-markie-got-the-last-laugh

[2] Izumi claims not to know what the compensation arrangement between Monte and Biz Markie. [Izumi Dep. at p. 14, lns. 16-18.]

1

Finally, Izumi indicates that she is also the sole owner of Balancing Acts, Inc. a "booking & management company" (herein "Balancing Acts".)[3]  [Izumi Dep. at p. 119 –121] There is no additional discussion of the business activities of Balancing Acts, other than that Letters of Direction for music royalties related to Hall's music career that were re-directed by Izumi from Biz Markie, Inc. to Balancing Acts allegedly under authority of the POW. This transfer was made on January 16, 2019. [Izumi Dep. at Exhibit 10.] In addition, Izumi mentions promissory notes between Balancing Acts and Biz Markie, Inc. [Izumi Dep. at p. 122, lns 2-21]

### Biz Markie's Music History
### Pre-2015 Time Line

Biz Markie released his first EP, *Make the Music with Your Mouth, Biz,* in 1986. Biz Markie released his first studio single in 1987 titled "*Nobody Beats the Biz*" featuring TJ Swan and "Pinckin Boogers." His debut album titled *Goin' Off* was released in February 23, 1988, which included the top charting single "*Vapors.*" Biz Markie went on to release four more solo studio albums between 1988 and 2003 including the platinum single "*Just a Friend*" reaching number 9 on Billboard's Hot 100 chart. Biz Markie also appeared on six compilation albums featuring chart toping singles.  Two greatest hits albums were released for Biz Markie in 2002 and 2009, respectively.  Biz Markie was a well-established music recording artist and DJ in 2015, when Izumi began working with him directly.

### Jennifer Izumi Experience In The Music Industry

Izumi stated her experience prior to working with Hall was "in the entertainment industry doing everything from promotions and marketing to administrative . . . ." [Izumi Dep. at p.10, lns 17-22] She then describes her initial work for Hall as "part-time administrative work." [Izumi Dep. at p.13, lns 2-5]

## II.    ARTIST MANAGEMENT SERVICES

Personal artist managers handle the day-to-day logistical matters and advise the artist on creative and career decisions. They offer professional advice and guidance on issues such as image, creative direction, and material to record. They often assist with procuring a recording contract either with a major label or an independent label. They also assist the music lawyer, talent agent and work with the artist's business manager or accountant. They participate in securing and negotiating recording deals, music publishing deals and importantly, live performance dates and tours, merchandizing deals, sponsorship and endorsement deals. Good managers also develop a plan for the artist's long-term career. [4]

---

[3] If Izumi had her own management and booking company, booking agents must be licensed and bonded in the states in which they operate; but, there are no such restrictions on artist management companies. [Krasilovsky, *This Business of Music,* 8th Ed. (2015) page 356]

[4] Krasilovsky, *This Business of Music,* 8th Ed. (2015); Lita Rosario-Richardson, *Personal Representatives; Economics and Private Ordering in the New Music Ecosystem*, The Oxford Handbook of Music Law and Policy, 2020 Section II(A)]

They also often assist with publicity and marketing matters including securing playlists and developing the artist's social media presence.[5] Historically, personal managers would arrange for copyrighting masters and songs, and shopping demonstration recordings to record labels.[6] They also arrange for,work with booking agents, and assisted with public relations professionals. They set up accounts for the artist at royalty collection societies and unions (such as ASCAP, BMI, or SESAC, SoundExchange and SAG-AFTRA.)[7] They also assist with establishing and managing social media accounts, for Facebook, Twitter, TikTok, SnapChat, and the like.[8]

Initially, Izumi testified in her deposition that she was Hall's artist manager. [Izumi Dep. at p. 10, lns 14-16]    Later in the deposition, Izumi claimed that she was Hall's business partner rather than his "manager." [Izumi Dep. at p. 3, lns 16-21]  But, she then goes on to describe how Hall would refer to her as his "manager" to third parties in the music industry. [Izumi Dep. at p. 30, lns 16-21]   "Speak with Jenny, my manager." [Izumi Dep. at p. 31, lns 7-1]    However, she was unable to advise if Monte, the prior manager with whom she worked for 16 of the 20 years that she worked with Hall, was also allegedly Hall's "business partner." [Izumi Dep. at p. 31, lns 14-16] Interestingly, press and media accounts of Monte' death, describe him as Hall's long time manager.  *See*  https://hiphopdx.com/news/id.66515/title.biz-markie-longtime-manager-revealed-to-be-a-wire-wearing-dea-informant-for-years

Izumi further states that the difference between a "manager" and a "business partner" is a title and that they really go hand in hand.  [Izumi Dep. at p. 32, lns 4-8]  While, she further describes the relationship between she and Hall as "managing business partners since we collaborated on things together." [Izumi Dep. at p. 32, lns 7-8] But, she then goes on to say that "if you want to say ***manager***, I mean managing both ***business and personal affairs,*** business partner is business partner. [emphasis added] [Izumi Dep. at p. 32, lns 9-14]  At other points in the deposition, Izumi

---

[5] *See* Krasilovsky, *This Business of Music,* 8th Ed. (2015); Lita Rosario-Richardson, *Personal Representatives; Economics and Private Ordering in the New Music Ecosystem*, The Oxford Handbook of Music Law and Policy, 2020, Section II(A).

[6] In Confessions of a Record Producer, Avolon, the author, gives a satirical description of what managers do: "So, let's say you're a recording artist (or hope to become one) and you're looking for a manager.  What will he or she do for the 15% to 20% that they will take off the top of your gross earnings?  Well… Managers shop and negotiate the deal between the artist and the record label. … Managers make sure that the artist gets their proper royalty payments. … Managers help the artist select material for the record and help develop the sound. … Managers make sure that the venue conditions are the ones agreed upon in the tour contract (i.e., that there's enough beer backstage and the instruments are in tune). …Manager's get the act great gigs on the road, like opening up for a national act.  Manager's supervise the artist's interviews and press releases.  They make sure that nothing too negative leaks to the press (unless they want it to).  *But don't we have publicists for that*?  Most definitely. . . Managers help mold the artist, like with the proper look.  *But can't you get a stylist or image consultant to do that for a few hundred bucks?*  Sure. Managers make sure that the venue conditions are the ones agreed upon in the tour contract (i.e., that there's enough beer backstage and the instruments are in tune).  *But don't we have tour managers and stage managers for that?*  Yup, we do. Manager's get the act great gigs on the road, like opening up for a national act.  *But can't a booking agency do that for 10%*?  Uh, yeah. Manager's supervise the artist's interviews and press releases.  They make sure that nothing too negative leaks to the press (unless they want it to).  *But don't we have publicists for that*?  Most definitely. Managers help mold the artist, like with the proper look." Moses Avalon, *Confessions of a Record Producer*, (1998) at p. 11.

[7] Izumi apparently referenced representatives of these royalty collection societies and unions in her discovery responses, as persons with knowledge.  [Izumi Dep. at p. 161, ln 3 to p. 162, ln 10.]

[8] Lita Rosario-Richardson, *Personal Representatives; Economics and Private Ordering in the New Music Ecosystem*, The Oxford Handbook of Music Law and Policy, 2020, Section II(A).

3

seems confused about the duties of a business manager versus a personal manager. *See* [Izumi Dep. at p. 33, lns 2-8.]

Izumi's statement that she handled personal and business matters, including paying household bills is what is called the "Alter Ego" theory of artist management. [Izumi Dep. at p. 36, lns 1-10] This theory basically takes the view that a manager can become the artist's alter ego if they are providing personal and business services for the artist. "Some personal managers provide more services to their clients than others; some even become the alter ego of the artist, meaning that they stand in the shoes of the artist for both professional, legal, and personal matters." *See* [Rosario-Richardson, *Personal Representatives; Economics and Private Ordering in the New Music Ecosystem*, The Oxford Handbook of Music Law and Policy, 2020, at Section (II)(A)] [9] However, obviously, acting as the alter ego of an artist does not convert an artist manager into a "business partner."

Izumi indicates that Hall placed his trust in her as his "business manager." [Izumi Dep. at p. 15, lns 4-5.] However, other than using an electronic facsimile of Hall's signature on contracts and other documents and paying personal bills, it is unclear what specific services Izumi provided for "business management" or "artist management" services. Further, there is no indication that Izumi was investing money or gave anything of value to acquire an interest in Biz Markie, Inc., which was essentially Hall's artist loan out company.[10] On the contrary Izumi references promissory notes between Biz Markie, Inc. and Balancing Acts, which means that monies were loaned not invested. [Izumi Dep. at p. 122, lns 2-17.]

### A. Personal Manager's Power of Attorney

In most written management contracts, managers are given a *limited* power of attorney in connection with the artist personal services. The manager having a power of attorney is typically about expediting artists in securing and executing agreements for live performances. Artist are often unavailable to execute live performance agreements and managers are typically responsible for making sure that happens.

The general power of attorney that Izumi held for Hall was unusual in the music business. As noted above, most artists only allow managers a limited power of attorney to execute personal service contracts.[11] However, the POA terminated upon Hall's death.

### B. Artist Loan Out Companies

Artist loan out companies are usually limited liability companies or corporations that artists form to collect their royalties and enter into agreements for their personal services.[12] These loan

---

[9] https://academic.oup.com/edited-volume/35420/chapter-abstract/426837501?redirectedFrom=fulltext.  A copy of this chapter is also included in the Appendix.

[10] *See* discussion *infra* about artist loan out companies at B, p. 4.

[11] Lita Rosario-Richardson, *Personal Representatives; Economics and Private Ordering in the New Music Ecosystem*, The Oxford Handbook of Music Law and Policy, 2020, Section II (G)

[12] *See* Donald Passman, *All You Need to Know About the Music Business*, (9th Ed.) (2015)  "Loan Out Deals" at pp. 203-206.

4

out companies are often not established when an artist initially begins their career so often their recording and music publishing agreements are contracted in their names as individuals.[13] The artist at a later point in their careers often create a loan out company and issue what are called "letters of direction" to direct payments of royalties to the loan out company.[14] Here it appears that both BizMont Entertainment, Inc. and Biz Markie, Inc. were Hall's artist loan out companies.

### III.   INDUSTRY STANDARD MANAGEMENT FEES/COMMISSIONS

#### A.   Artist Managers Commission  10%-20% of "Gross Monies"

"A commission is the negotiated percentage the [artist] manager will receive from the artist's earnings.  This percentage usually falls between 10 and 20 percent, according to industry manager Darren Hall.  Here is a calculated example to help you better understand.  If you performed on a tour and earned $5,000 per engagement, a 10-percent commission of $500 would be paid to the manager.  It is called a commission because it is earned off of the fee the artist gets from a third party." *See* James L. Walker, Jr., Esq., *This Business of Urban Music*, p. 42.  "Also, a personal manager's percentage can fluctuate between 10 and 20 percent or even higher, depending on experience." *Id.* at p. 49[15]  *See* Lita Rosario-Richardson, *Personal Representatives; Economics and Private Ordering in the New Music Ecosystem*, The Oxford Handbook of Music Law and Policy, 2020, Section II(C).

Regarding the percentage payable to an artist manager many lawyers negotiate for a 15% commission. "The first and most obvious issue is the manager's percentage. You should try to limit the percentage to 15%, although some managers argue that the risk of taking on a new band is worth 20%."  Donald Passman, *All You Need to Know About the Music Business*, (9th Ed.) (2015) p. 30.  *See* a*lso* Rapaport, *A Music Business Primer*, Prentice Hall (2003), p. 124 (Managers typically make 15% to 25% of their artist's **gross earnings** from their artistic activities . . . . )[emphasis added]; Krasilovsky, *This Business of Music,* 8th Ed. (2015), p. 354 ("The term *commissionable income* in a management agreement includes the artist's gross income in whatever

---

[13] Hall's original recording contract with Prism Records was between Marcel Hall, a/k/a BIZ MARKIE and Prism Records dated August 14, 1986. *See* Izumi Dep. at Exhibit 10 – [Rhino LOD to Balancing Acts].

[14] LODs sometimes say they are irrevocable but that is not the case if there was no consideration and no underlying agreement to support the LOD.

[15] It is well established that artist managers receive between 10-20% of the artist gross earnings in the entertainment industry. Part 1: The Artist & Manager Relationship - A Look At Recording Industry Management Agreements - TuneCore March 28, 2017. ("While there is no set typical payment or commission rate for a manager, most managers earn anywhere from 10-25% of the artist's total income, typically the rate is between 15-20%."); What It Takes to Be a Band/Artist Manager (liveabout.com) February 10, 2019 ("Managers are generally paid a percentage of the band's income: often 15% to 20%. In addition to their percentage, managers should not have to cover any expenses out of their pocket."); What does an artist manager do? (With skills and salary) | Indeed.com UK January 17, 2023 ("Contract agreements usually stipulate that the artist manager takes a fixed percentage of the artist's gross revenue. This fixed percentage is usually around 15-30 percent."); Do Music Managers Get Royalties? Everything You Need To Know - Industry Hackerz ("The typical commission is 10-20%, but it can be higher or lower depending on the situation.") How to Negotiate a Contract with a Music Manager – ArtistPR.com ("The average fee is between 10 and 20 percent.") https://www.billboard.com/music/music-news/what-artists-managers-really-earn-its-not-cheap-to-be-available-24-7-6605758/.

form (royalties, bonuses, and stock")). *See also* Kellogg, *Take Care of Your Music Business*, 2d, (2014), pp. 180-181 (interpreting "gross compensation" in a management agreement to include, inter alia, fees, salaries, earnings, royalties, residuals, advances, report and or union fees, bonuses, proceeds from sales, leases or licenses, *recordings costs*, gifts, shares of stock, partnership interests . . . .) [emphasis added]; Siegel, *Breaking into the Music Business* (1990), pp 173 (noting that "gross income" in "the entertainment field" is the traditional compensation for managers; but, can be limited by contract, to deduct things like recording costs); and *See also* Halloran, *The Musicians Business & Legal Guide*, A Presentation of the Beverly Hills Bar Association, Prentice Hall, p. 268-269, (2001) ("The term 'gross monies or other considerations' as used herein shall include, without limitation, salaries, earnings, fees, royalties, gifts, bonuses, shares of profits and other participations, shares of stock, partnership interests, percentages music related income [sic] . . .").

On the other hand, "[b]usiness managers may or may not have written agreements and are sometimes accountants or certified public accountants (CPAs) but typically have a finance/accounting background. They usually receive either an hourly billable rate or typically 5% of the artist's gross income in "the entertainment industry." Road managers handle all logistical matters for the artist and usually receive a daily rate that is based upon the number of days they are working for the artist on the road. Their pay typically depends upon the artist's stature and their experience; but usually ranges from $100 to several thousand dollars per day. Booking agents typically receive 10%–15% of the live performances booked for the artist or if they have an exclusive contract, they receive 10%–15% of all live performance income whether booked by them or not.

### B.     Oral v. Written Management Agreements

Written management agreements provide for long-term compensation and typically cannot be terminated by the artist even for cause; however, oral agreements can be terminated at any time, leaving the artist manager without recourse, other than to receive payment for work already completed.

> The agreements that artists have with these personal representatives can be either oral or written. Importantly, oral agreements can be terminated at any time by the Artist without much liability. On the other hand, traditional written management and booking agent agreements typically cannot be terminated by the Artist even "with cause" without severe financial consequences. Many of these agreements can also be exclusive or nonexclusive, and if oral, the agreement can be terminated at the Artist's whim; however, the terms of any written agreement will typically dictate whether the arrangement is exclusive or nonexclusive.

*See* Lita Rosario-Richardson, Personal Representatives; Economics and Private Ordering in the New Music Ecosystem, The Oxford Handbook of Music Law and Policy, 2020 Section II(A).
A further common standard music industry definition of "***activities in the entertainment or related fields***" provides greater clarity:  The definition includes, inter alia, "any and all gross income"[16]

---

[16] *See* Krasilovsky, *This Business of Music,* (2015) p. 355 (both *gross income* and *entertainment field* should be defined); *See also* Kellogg, *Take Care of Your Music Business*, 2d, PJ Kelly & Associates (2014) pp.

6

from recordings, songwriting and music publishing, use of any professional names, live performances, TV or film engagements, as well as income or consideration from merchandizing, advertising and endorsements.

### 1. Interest in Biz Markie's Copyrights, Trademark, Name & Likeness Rights

In order to acquire an interest in copyright and trademarks there must be a signed writing transferring such rights.[17] There is no written agreement allowing Izumi or Biz Markie, Inc. to file or own any trademarks or to granting any name and likeness rights to Izumi or Biz Markie, Inc.[18] [Izumi Dep. at p. 86 ln 1, to p. 89, ln 20]

### 2. Interest in Biz Markie's Entertainment Related Companies

As noted above BizMont Entertainment, Inc.[19]. and Biz Markie, Inc.[20] are artist loan out companies for Hall. Izumi presented a stock certificate for Biz Markie, Inc. that showed her as a co-owner with a majority 51% interest in the company. [Izumi Dep. at Exhibit 6] Izumi also claims that there is Shareholder's Agreement for Biz Markie, Inc. with a digital signature for Hall. She testified that the Shareholder's Agreement was executed by her under the alleged authority of the POA, after Hall became incapacitated in June 2020. [Izumi Dep. at p. 60, lns. 7-18]

Based upon my 30 years of experience in the music industry, artist managers typically do not co-own the artist loan out companies (certainly not a majority interest), and are usually not considered partners or business partners unless they actually invest their own funds in the artist projects, i.e., an album projects, TV shows, films or live performances/tours.[21]

#### a. Artist Royalties

The royalties from Hall's music career (both his artist and songwriter/music publishing royalties) were being paid to Biz Markie Inc. and later Balancing Acts via Letters of Direction (LOD). LODs are common in the music business; but are not a binding assignment without an

---

181; Siegel, *Breaking into the Music Business,* Simon & Schuster/Fireside (1990), pp. 173-174 (calculation of management commissions "or other consideration").

[17] *See* 17 U.S. Code § 204 - Execution of Transfers of Copyright.

[18] *See.* 15 U.S.C. § 1060(a)(3) " Assignments shall be by instruments in writing duly executed." *See also* J. Thomas McCarthy, Trademarks and Unfair Competition § 18 (4th Ed. 2015). Likewise, a common law trademark can only be transferred with a writing.

[19] BizMont Entertainment, Inc. was formed in the District of Columbia on March 17, 1998 and is currently dissolved. Another BizMont Entertainment, Inc. was formed in Maryland on January 7, 2010 and entity's status was forfeited on October 10, 2016.

[20] Biz Markie, Inc. was formed in the District of Columbia on February 3, 2015 and is currently in active status with a business address located at 1905 15th Street NW, Unit 32, Washington, D.C. 20009. [DCRA]

[21] For example if they invested together in buying a building for a music studio, invested in developing new artists or developing post cast, TV- show or film project.

underlying agreement between the owner of the royalty account and the LOD beneficiary. Here Biz Markie, Inc. is the LOD beneficiary.

The Rhino LOD expressly states:

> "Rhino's compliance with the foregoing authorization shall constitute an accommodation to me alone, and New Recipient will not be a beneficiary of it. All accountings and payments to the New Recipient under this authorization shall constitute payment to me, and Rhino shall have no liability by reason of any erroneous payment or failure to comply with such authorization."

*See* Izumi Dep. Exhibit 10. Thus, this LOD non-binding.

In addition, the Rhino LOD references Hall's recording agreement with Warner Music Group:

> [A]greement between Marcel Hall, a/k/a BIZ MARKIE and Prism Records dated August 14, 1986, as may have been amended from time to time, including the amendment with Rhino Entertainment Company, A Warner Music Group Company ('Rhino) dated March 6, 2009 (the "Agreement'). All terms defined in the Agreement shall have the same meanings when used in this letter of direction. In a Letter of Direction dated as of November 1, 2017, I previously instructed you to pay royalties payable to me to Biz Markie, Inc.

*See* Izumi Dep. Exhibit 10. The recording agreement was with Hall in his personal capacity. Any assignment of royalties via an LOD can be withdrawn by the Estate.

### b.     Music Publishing Royalties

ASCAP and BMI are the two prominent Performing Rights Societies[22] in the United States. My research shows that Hall was a member of ASCAP.[23] Hall's Estate should receive the so-called "writer share of public performance income" directly from ASCAP or BMI. In addition, the ASCAP and BMI Repertoire search shows that Cold Chillin' Publishing Inc./CAK Music Publishing, Inc. are the music publisher for Hall's songwriting catalog. As such, any music publishing royalties for Hall's 46 musical compositions would be paid to Hall by CAK Music Publishing, Inc., as directed by Hall.

Therefore, royalty statements from CAK should show the worldwide gross income collected that includes the "publisher's share" of performance income (radio play, digital streaming, live performances, etc.), mechanical income (CD's, downloads, ringtones, etc.) synchronization income (TV, Film, Advertisings, etc. licensing income), and print income (folios, lyric sheets, printed copies, etc.) for Hall's 46 musical compositions.

---

[22] Performing Rights Societies collect "public performance" royalties for songwriters and music publishers on a 50/50 basis for the public performance of music on broadcast radio, TV, cable, concert halls and other live performance venues, internet streaming and the like. ASCAP and BMI provide a "Repertoire Search" function that allows the general public to search their catalog files to see the names of songs, songwriters and music publishers. The ASCAP and BMI Repertoires are regularly and consistently used by the music, TV and Film industries to determine royalty participants for musical compositions.

[23]

https://www.ascap.com/repertory#/ace/search/writer/Marcel%20Hall/performer/Biz%20Markie?searchFilter=SVW&page=1

As is the case with Hall's artist royalties there is no legally binding assignment of Hall's music publishing income form ASCAP or CAK to Biz Markie, Inc. or Izumi/as such those monies are properly payable to the Estate.

## IV.    DETERMINING THE RELEVANT PERIOD FOR COMMISSIONS

All Izumi had was an implied or an oral agreement to provide management services to Hall.[24] If Izumi had a written agreement she would be entitled to commissions after Hall's death; however, with only an oral or implied agreement her right to commissions ended with Hall's death. Consequently, Izumi has no continuing right to any management commissions or any amounts for which she does not have a written agreement.[25]

## V.    FINDINGS & CONCLUSIONS

Contrary to Izumi's contentions, there is no evidence on the record that she was a "business partner" of Hall.  Izumi only performed traditional artist management services, assisting with booking live shows, assisting with setting up royalty accounts, and assisting with merchandizing and other agreements. She did administrative work for Hall through Biz Markie, Inc., assisting with executing contract with electronic signatures and paying his personal bills.  She also interacted with accountants and others professionals for Hall, via Biz Markie, Inc.  Biz Markie, Inc. was in essence a traditional music industry standard "artist loan company."  There is no evidence that Izumi invested in Biz Markie, rather there is evidence that the company solely owned by her, Balancing Acts, Inc., loaned money to Biz Markie, Inc.  Izumi's rights to any earnings from Hall's music career are undocumented.[26]

Further, based upon Izumi's lack of experience and Hall's stature in the music business at the time she began working with him, my conclusion is that Izumi is only entitled to 15% of any of Hall's "gross income," without deductions, for "activities in the entertainment and related fields" for the Relevant Period.

---

[24] Artist managers must have a written agreement with a specific provision that entitles them to continuing commissions. *See* Krasilovsky, *This Business of Music,* 8th Ed. (2015), p. 354 (Upon the termination of a management agreement, the manager's obligation to give advice and counsel terminates. However, almost every [written] management agreement provides that management commissions continue after the end of the term on the artist's earnings under contracts or engagements entered into during the term . . . ."). *See also* Kellogg, *Take Care of Your Music Business*, 2d, (2014), pp. 183 (commissions due after the term of a written agreement);  Siegel, *Breaking into the Music Business* (1990), pp 175-177 ("The issue is the extent to which the manager is entitled to commissions after the end of his contract with the artist, with respect both to events during the term of his contract and certain sources occurring after the term has expired. . . . . From the artist's point of view, the most felicitous resolution is for the manager to receive commission with respect to all services performed by the artist, including recordings, that are rendered during his tenure as manager, but not those that occur after he is no longer manager.")

[25] Izumi's alleged majority ownership of Biz Markie, Inc. is discussed *infra* at p. 7.

[26] Even assuming Izumi's 51% ownership interest in Biz Markie, Inc. is valid, any rights claimed by Biz Markie, Inc. would be limited to agreements entered into directly with Biz Markie, Inc. with third parties while Hall was live. Izume, if a shareholder, would be entitled to net profits therefrom. Equally, the Estate would be entitled to 49% of the net profits from Biz Markie, Inc. It is unclear from Izumi's Deposition what agreements, if any, actually exist with Biz Markie, Inc.

Izumi or Biz Markie, Inc. are only entitled to receive compensation in connection with an oral or an implied agreement to receive any amounts from Hall's activities in the entertainment and related fields up to his date of Hall's death, the Relevant Period. Any Letters of Direction are not binding legal assignments of ownership rights or royalties associated with Hall's copyrights, trademarks, or name and likeness rights (publicity rights). As such, Izumi has no claim to any of Hall's intellectual property.

While Letters of Direction to Biz Markie Inc. may have been issued while Hall was alive (allowing Izumi to share in his artist royalties and music publishing royalties) the Estate is not bound to those Letters of Direction, after his death, as they are not legally binding assignments.

Further, Izumi is not entitled to any ownership interest in Hall's intellectual property after his death as there are no agreements assigning any intellectual rights from Hall to Biz Markie, Inc. or Balancing Acts, Inc. Any such interest would have to be evidenced by a signed writing.[27] No such writings exist.

I reserve the right to supplement this Expert Report if more evidence becomes available.

/s/ *Lita Rosario-Richardson*

**Lita Rosario-Richardson, Esq.**
**Shulman Rogers, P.A.**

---

[27] Indeed, any such transfer of intellectual property rights without a writing is also precluded by the statute of frauds.

10

(Exhibits to Report Omitted)